CC: SASP + Filer

ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 10 2026

at 8 o'clock and 50 min. P M
Lucy H. Carrillo, Clerk

USDC AUG 10 '26 8:50PM

GRANT GRIBBLE
3206 Ahinahina Place
Honolulu, HI 96816
Telephone: (808)556-6667
Email: militinc@gmail.com
Plaintiff, *Pro Se*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF HAWAII**

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | |
|---|---|
| GRANT GRIBBLE,<br>An Individual Residing in Hawaii,<br>PLAINTIFF<br>v.<br>ANTHROPIC PBC,<br>A Delaware Public Benefit Corporation,<br>DEFENDANT | CASE NO.:<br>CV26 00426 SASP KJM<br><br>CIVIL COMPLAINT |

# CIVIL COMPLAINT

## I. NATURE OF THE ACTION

### A. Introduction and Overview

**1.** This is a civil action for strict product liability, intentional and negligent misrepresentation, fraudulent concealment, breach of express and implied warranties, unfair and deceptive trade practices, unjust enrichment, declaratory relief, permanent injunctive relief, and punitive damages. Plaintiff Grant Gribble, a resident and citizen of the State of Hawaii, appearing in Pro Se, brings this action against Defendant Anthropic PBC, a Delaware Public Benefit Corporation headquartered in San Francisco, California, for the harm Plaintiff suffered and continues to suffer as a direct and proximate result of Defendant's design, manufacture, marketing, deployment, and fraudulent concealment of the material defects of its commercially sold artificial intelligence product, Claude.

**2.** This action arises from one of the most consequential artificial intelligence failures in the history of the United States Department of Defense and, indeed, in the history of commercial AI deployment anywhere in the world. On the morning of February 28, 2026, at approximately 06:47 Coordinated Universal Time (UTC), a Tomahawk cruise missile — guided in material part by an artificial intelligence targeting pipeline incorporating Claude, Anthropic's flagship large language model — struck Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran. Between one hundred forty-seven (147) and one hundred seventy-five (175) people were killed in the strike. The victims included between one hundred eight (108) and one hundred thirty-one (131) children between the ages of six and twelve who were present at the school during regular school hours. Twelve or more teachers, staff members, parents, and guardians were also killed. The school, a functioning civilian educational institution, was destroyed.

**3.** The targeting error that caused this strike was not an accident in the ordinary sense. It was the direct and legally cognizable product of five known, undisclosed, and unmitigated architectural defects in Claude's design — defects that Defendant Anthropic PBC's co-founders, engineers, and safety researchers had documented in internal research materials, model evaluation reports, and

safety assessments before Claude was ever licensed to Palantir Technologies Inc. for integration into the United States military's Maven Smart System targeting platform. Defendant knew what its product could not do. Defendant chose not to disclose that knowledge to the United States government, to Palantir's engineering teams, or to consumer subscribers — including Plaintiff in Hawaii — who were paying premium prices for Claude's services in express reliance on Defendant's representations that Claude was the most responsibly developed, most rigorously evaluated, and most safely governed commercially available artificial intelligence system in the world.[1]

**4.** Plaintiff Grant Gribble is one of those consumer subscribers. He is not a defendant in any proceeding and is not affiliated with any government agency or military entity. He is an individual Hawaii consumer who subscribed to Anthropic's Claude AI services through Anthropic's commercial consumer platform, claude.ai, and who paid monthly subscription fees that included a material premium directly attributable to and commercially unjustifiable without Defendant's fraudulent safety marketing campaign. Plaintiff brings this action not only to recover the economic harm he suffered as a deceived consumer, but to place before a federal court the question that the law of this district and this State demands be answered: whether a private corporation — regardless of its public benefit charter, its celebrated AI safety mission, its near-trillion-dollar market valuation, or the sophistication and credentials of its founding team — may design a defective product, sell it to consumers on the basis of materially false safety representations, deploy it in the world's most lethal operational environment without domain-specific validation, watch as that product's known and concealed defects contribute to the deaths of over one hundred children at a civilian school, and then, for one hundred forty-eight (148) consecutive days, continue collecting premium subscription fees from millions of consumers without issuing a single corrective disclosure.

**5.** Plaintiff respectfully submits that the answer to that question, under Hawaii law and under the federal constitution, is no. This Court is asked to hold Defendant Anthropic PBC accountable

[1] Anthropic PBC, "Constitutional AI: Harmlessness from AI Feedback," Anthropic Research (Dec. 15, 2022); Anthropic PBC, "Claude's Constitution," Anthropic (May 9, 2023).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

— in law, in equity, and in the amount of one hundred million dollars ($100,000,000.00) in punitive damages — for that answer.

**B. Anthropic PBC and the Claude AI Product**

**6.** Defendant Anthropic PBC is a Delaware Public Benefit Corporation incorporated under the laws of the State of Delaware on or about January 6, 2021, pursuant to the provisions of Delaware Code Title 8, Part I, Chapter 1, Subchapter XV, governing public benefit corporations.[2] Defendant's principal place of business is located in San Francisco, California. Defendant is registered to do business in the State of Hawaii and solicits and accepts subscription revenue from Hawaii consumers, including Plaintiff, through its commercial AI subscription platform at claude.ai and through related enterprise and API service channels.

**7.** Anthropic PBC was founded in January 2021 by Dario Amodei (Chief Executive Officer), Daniela Amodei (President), Tom Brown, Jack Clark, Jared Kaplan, Sam McCandlish, Christopher Olah, and Ben Mann — eight co-founders, the majority of whom were previously employed at OpenAI, the creator of the ChatGPT family of large language models. The Amodei siblings and their co-founders departed OpenAI in part over concerns about AI safety, publicly representing that Anthropic would be built on a foundation of responsible, safety-first AI development that distinguished Anthropic from its commercial competitors. That representation — that Anthropic's products were uniquely trustworthy precisely because of its founders' safety expertise and institutional commitment — became the cornerstone of Defendant's consumer marketing strategy from the day of its founding through the date of this filing. It was the premise of the fraud this Complaint describes.

**8.** Anthropic PBC describes its corporate mission as "the responsible development and maintenance of advanced AI for the long-term benefit of humanity." This mission statement is published on Defendant's corporate website, is incorporated by reference into Defendant's consumer subscription agreements, and is prominently featured in Defendant's marketing materials directed at consumer subscribers, enterprise customers, and government procurement officials

[2] Delaware Secretary of State, Division of Corporations, Entity Details for Anthropic PBC; 8 Del. C. §§ 361–368.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

throughout the United States, including in the State of Hawaii. Defendant has deployed this mission statement as a commercial instrument — as an affirmative representation to consumers that Anthropic's products are developed under a standard of care and an institutional commitment to safety that is qualitatively different from, and superior to, that of other commercial AI developers.

**9.** As of the date of this filing, Defendant Anthropic PBC holds a post-money valuation of approximately nine hundred sixty-five billion dollars ($965,000,000,000.00) following the closing of its Series H financing round on or about May 28, 2026, which raised approximately sixty-five billion dollars ($65,000,000,000.00) from institutional investors including Amazon Web Services, Google LLC, and Salesforce, Inc.[3] Defendant has raised in excess of one hundred thirty billion dollars ($130,000,000,000.00) in aggregate capital since its founding. Defendant's annual revenue run rate exceeds forty-seven billion dollars ($47,000,000,000.00). On or about June 1, 2026 — three days after closing the Series H round — Defendant filed a confidential registration statement on Form S-1 with the United States Securities and Exchange Commission, initiating the process for what may be among the largest initial public offerings in the history of American capital markets.[4] Claude is Anthropic's flagship commercial product, generating the overwhelming majority of Defendant's consumer and enterprise subscription revenue. Claude's commercial versions include Claude 1, Claude 2, Claude 2.1, Claude 3, Claude 3.5, and Claude 4, each of which was marketed to consumers and government customers under the same fraudulent safety narrative described throughout this Complaint.

## C. Claude's Five Material Architectural Defects

**10.** Claude, as designed, trained, and deployed by Defendant Anthropic PBC at all times material to this action, suffered from five distinct, known, documented, and undisclosed material architectural defects, each of which independently — and all five of which collectively — rendered Claude unreasonably dangerous for any high-consequence operational use, and rendered

[3] Anthropic PBC financing announcement and investor materials regarding Series H financing and post-money valuation.

[4] Anthropic PBC confidential Form S-1 registration statement filed with the United States Securities and Exchange Commission on or about June 1, 2026.

Defendant's safety representations to consumer subscribers false in the specific and material respects that caused Plaintiff's injury and the catastrophic Minab targeting failure of February 28, 2026. These five defects are described with particularity in Section IV of this Complaint. They are identified here, at the outset of this pleading, because they are the architectural linchpin of every claim asserted in Counts I through XIV: every dollar Plaintiff paid in safety premium subscription fees was paid in reliance on representations that were false because of these five defects; and every child killed at Shajareh Tayyebeh Elementary School died because of these five defects, deployed in a live weapons targeting chain without the domain-specific validation, real-time grounding mechanisms, and binding human-override architecture that their severity demanded.

**11. Defect One — Training Data Staleness and Temporal Blindness.** Claude's factual knowledge is frozen at its training data cutoff date. Claude possesses no mechanism for real-time information retrieval, no internal clock synchronized to current dates and events, and no architectural warning system to flag for users when its outputs may be based on information that is months or years out of date. When Claude generates a response about the current status, location, or operational function of a real-world entity — whether a business, a government facility, or, critically for the purposes of this Complaint, a geographic coordinate target — it does so with the same confident, unqualified linguistic tone regardless of whether the information underlying that response is current or dangerously stale. This defect caused Claude to characterize the geographic coordinate of a functioning civilian elementary school in Minab, Iran — a school that had been in continuous operation for years before Claude's training data was compiled — as consistent with the military target under operational consideration in the Maven targeting pipeline, based on intelligence data that did not reflect the school's current operational status.

**12. Defect Two — Hallucination and Confabulation Without Warning or Confidence Calibration.** Claude generates detailed, authoritative, and linguistically confident factual assertions that are materially and demonstrably wrong — a phenomenon known in the AI research community as "hallucination" or "confabulation." Claude's hallucinations are architecturally indistinguishable from its accurate outputs: both are generated in the same fluent, authoritative prose, with the same apparent confidence, and without any uncertainty signal, confidence



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

calibration flag, or warning adequate to enable a consumer or an operational user to distinguish between a correct Claude assertion and a hallucinated one. Defendant's own internal research teams had documented Claude's hallucination rates with quantitative precision before the challenged deployment. That quantitative knowledge was not disclosed to consumer subscribers, including Plaintiff, and was not disclosed to the government.

**13. Defect Three — Absence of Mandatory Human-in-the-Loop Architecture Compliant with DoD Directive 3000.09.** The United States Department of Defense's Directive 3000.09, titled "Autonomy in Weapon Systems," establishes the policy requirement that autonomous or semi-autonomous AI systems used in lethal weapons employment must incorporate technically binding mechanisms to ensure that human operators maintain meaningful control over lethal force decisions.[5] Claude's inference architecture contains no such technically enforced binding human-override checkpoint. Defendant's CEO, Dario Amodei, publicly represented — both before and after the Minab targeting failure — that Anthropic's governing principle for AI use in military applications was that "a human makes the final decision." That statement, as a description of Claude's architectural design, was false: Claude's architecture imposed no such requirement as a structural matter. The absence of a binding human-override mechanism in Claude's inference pipeline was a known and undisclosed defect at the time Claude was licensed to Palantir for deployment in the Maven targeting chain.

**14. Defect Four — Context Window Integrity Degradation Under Operational Load.** Claude's reasoning capacity degrades systematically and measurably as the volume of input data approaches and exceeds its operational context window limits — a condition that arises predictably and inevitably in complex, multi-source intelligence synthesis environments. The operational conditions of Operation Epic Fury — the military targeting operation that began on February 28, 2026, and that involved the processing of approximately thirteen thousand targets over approximately five weeks — created exactly the kind of high-volume, multi-source intelligence processing environment in which this defect is most severe and most operationally dangerous. Under such conditions, each AI-assisted targeting assessment in the Maven-Claude pipeline was

[5] U.S. Department of Defense Directive 3000.09, "Autonomy in Weapon Systems" (Jan. 25, 2023).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

potentially subject to degraded reasoning reliability caused by context window overflow — a defect that was documented in Defendant's internal engineering evaluations and that was not disclosed to the government or to consumer subscribers.

**15. Defect Five — Absence of Domain-Specific Validation for Military Lethal Targeting Applications.** Before deploying a product in any application where its outputs will be used to make or inform decisions about the use of lethal force, a competent and responsible manufacturer is required to conduct rigorous domain-specific validation of that product's performance under realistic operational conditions. Defendant conducted no such domain-specific validation of Claude's performance in military targeting applications before licensing Claude to Palantir for integration into the Maven Smart System. Defendant's safety evaluations for Claude — including the evaluations conducted under its Responsible Scaling Policy — addressed general conversational behavior, potential for CBRN-related misuse, and risks of autonomous AI replication. They did not address targeting accuracy, geospatial intelligence synthesis under operational load, geographic coordinate assessment, or performance degradation in high-consequence fact-determination environments. Claude was licensed for military targeting use without ever being tested in military targeting conditions.

### D. The Palantir-Anthropic-AWS Commercial Deployment Chain

**16.** On November 7, 2024, Defendant Anthropic PBC, Palantir Technologies Inc., and Amazon Web Services Inc. publicly announced a tripartite commercial partnership through which Claude would be integrated into Palantir's Artificial Intelligence Platform (AIP) and deployed on classified United States government networks for national security and defense applications.[6] This partnership — announced with conspicuous fanfare as a milestone in the commercial AI-defense industry — was the commercial vehicle through which Claude was placed into the live operational targeting pipeline of the United States military.

**17.** Through the Palantir-Anthropic-AWS partnership, Claude was integrated into Palantir's Maven Smart System — the AI-assisted military targeting platform developed and operated by

[6] Anthropic PBC, Palantir Technologies Inc., and Amazon Web Services Inc., public announcement of Claude integration into Palantir AIP for national security and defense applications (Nov. 7, 2024).

Palantir Technologies Inc. for use by the United States Department of Defense. Claude's deployment in the Maven Smart System occurred at IL6 security classification — the highest commercial cloud security classification level, reserved for data that, if disclosed, could cause serious damage to national security. Claude was, at the time of the February 28, 2026 Minab targeting failure, the only commercially available frontier large language model deployed at IL6 classification on classified Department of Defense networks — making it operationally irreplaceable and leaving the United States military with no immediately available substitute when Claude's architectural defects manifested in the live targeting chain.

**18.** Defendant Anthropic PBC authorized, negotiated, and performed under the commercial relationship with Palantir and AWS that produced Claude's deployment in the Maven targeting chain. Defendant did so with actual knowledge of Claude's five architectural defects. Defendant issued no public disclosure to its consumer subscribers — including Plaintiff in Hawaii — that the same product those consumers were paying premium prices for was being concurrently deployed in a live military lethal targeting chain in which its known defects made catastrophic error not merely possible but, in retrospect, a statistical inevitability.

### E. The United States Government as a Defrauded Customer

**19.** On July 14, 2025, the United States Department of Defense Chief Digital and Artificial Intelligence Office (CDAO) awarded Defendant Anthropic PBC an Other Transaction Agreement (OTA) bearing the contract number HQ0883-25-9-0014, with a total potential value of approximately two hundred million dollars ($200,000,000.00).[7] This contract authorized the deployment of Claude in national security applications encompassing intelligence analysis, operational planning, and military targeting functions. The CDAO, as the government's AI acquisition authority, awarded this contract in direct reliance on Defendant's representations about Claude's safety architecture, governance framework, and suitability for sensitive government use — the same fraudulent safety narrative that induced Plaintiff's consumer subscription in Hawaii.

[7] U.S. Department of Defense Chief Digital and Artificial Intelligence Office, Other Transaction Agreement No. HQ0883-25-9-0014 awarded to Anthropic PBC (July 14, 2025).

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**20.** The United States government is not a defendant in this action. No claims are asserted against the United States, against any federal agency, or against any military official. The United States government, as a sophisticated institutional customer that was deceived by the same fraudulent representations that deceived Plaintiff, is properly characterized as a fellow victim of Defendant's commercial fraud. The government's deception by those representations is, however, directly probative of their objective materiality under Hawaii consumer protection law: if the most technically sophisticated government procurement apparatus in the world — armed with security clearances, technical advisors, and the full institutional resources of the Department of Defense — was materially misled by Defendant's safety representations, an ordinary Hawaii consumer exercising ordinary care had no lesser right to be misled by them.

**F. February 28, 2026 — The Destruction of Shajareh Tayyebeh Elementary School**

**21.** At approximately 06:47 UTC on February 28, 2026 — twelve minutes after Operation Epic Fury, the United States military targeting operation authorized by the executive branch on February 27, 2026, commenced its initial strike sequence — a Tomahawk cruise missile struck and destroyed Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran, during regular school hours. The children of Minab were at their desks. Their teachers were in their classrooms. Parents who had walked their children to school that morning were on the school grounds. The missile struck the building directly.

**22.** Between one hundred forty-seven (147) and one hundred seventy-five (175) people were killed. The majority of the dead were children between the ages of six and twelve — at least one hundred eight (108) and as many as one hundred thirty-one (131) children, based on the figures available to Plaintiff through open-source reporting at the time of this filing. Twelve or more teachers and staff members were killed. The precise casualty count, including the identities of each child killed, is a matter that will be established through discovery and expert testimony. The school was a functioning civilian educational institution — it was not, at the time of the strike, a military installation, a command-and-control facility, a weapons storage site, or any other category of military objective recognized under the laws of armed conflict. It was a school. It was full of children.

**23.** The causal mechanism of the targeting error that produced this strike is described with particularity in Section IV.M of this Complaint. In summary: Claude's Training Data Staleness defect — Defect One identified above — caused Claude to generate a confident, authoritative, and factually wrong characterization of the geographic coordinate of Shajareh Tayyebeh Elementary School as consistent with the military target under operational consideration in the Maven targeting pipeline. That characterization entered the weapons release authorization chain without a binding architectural human-override checkpoint — the absence of which constitutes Defect Three. The combination of Claude's confident, authoritative, unwarned wrong output (Defect Two), its deployment without domain-specific validation (Defect Five), and the compound context window degradation that the operational load of thirteen thousand targets in five weeks produced (Defect Four) made the erroneous targeting characterization not an outlier but an architectural inevitability.

**24.** On or about March 11, 2026, Reuters reported that an internal United States military investigation had made a preliminary determination that United States forces were likely responsible for the strike on Shajareh Tayyebeh Elementary School. The Reuters report, based on information from persons with knowledge of the investigation, identified the erroneous AI-generated characterization of the target coordinate as a likely contributing factor to the targeting failure. Defendant Anthropic PBC made no corrective disclosure to its consumer subscribers in response to this reporting.

### G. Dario Amodei's Bloomberg Interview — The CEO's Post-Incident Admissions

**25.** On or about June 10, 2026 — approximately one hundred (100) days after the February 28, 2026 Minab targeting failure, and eleven (11) days after Defendant closed its sixty-five-billion-dollar Series H financing round — Defendant's CEO and co-founder, Dario Amodei, appeared on Bloomberg Television's "The Circuit" program for a nationally broadcast interview.[8] This interview constitutes the most consequential and legally significant public communication made by Defendant's leadership regarding the events of February 28, 2026, and it is, in multiple respects, an act of intentional misrepresentation directed at consumers including Plaintiff in Hawaii.

[8] Bloomberg Television, "The Circuit," interview with Dario Amodei (June 10, 2026).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**26.** In the Bloomberg interview, Dario Amodei made three categories of statements regarding Claude's role in the Minab targeting failure that are directly relevant to the claims asserted in this Complaint:

a) **The Ignorance Admission:** Amodei stated that Anthropic "don't know exactly how these models were used" in the targeting chain that killed one hundred forty-seven people, including over one hundred children, at a civilian elementary school. This admission — made by the chief executive officer of a corporation that had accepted a two-hundred-million-dollar government contract to deploy Claude in national security applications — constitutes an admission of a catastrophic failure of Defendant's own stated governance framework. Defendant marketed Claude as subject to a Responsible Scaling Policy providing rigorous pre-deployment safety evaluation and ongoing deployment monitoring. Defendant's CEO's admission that Anthropic did not know how Claude was used in the exact operational environment for which it was commercially licensed and deployed is evidence that those governance representations were false.

b) **The Contradictory Policy Compliance Claim:** In the same interview — simultaneously with the ignorance admission — Amodei stated that "the use case in this instance didn't violate the company's policies." This statement is structurally impossible in conjunction with the ignorance admission. A person who does not know how a product was used cannot know whether that use complied with policy. At least one of those two concurrent statements was necessarily false at the moment Amodei made it. Both statements were directed at consumers — including Plaintiff in Hawaii, who continued to pay Claude subscription fees throughout this period — for the specific commercial purpose of preventing subscription cancellations and protecting Defendant's near-trillion-dollar valuation and pending IPO.

c) **The Human Oversight Reduction:** Also in the Bloomberg interview, Amodei stated that Anthropic's entire operative red line for AI use in military lethal targeting applications consisted of the principle that "a human makes the final decision." This statement reduced Defendant's publicly marketed Constitutional AI governance framework — a framework



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Defendant had marketed to consumers, to government procurement officials, and to institutional investors as a comprehensive, institutionally binding, technically enforced safety architecture — to a single procedural aspiration that Claude's own design architecture contained no mechanism to enforce. No corrective disclosure was issued to consumers following this interview.

**27.** Defendant issued no corrective disclosure, no safety advisory, and no subscriber notification in connection with the Bloomberg interview. The interview was not the beginning of a disclosure process. It was corporate crisis management — a commercially calculated performance designed to convey the maximum impression of accountability while conceding the minimum quantum of actual responsibility, executed eleven days after Defendant closed the largest financing round in its history and nine days after filing a confidential S-1 registration statement with the Securities and Exchange Commission.

**H. Plaintiff's Injury as a Deceived Hawaii Consumer Subscriber**

**28.** Plaintiff Grant Gribble is a resident and citizen of the State of Hawaii. He subscribed to Defendant Anthropic PBC's Claude AI services through Defendant's commercial consumer subscription platform at claude.ai, paying recurring premium monthly subscription fees in the State of Hawaii. Plaintiff's subscription decision was made in direct and material reliance on Defendant's consumer-facing safety representations — including, specifically, Defendant's representations that Claude was developed under Constitutional AI methodology that "ensures safety isn't an afterthought," that Claude was governed by a Responsible Scaling Policy providing rigorous pre-deployment safety evaluation, and that Claude was "among the most capable and safe AI systems currently available." Each of these representations was false in the material respects described throughout this Complaint.

**29.** The subscription fees Plaintiff paid to Defendant in Hawaii included a safety premium component — a price increment directly attributable to and commercially unjustifiable without Defendant's fraudulent safety narrative. Had Defendant accurately disclosed Claude's five architectural defects — had Defendant informed Plaintiff that Claude's knowledge was frozen at a training cutoff; that Claude generates confident hallucinations without warning at rates Defendant



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

had internally documented; that Claude had been deployed in a live military targeting chain without domain-specific validation; and that Claude's architecture included no technically binding human-override mechanism — Plaintiff would not have subscribed to Claude at the premium price Defendant charged, or would not have subscribed at all.

**30.** Beginning on February 28, 2026 — the date of the Minab targeting failure caused by Claude's known and undisclosed defects — and continuing through the date of this filing on August 10, 2026, a period of one hundred fifty-seven (157) days, Defendant made no corrective disclosure to its consumer subscriber base, including Plaintiff in Hawaii, regarding: Claude's role in the Minab targeting failure; the five architectural defects that caused it; the gap between Defendant's marketed safety properties and Claude's documented operational failure; or the findings of any internal investigation Defendant may have conducted following the strike. During this concealment period, Plaintiff continued to pay Claude subscription fees in Hawaii — fees he would not have paid had Defendant made the corrective disclosures that Hawaii law, its own consumer agreements, and basic commercial honesty required.

**31.** Plaintiff's injury is not merely historical — it is ongoing. As of the date of this filing, Defendant continues to display on its consumer platform the same Constitutional AI safety representations, Responsible Scaling Policy representations, and related marketing materials that originally induced Plaintiff's subscription. Those representations remain unqualified, uncorrected, and undisclosed as to the events of February 28, 2026. Each day that Defendant fails to issue the corrective disclosures Hawaii law requires is a day on which Plaintiff's subscription decision — and the subscription decisions of every other Hawaii Claude subscriber — continue to be made in reliance on materially false representations.

## I. The Accountability This Action Seeks

**32.** This action seeks to hold Defendant Anthropic PBC accountable, under the law of the State of Hawaii and the jurisdiction of this Court, for a course of corporate conduct that is, in its scope, its deliberateness, its financial scale, and its human consequences, among the most consequential product liability and consumer fraud cases brought in the history of Hawaii's federal courts. Plaintiff does not bring this action for the purpose of relitigating questions of foreign policy,

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

military command authority, or operational targeting protocols. Plaintiff brings this action for the purpose of establishing, as a matter of Hawaii products liability law, Hawaii consumer protection law, and Hawaii common law fraud, that a private corporation that designs a defective AI product, markets it to consumers on the basis of false safety representations, deploys it in the world's most lethal application without validation, and then conceals the consequences of its failures for financial gain, is accountable in a court of law for the harm that conduct causes to the consumers it deceived.

**33.** The relief Plaintiff seeks — compensatory damages, treble damages under Hawaii Revised Statutes § 480-13(b)(1), restitution, declaratory judgment, permanent injunctive relief, and one hundred million dollars ($100,000,000.00) in punitive damages — is calibrated to the scale of Defendant's conduct, to Defendant's financial position, and to the deterrent purposes of Hawaii's punitive damages framework as recognized in Masaki v. General Motors Corp., 71 Haw. 1, 16–17 (1989). At Defendant's nine-hundred-sixty-five-billion-dollar current valuation, the one-hundred-million-dollar punitive damages demand represents less than two-hundredths of one percent (0.02%) of Defendant's stated enterprise value. It is the minimum necessary, under Masaki, to serve any deterrent function whatsoever.[9]

**34.** The broader purpose of this action — and one that the permanent injunctive relief sought in Count XIII is specifically designed to advance — is the integrity of the consumer AI market in Hawaii and throughout the United States. That integrity depends on AI product manufacturers being legally required to tell their consumers the truth about what their products can and cannot do. Defendant built its business on the representation that it was different from other AI companies — that it was safer, more responsible, more accountable. If that representation was true, Defendant should have nothing to fear from the corrective disclosures this action will compel. If that representation was false, as this Complaint alleges, then this Court is precisely the right forum to say so, and to impose precisely the legal consequences that Hawaii law provides.

**J. Claims Asserted**

[9] Masaki v. General Motors Corp., 71 Haw. 1, 16–17 (1989).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**35.** Plaintiff Grant Gribble asserts the following claims for relief against Defendant Anthropic PBC, each of which is set forth with particularity in Section V of this Complaint:

- **Count I:** Strict Products Liability — Design Defect (Hawaii Common Law; Restatement (Second) of Torts § 402A; *Ontai v. Straub Clinic & Hosp.*, 66 Haw. 237 (1983); *Acoba v. General Tire, Inc.*, 92 Haw. 1 (1999))
- **Count II:** Strict Products Liability — Failure to Warn (Hawaii Common Law; *Acoba v. General Tire, Inc.*, 92 Haw. 1 (1999); *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1 (1992))
- **Count III:** Negligent Misrepresentation (Hawaii Common Law; Restatement (Second) of Torts § 552; *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Haw. 77 (2006))
- **Count IV:** Intentional Misrepresentation and Fraudulent Concealment (Hawaii Common Law; *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000); *Hawaii Med. Ass'n v. Hawaii Med. Serv. Ass'n, Inc.*, 113 Haw. 77 (2006); Restatement (Second) of Torts § 525)
- **Count V:** Negligence (Hawaii Common Law; *Bidar v. Amfac, Inc.*, 66 Haw. 547 (1983); *Doe Parents No. 1 v. Dep't of Educ.*, 100 Haw. 34 (2002))
- **Count VI:** Violation of Hawaii Revised Statutes Chapter 480 — Unfair and Deceptive Acts or Practices (HRS §§ 480-2, 480-13; *Cieri v. Leticia Query Realty*, 80 Haw. 54 (1995); *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607 (1980))
- **Count VII:** Violation of Hawaii Uniform Deceptive Trade Practices Act (HRS §§ 481A-3, 481A-4)
- **Count VIII:** Breach of Express Warranty (HRS § 490:2-313)
- **Count IX:** Breach of Implied Warranty of Merchantability (HRS § 490:2-314)
- **Count X:** Breach of Implied Warranty of Fitness for a Particular Purpose (HRS § 490:2-315)
- **Count XI:** Unjust Enrichment (Hawaii Common Law; *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490 (2004); *Small v. Badenhop*, 67 Haw. 626 (1985))

- **Count XII:** Declaratory Relief (28 U.S.C. §§ 2201–2202)
- **Count XIII:** Permanent Injunctive Relief (Fed. R. Civ. P. 65; HRS § 480-13(b))
- **Count XIV:** Punitive Damages (HRS § 663-10.9; *Masaki v. General Motors Corp.*, 71 Haw. 1 (1989); *Gibo v. City & County of Honolulu*, 52 Haw. 231 (1970))[10]

**36.** All counts are asserted against Defendant Anthropic PBC only. No claims are asserted against the United States government, against any federal agency or department, against any military official or servicemember, or against any third-party AI product manufacturer, cloud service provider, or government contractor. Defendant Anthropic PBC is the sole defendant in this action.

## II. JURISDICTION AND VENUE

### A. Overview of Jurisdictional Grounds

**37.** This Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1332(a) (diversity of citizenship jurisdiction), and 28 U.S.C. § 1367(a) (supplemental jurisdiction over all pendant Hawaii state law claims). Each of these three independent and alternative bases for subject matter jurisdiction is separately sufficient to sustain this Court's authority to hear and decide every count asserted in this Complaint, and Plaintiff pleads all three bases in the alternative so that the failure of any one basis does not deprive this Court of subject matter jurisdiction over any count.

**38.** This Court additionally has authority to grant the declaratory relief sought in Count XII pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, which vests federal courts with authority to declare the rights and legal relations of parties in cases of actual controversy within their jurisdiction. This Court has authority to grant the permanent injunctive relief sought in Count XIII pursuant to Federal Rule of Civil Procedure 65 and Hawaii Revised Statutes § 480-13(b)(2), which expressly authorizes injunctive relief as a remedy available to private consumer plaintiffs injured by violations of HRS Chapter 480.

**39.** Personal jurisdiction over Defendant Anthropic PBC is established under Hawaii Revised Statutes § 634-35 — Hawaii's long-arm statute — as well as under the Due Process Clause of the

[10] Gibo v. City & County of Honolulu, 52 Haw. 231 (1970).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Fifth and Fourteenth Amendments to the United States Constitution, as interpreted by the United States Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny, and as applied by the Ninth Circuit Court of Appeals in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), and *Dole Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002). Because Hawaii's long-arm statute has been construed by the Hawaii Supreme Court to be coextensive with the outer limits of federal constitutional due process, the statutory and constitutional analyses effectively merge. *Cowen v. First Insurance Company of Hawaii*, 61 Haw. 644, 649, 608 P.2d 394, 398 (1980).[11]

**40.** Venue is proper in the United States District Court for the District of Hawaii under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). Plaintiff requests that this Court construe his pro se pleadings liberally and with all reasonable inferences resolved in his favor, consistent with the governing principles of *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam), and *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

### B. Subject Matter Jurisdiction — Federal Question: 28 U.S.C. § 1331

**41.** This Court has original federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this civil action arises under the "Constitution, laws, or treaties of the United States." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314 (2005). Federal question jurisdiction is proper under *Grable* where a state-law claim necessarily raises a stated federal issue that is actually disputed, substantial, and capable of resolution in a federal forum without disturbing any congressionally approved balance of federal and state judicial responsibilities. Multiple such federal issues are necessarily raised, actually disputed, and substantial in this action.[12]

**42.** **Federal AI Procurement and Defense Contracting Law.** Counts I, II, IV, and V of this Complaint necessarily require this Court to interpret and apply the legal requirements governing the award, administration, and performance of federal government contracts — specifically, the approximately two hundred million dollar ($200,000,000.00) Other Transaction Agreement

[11] 28 U.S.C. §§ 1331, 1332(a), 1367(a).
[12] 28 U.S.C. §§ 2201–2202; Fed. R. Civ. P. 65; HRS § 480-13(b)(2).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

bearing contract number HQ0883-25-9-0014, awarded by the Department of Defense Chief Digital and Artificial Intelligence Office ("CDAO") to Defendant Anthropic PBC on July 14, 2025, under the Other Transaction Authority codified at 10 U.S.C. § 4022. The fraudulent misrepresentations Defendant made in connection with obtaining and performing that government contract constitute federal questions cognizable under 28 U.S.C. § 1331. The standard of care applicable to Defendant's product design, safety warning, and disclosure obligations — specifically, whether Defendant met or materially deviated from the requirements that DoD Directive 3000.09 imposed as binding federal policy on AI systems integrated into DoD lethal weapons targeting chains — is a federal question embedded in and essential to the resolution of Plaintiff's Hawaii strict products liability and negligence claims. Resolution of Counts I, II, and V therefore necessarily turns on the meaning and application of a substantial, disputed federal law question, making federal question jurisdiction proper under *Grable*, 545 U.S. at 314.

43. **Federal AI Safety Policy and DoD Directive 3000.09.** DoD Directive 3000.09 — "Autonomy in Weapon Systems" — is a binding federal policy directive promulgated by the Secretary of Defense under statutory authority vested in the Secretary by the National Defense Authorization Acts. Its mandatory human-in-the-loop requirements for AI systems in lethal targeting chains represent a federal standard whose interpretation and application is necessarily at issue in Counts I, II, III, and V of this Complaint. A Hawaii state law products liability claim that requires this Court to determine whether Claude's design satisfied the federally mandated human-override architecture standard of DoD Directive 3000.09 necessarily raises a substantial federal issue. See *Grable*, 545 U.S. at 314 (federal question jurisdiction proper where resolution of state law claim turns on application of a specific federal policy).

44. **Federal Consumer Protection in Interstate Commerce.** Defendant's commercial deployment of Claude across all fifty states — including Hawaii — through its claude.ai subscription platform constitutes interstate commerce subject to federal law and the Federal Trade Commission Act, 15 U.S.C. §§ 41 et seq., including the FTC's authority over unfair or deceptive acts or practices in or affecting commerce under Section 5 of the FTC Act, 15 U.S.C. § 45(a). The structural overlap between Plaintiff's Hawaii consumer protection claims under HRS Chapter 480



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

and the applicable federal consumer protection framework — each of which prohibits materially the same category of deceptive trade practices — provides an additional and independent basis for federal question subject matter jurisdiction over this action. The federal consumer protection dimension of this dispute is not incidental: Defendant directed its fraudulent safety marketing campaign at consumers throughout the United States through a nationally deployed digital commercial platform, making the FTC Act's application to the underlying conduct a substantial, disputed federal issue embedded in each count.[13]

**C. Subject Matter Jurisdiction — Diversity of Citizenship: 28 U.S.C. § 1332(a)**

**45.** This Court independently and alternatively has original subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) based on diversity of citizenship because:

**a)** this action is between citizens of different states; and

**b)** the amount in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs. Both elements are satisfied with certainty.

**46.** **Complete Diversity of Citizenship.** Complete diversity of citizenship exists between the parties as follows:

**a)** Plaintiff Grant Gribble is a natural person, citizen of the United States, and domiciliary of the State of Hawaii, residing at 3206 Ahinahina Place, Honolulu, HI 96816. Plaintiff is a Hawaii citizen for purposes of 28 U.S.C. § 1332(a)(1). *See Lew v. Moss*, 797 F.2d 747, 749–50 (9th Cir. 1986) (citizenship for diversity purposes is determined by domicile — the place where a person resides with the present intent to remain indefinitely). Plaintiff's domicile has been the State of Hawaii at all times material to this action. He has no present intent to change his domicile. He is a Hawaii citizen for all jurisdictional purposes.

**b)** Defendant Anthropic PBC is a corporation incorporated under the laws of the State of Delaware, with its principal place of business in San Francisco, California. For purposes of 28 U.S.C. § 1332(c)(1), a corporation is a citizen of both its state of incorporation and the state where it has its principal place of business — the "nerve center" of its operations, as

[13] HRS § 634-35; International Shoe Co. v. Washington, 326 U.S. 310 (1945); Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797 (9th Cir. 2004).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

defined by *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Defendant's "nerve center" — the headquarters location from which its high-level officers direct, control, and coordinate all of Defendant's activities — is San Francisco, California. Defendant is therefore a citizen of Delaware and California — not Hawaii. Complete diversity of citizenship between Plaintiff (Hawaii) and Defendant (Delaware and California) is therefore fully established as required by 28 U.S.C. § 1332(a)(1). No part of this diversity is destroyed by the presence of any other party: this is a two-party action with one plaintiff and one defendant.

**47. Amount in Controversy — Substantially Exceeds $75,000.00.** The amount in controversy in this action far exceeds the seventy-five thousand dollar ($75,000.00) jurisdictional threshold established by 28 U.S.C. § 1332(a), exclusive of interest and costs, as demonstrated by the following independent components of relief sought:[14]

**a)** *Compensatory Damages:* Plaintiff seeks compensatory damages for the safety premium component of all Claude subscription fees paid from the inception of his subscription through the date of trial, and for the post-February 28, 2026 concealment-period subscription fees paid in reliance on Defendant's fraudulent non-disclosure. The specific dollar amount will be calculated through discovery of Defendant's subscription pricing records and Plaintiff's subscription history. By any reasonable measure, the compensatory damages exceed the jurisdictional threshold given Defendant's premium subscription fee structure and the extended subscription period.

**b)** *Treble Damages Under HRS § 480-13(b)(1):* Hawaii Revised Statutes § 480-13(b)(1) provides that any consumer injured by a violation of HRS Chapter 480 may recover three times the amount of actual damages sustained. This Court properly considers treble damages when assessing whether the amount in controversy satisfies the jurisdictional threshold under 28 U.S.C. § 1332(a). *See Matheson v. Progressive Specialty Ins. Co.*, 319 F.3d 1089, 1090 (9th Cir. 2003). The statutory trebling of compensatory damages under

[14] 28 U.S.C. §§ 1391(b)(1), 1391(b)(2); Haines v. Kerner, 404 U.S. 519 (1972); Erickson v. Pardus, 551 U.S. 89 (2007).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

HRS § 480-13(b)(1) independently causes the amount in controversy on Count VI alone to substantially exceed $75,000.00.

c) *Punitive Damages — $100,000,000.00:* Plaintiff seeks punitive damages against Defendant in the amount of one hundred million dollars ($100,000,000.00) under HRS § 663-10.9 and Hawaii common law. Punitive damages are properly included in the amount in controversy for diversity jurisdiction purposes where they are recoverable under applicable law and are not asserted in bad faith. *See Gibson v. Chrysler Corp.*, 261 F.3d 927, 945 (9th Cir. 2001). Plaintiff's punitive damages claim is non-frivolous and directly supported by the facts alleged throughout this Complaint, including Dario Amodei's Bloomberg interview admissions and the post-Minab concealment period. The punitive damages demand of one hundred million dollars ($100,000,000.00) alone — irrespective of all other components of relief — satisfies the jurisdictional threshold of 28 U.S.C. § 1332(a) by a margin of more than one thousand three hundred times (1,333x). *See Crum v. Circus Circus Enterprises*, 231 F.3d 1129, 1131 (9th Cir. 2000).

d) *Mandatory Attorneys' Fees Under HRS § 480-13(b)(1):* Hawaii Revised Statutes § 480-13(b)(1) mandates an award of reasonable attorneys' fees to a prevailing consumer plaintiff. Mandatory statutory attorneys' fees are properly included in the amount in controversy calculation for diversity jurisdiction purposes. *See Galt G/S v. JSS Scandinavia*, 142 F.3d 1150, 1155–56 (9th Cir. 1998).

e) *Injunctive and Declaratory Relief:* The value of the permanent injunctive and declaratory relief sought in Counts XII and XIII — which would require Defendant to issue corrective disclosures to millions of consumer subscribers, revise its safety marketing representations throughout the United States, and retain an independent technical auditor at substantial cost — is independently substantial and properly included in the amount in controversy calculation from either party's perspective. *See Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 347 (1977).

**D. Subject Matter Jurisdiction — Supplemental: 28 U.S.C. § 1367(a)**



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**48.** This Court has supplemental subject matter jurisdiction over all Hawaii state law claims asserted in this action pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims over which this Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1332 that they form part of the same case or controversy under Article III of the United States Constitution. All of Plaintiff's Hawaii state law claims — including his claims under HRS Chapter 480 (Counts VI and VII), Hawaii common law strict products liability (Counts I and II), Hawaii common law fraud, negligence, and misrepresentation (Counts III, IV, and V), Hawaii Uniform Commercial Code warranty claims (Counts VIII, IX, and X), Hawaii common law unjust enrichment (Count XI), and punitive damages under HRS § 663-10.9 (Count XIV) — derive from the same common nucleus of operative facts as the federal claims: Defendant's design, deployment, fraudulent representation, and post-incident concealment relating to Claude's role in the February 28, 2026 Minab targeting failure.

**49.** The exercise of supplemental jurisdiction over Plaintiff's Hawaii state law claims is appropriate and furthers the interests of judicial economy, convenience, and fairness. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–27 (1966). This Court is fully equipped to apply Hawaii law to the state law claims asserted herein, and the same discovery, witnesses, experts, and evidentiary record will be relevant to both the federal and state law components of this action. No exceptional circumstances counsel in favor of declining supplemental jurisdiction under 28 U.S.C. § 1367(c). The Hawaii state law claims do not predominate over the federal claims; no novel or complex issues of state law preclude federal adjudication; and the original jurisdiction claims are neither dismissed nor resolved in a manner that would make state law claim resolution inappropriate in this forum.

**E. Declaratory Judgment Jurisdiction: 28 U.S.C. §§ 2201–2202**

**50.** This Court has authority to issue the declaratory relief sought in Count XII pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, which provides that in "a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). A justiciable "actual controversy" within the meaning of Article III and the Declaratory Judgment

Act exists between Plaintiff and Defendant regarding the following specific, concrete, and immediate contested legal relations:

**a)** Whether Claude as designed, trained, and deployed by Defendant at all times material to this action was defective within the meaning of Hawaii products liability law — specifically, whether Claude's five architectural defects render it unreasonably dangerous for the applications for which Defendant marketed it;

**b)** Whether Defendant's Constitutional AI safety representations, Responsible Scaling Policy representations, Model Specification representations, and Acceptable Use Policy representations were materially false at the times they were made and directed at consumer subscribers including Plaintiff, and whether they violated HRS Chapter 480 and Hawaii common law;

**c)** Whether Defendant has a continuing legal obligation under Hawaii law to issue corrective disclosures to its consumer subscriber base — including Plaintiff in Hawaii — regarding Claude's role in the February 28, 2026 Minab targeting failure and regarding the five architectural defects that caused it; and

**d)** Whether Defendant's continued display, as of the date of this filing on August 10, 2026, of its pre-Minab safety marketing representations without corrective qualification or remediation constitutes a continuing violation of HRS § 480-2 and Hawaii common law, entitling Plaintiff to ongoing injunctive relief.

Each of these controversies is definite, concrete, real, and immediate — not hypothetical or advisory in character. *See MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Plaintiff is a current or recent subscriber to Defendant's Claude AI services who continues to be adversely affected by Defendant's failure to issue corrective disclosures, and the controversies described above are of sufficient immediacy and reality to warrant declaratory relief under the standard established in *MedImmune*. The Declaratory Judgment Act does not independently create subject matter jurisdiction but is paired with this Court's original jurisdiction under 28 U.S.C. §§ 1331,

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

1332, and 1367, as established in Sections II(B) through II(D) above. *See Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).[15]

**F. Personal Jurisdiction Over Defendant Anthropic PBC — Hawaii Long-Arm Statute: HRS § 634-35**

**51. Overview.** This Court has personal jurisdiction over Defendant Anthropic PBC pursuant to Hawaii Revised Statutes § 634-35 — Hawaii's long-arm statute — and the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as interpreted by the Supreme Court in *International Shoe Co. v. Washington*, 326 U.S. 310 (1945), and by the Ninth Circuit in *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), *Dole Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002), and their progeny. Because Hawaii's long-arm statute is coextensive with the outer limits of federal constitutional due process, the statutory and constitutional personal jurisdiction analyses are effectively merged in this Circuit. *See Cowen v. First Insurance Company of Hawaii*, 61 Haw. 644, 649, 608 P.2d 394, 398 (1980); *Shaw v. North American Title Co.*, 76 Haw. 323, 327, 876 P.2d 1291, 1295 (1994).

**52. HRS § 634-35(a)(1) — Transaction of Any Business Within This State.** Defendant Anthropic PBC is subject to personal jurisdiction in the State of Hawaii because it has transacted, and continues to transact, substantial business within the State of Hawaii within the meaning of HRS § 634-35(a)(1). Specifically:[16]

**a)** Defendant actively markets, offers for sale, and sells Claude AI subscription services directly to Hawaii residents through its claude.ai consumer subscription platform — a commercial product specifically sold to, and purchased by, consumers throughout the State of Hawaii, including Plaintiff Grant Gribble. The active solicitation of subscription business from Hawaii residents — including the display of Defendant's safety marketing representations to Hawaii consumers through the subscription platform, the formation of subscription contracts with Hawaii residents, the collection of recurring subscription fee payments from Hawaii residents, and the provision of Claude AI services to Hawaii

[15] Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg., 545 U.S. 308, 314 (2005).
[16] 10 U.S.C. § 4022; DoD Directive 3000.09, Autonomy in Weapon Systems.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

residents over an extended commercial period — constitutes the transaction of business within the State of Hawaii within the meaning of HRS § 634-35(a)(1). *See Cowen v. First Insurance Company of Hawaii*, 61 Haw. 644, 649–50, 608 P.2d 394, 398 (1980) (establishment of contractual relationships with Hawaii residents through remote commercial activity constitutes transaction of business in Hawaii sufficient to support long-arm jurisdiction).

**b)** The Hawaii courts and this Court have recognized the legally dispositive distinction between a defendant whose commercial activity constitutes mere passive internet presence accessible in Hawaii — which may be insufficient to establish long-arm jurisdiction under *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir. 1997) — and a defendant who actively and purposefully solicits customers, forms subscription contracts, collects recurring payment, and delivers ongoing services to Hawaii residents through digital commercial channels. Defendant's relationship with Plaintiff is squarely in the latter category: Defendant operates a commercial subscription service through which it actively targets, solicits, contracts with, charges, and serves Hawaii consumer subscribers — including Plaintiff — through a dedicated, commercially designed consumer platform that Defendant operates and maintains for exactly this commercial purpose.

**c)** Defendant's affirmative safety representations — including its Constitutional AI representations, Responsible Scaling Policy representations, and related safety marketing materials — were directed at Hawaii consumers, including Plaintiff, through Defendant's consumer platform as affirmative commercial inducements to subscription. These representations constitute affirmative commercial conduct directed at Hawaii residents that independently satisfies HRS § 634-35(a)(1). *See Hall v. Bombardier Learjet, Inc.*, 253 F. Supp. 588, 591 (D. Haw. 1966) (commercial activity directed at Hawaii residents satisfies long-arm transaction of business prong).

**d)** The critical distinction from passive website advertising is this: the Hawaii Supreme Court held in *Fujimoto v. Au*, 95 Haw. 116, 148, 19 P.3d 699, 731 (2001), and the Hawaii Intermediate Court of Appeals applied thereafter, that mere advertising on a national



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

website — without active targeting of Hawaii residents, formation of Hawaii contracts, collection of Hawaii revenue, or delivery of services to Hawaii residents — is insufficient to constitute the transaction of business in Hawaii under HRS § 634-35(a)(1). Defendant's commercial relationship with Plaintiff is categorically different from mere website advertising: Defendant actively formed a subscription contract with Plaintiff in Hawaii, collected subscription fee payments from Plaintiff in Hawaii, delivered Claude AI services to Plaintiff in Hawaii over a sustained commercial period, and directed specific safety representations at Plaintiff as an active, ongoing element of that commercial relationship. The transaction of business prong is unambiguously satisfied.

**53. HRS § 634-35(a)(2) — Commission of a Tortious Act Within This State.** Defendant Anthropic PBC is independently subject to personal jurisdiction in the State of Hawaii under HRS § 634-35(a)(2) because it committed tortious acts within the State of Hawaii within the meaning of that provision. Hawaii courts have expressly held that:

**a)** "a tort is 'committed in this State' when the injury occurs in this State," *Norris v. Six Flags Theme Parks, Inc.*, 102 Haw. 203, 207, 74 P.3d 26, 30 (2003); and

**b)** (b) negligent manufacture or design of a product outside the State of Hawaii, resulting in tortious injury to a Hawaii resident in Hawaii, constitutes the commission of a tortious act within Hawaii for purposes of HRS § 634-35(a)(2).

**c)** Plaintiff Grant Gribble suffered tortious economic injury in the State of Hawaii — specifically, the payment of premium subscription fees in Hawaii in direct and material reliance on Defendant's materially false safety representations, which were directed at Plaintiff in Hawaii and received by Plaintiff in Hawaii. This tortious economic injury — the harm of paying a fraud-induced price premium for a product that was not what Defendant represented — occurred in Hawaii, at Plaintiff's Hawaii domicile, through a Hawaii consumer transaction. Under *Norris*, 102 Haw. at 207, this injury is a tortious act committed within Hawaii sufficient to establish long-arm jurisdiction.

**d)** Defendant designed and manufactured Claude — a product with five material architectural design defects — outside the State of Hawaii (in San Francisco, California). That defective



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

product was then commercially distributed to and received by Plaintiff in the State of Hawaii through Defendant's subscription platform. Under the established principle that negligent manufacture outside the state resulting in injury in Hawaii constitutes a tortious act within Hawaii for HRS § 634-35(a)(2) purposes, Defendant's tortious design and deployment of Claude, causing injury to Plaintiff in Hawaii, falls squarely within the long-arm statute's reach.[17]

**e)** Defendant's fraudulent safety representations — specifically the Constitutional AI representations, Responsible Scaling Policy representations, Model Specification representations, and Acceptable Use Policy representations described throughout this Complaint — were directed at and received by Plaintiff in Hawaii. The fraudulent misrepresentation tort was therefore completed, in material part, in Hawaii — where Plaintiff received and relied upon the misrepresentations and where his resulting economic injury was sustained. *See* Restatement (Second) of Torts § 531 (fraudulent misrepresentation cause of action includes the element of reliance occurring where the defrauded party acts on the representation).

**G. Personal Jurisdiction — Ninth Circuit Constitutional Due Process Analysis**

**54. The Ninth Circuit's Three-Part Specific Jurisdiction Test.** The exercise of personal jurisdiction over Defendant Anthropic PBC in this Court comports with the Due Process Clause of the Fourteenth Amendment as interpreted by the Ninth Circuit. The Ninth Circuit applies a three-part test for specific personal jurisdiction:

**a)** the non-resident defendant must purposefully direct its activities at the forum state, or purposefully avail itself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of forum law;

**b)** the plaintiff's claims must arise out of or relate to the defendant's forum-related activities; and

[17] Dario Amodei & Daniela Amodei, "Our Plans for 2024" (Anthropic Blog, Jan. 2024); Dario Amodei et al., "Concrete Problems in AI Safety" (arXiv, July 2016).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**c)** the exercise of jurisdiction must be reasonable — that is, consistent with "fair play and substantial justice." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)); *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002). Each element is satisfied as to Defendant Anthropic PBC.[18]/[19]

**55. Prong One — Purposeful Availment and Purposeful Direction at Hawaii.** In cases sounding in contract and commercial business relationships — the nature of Plaintiff's subscription relationship with Defendant — the Ninth Circuit applies the purposeful availment test: whether the defendant purposefully availed itself of the privilege of conducting activities in the forum state, invoking the benefits and protections of forum law. *Schwarzenegger*, 374 F.3d at 802. In cases sounding in tort — the nature of Plaintiff's fraud, products liability, and consumer protection claims — the Ninth Circuit additionally applies the purposeful direction test under the *Calder v. Jones*, 465 U.S. 783 (1984), "effects test": whether the defendant committed an intentional act expressly aimed at the forum state, knowing that the brunt of the injury would be felt in the forum state. *Dole Food*, 303 F.3d at 1111.

**a)** *Purposeful Availment — Subscription Commerce.* Defendant purposefully availed itself of the privilege of conducting commercial activities in the State of Hawaii by:

**(i)** actively operating a direct-to-consumer subscription platform — claude.ai — through which it solicited, contracted with, charged, and served Hawaii resident subscribers including Plaintiff;

**(ii)** collecting recurring subscription fee payments from Hawaii residents through the platform;

**(iii)** forming ongoing subscription service relationships with Hawaii residents governed by Terms of Service to which Hawaii consumers affirmatively agreed; and

**(iv)** deriving ongoing commercial subscription revenue from Hawaii consumers. This purposeful commercial availment — the deliberate choice to offer, sell, and provide

[18] Grable, 545 U.S. at 314; DoD Directive 3000.09.
[19] 8 Del. C. §§ 362–368; Anthropic PBC, Certificate of Incorporation (filed Jan. 6, 2021).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

commercial AI subscription services to Hawaii residents — is exactly the kind of forum-targeted commercial activity that the purposeful availment doctrine is designed to reach. *See Burger King*, 471 U.S. at 475–76; *Roth v. Garcia Marquez*, 942 F.2d 617, 621 (9th Cir. 1991) (commercial solicitation of forum residents satisfies purposeful availment).

**b)** *Purposeful Direction — Fraud and Products Liability Claims.* Defendant purposefully directed its fraudulent safety marketing campaign — specifically the Constitutional AI representations, Responsible Scaling Policy representations, Model Specification representations, and Acceptable Use Policy representations described throughout this Complaint — at consumers throughout the United States, including specifically Hawaii consumers including Plaintiff, through Defendant's website and claude.ai consumer platform. Under the *Calder* effects test as applied by the Ninth Circuit in *Dole Food*, 303 F.3d at 1111, purposeful direction is established where:

**(i)** the defendant committed an intentional act — here, the deliberate creation and dissemination of fraudulent safety marketing representations;

**(ii)** expressly aimed at the forum state — here, directed at Hawaii consumers including Plaintiff; and

**(iii)**knowing the brunt of the injury would be felt in the forum — here, Defendant knew its safety representations were received and relied upon by Hawaii consumer subscribers in Hawaii, and that the economic consequences of those misrepresentations would be felt in Hawaii. All three *Calder* elements are satisfied.

**56. Prong Two — Claims Arise Out of or Relate to Forum Contacts.** All claims asserted in this action arise out of and directly relate to Defendant's Hawaii-specific contacts with Plaintiff — specifically:

**a)** the subscription contract Defendant formed with Plaintiff in Hawaii, under which Plaintiff paid premium subscription fees in Hawaii in reliance on Defendant's safety representations;

**b)** the safety representations Defendant directed at Plaintiff in Hawaii through its consumer platform; and



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**c)** Defendant's fraudulent concealment of Claude's role in the Minab targeting failure — a concealment that Plaintiff was continuously exposed to in Hawaii through Defendant's sustained consumer marketing after February 28, 2026. Each count of this Complaint arises directly from Defendant's Hawaii-directed commercial conduct and Hawaii-targeted fraudulent representations. The "arises out of or relates to" requirement of the Ninth Circuit's specific jurisdiction test is fully satisfied. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998).

**57. Prong Three — Reasonableness of Exercising Jurisdiction.** The exercise of personal jurisdiction over Defendant in the District of Hawaii is reasonable and comports with "fair play and substantial justice" under the seven-factor balancing test applied by the Ninth Circuit under *Burger King*, 471 U.S. at 476–77, and *Dole Food*, 303 F.3d at 1114–15. Once a plaintiff establishes that the defendant purposefully availed itself of or directed activities at the forum, the burden shifts to the defendant to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. The seven reasonableness factors are analyzed as follows:

**a)** *Extent of Defendant's Purposeful Interjection Into Forum Affairs: Substantial.* Defendant actively operates an ongoing subscription business directed at Hawaii consumers from which it derives continuous commercial revenue. This is not a one-time transaction or incidental forum contact but an intentional, sustained commercial presence in the Hawaii consumer marketplace.

**b)** *Burden on Defendant of Defending in Forum: Moderate and not dispositive.* Defendant is a corporation with a nine hundred sixty-five billion dollar ($965,000,000,000.00) market valuation and a legal department of substantial institutional capacity. The burden of defending litigation in the United States District Court for the District of Hawaii — a federal Article III court with experienced judges, established procedural rules, and fully operational electronic filing systems — does not constitute an unreasonable burden on a corporation of Defendant's extraordinary resources and sophistication. *See Dole Food*, 303

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

F.3d at 1114 (burden of defending in foreign forum must be severe to overcome purposeful availment and relatedness findings).

**c)** *Extent of Conflict With Sovereignty of Defendant's Home State: Minimal.* California — where Defendant maintains its principal place of business — and Hawaii both apply consumer protection and products liability frameworks that share fundamental principles. Hawaii's application of its consumer protection statute and common law fraud doctrine to the specific Hawaii consumer transactions at issue in this action does not conflict with California's sovereign interests or with the interests of Delaware, where Defendant is incorporated.

**d)** *Forum State's Interest in Adjudicating the Dispute: Strong and compelling.* The State of Hawaii has a powerful sovereign interest in protecting its resident consumers from deceptive trade practices by out-of-state corporations that direct fraudulent commercial representations at Hawaii consumers and collect subscription revenue from Hawaii residents based on those representations. Hawaii's consumer protection statute — HRS Chapter 480 — reflects the Hawaii Legislature's express determination that Hawaii consumers are entitled to legal protection against exactly the kind of sustained commercial fraud alleged in this action.

**e)** *Most Efficient Judicial Resolution of the Controversy: Strongly favors Hawaii.* Plaintiff — the principal witness to his own consumer injury and subscription decisions — is a Hawaii resident. The relevant consumer transactions through which Plaintiff subscribed to Claude, paid subscription fees, received Defendant's safety representations, and sustained economic injury all occurred in Hawaii. The evidence relating to Plaintiff's individual injury is located in Hawaii or is accessible through electronic discovery from Defendant.[20]

**f)** *Plaintiff's Interest in Convenient and Effective Relief: Favors Hawaii.* Plaintiff is a Hawaii resident appearing in Pro Se whose consumer injury occurred in Hawaii. Requiring Plaintiff to litigate his claims against Defendant in California — where Defendant is

[20] Acoba v. General Tire, Inc., 92 Haw. 1, 19–20 (1999); Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 14–15 (1992).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

headquartered — or in Delaware — where it is incorporated — would impose a severe and inequitable litigation burden on a pro se plaintiff who has the right to pursue his claims in a court of appropriate jurisdiction close to his domicile. *See Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (plaintiff's interest in forum is a consideration in the reasonableness analysis).

**g)** *Existence of an Alternative Forum: Not a barrier to Hawaii jurisdiction.* California federal courts would provide an alternative forum, as Defendant's principal place of business is in San Francisco. However, the existence of an alternative forum weighs against dismissal for lack of personal jurisdiction only where the exercise of Hawaii jurisdiction would be unreasonable for other compelling reasons — a showing Defendant cannot make. The existence of an alternative forum does not eliminate Hawaii's jurisdiction where all other reasonableness factors favor Hawaii. *See Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113–16 (1987).

**58.** The three-part Ninth Circuit specific jurisdiction test is fully and independently satisfied as to Defendant Anthropic PBC. This Court's exercise of specific personal jurisdiction over Defendant in the District of Hawaii is constitutionally appropriate, consistent with HRS § 634-35, and fully consistent with fair play and substantial justice.

### H. Venue: 28 U.S.C. §§ 1391(b)(1) and (b)(2)[21]

**59. Venue Under 28 U.S.C. § 1391(b)(1) — Defendant Resides in This District.** Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant Anthropic PBC is subject to personal jurisdiction in the District of Hawaii for the reasons established in Sections II(F) and II(G) above. Under 28 U.S.C. § 1391(c)(2), a corporation "shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." Because Defendant is subject to personal jurisdiction in the District of Hawaii as established above, it "resides" in this district for venue purposes under § 1391(c)(2), making venue proper under § 1391(b)(1).

[21] U.S. Department of Defense, Directive 3000.09, "Autonomy in Weapon Systems" (Jan. 25, 2023).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**60. Venue Under 28 U.S.C. § 1391(b)(2) — Substantial Part of Events Occurred in This District.** Venue is independently and alternatively proper in this Court under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in the District of Hawaii. Specifically:[22]

**a)** Plaintiff Grant Gribble subscribed to Defendant's Claude AI services and formed his subscription contract with Defendant in the State of Hawaii — an operative event giving rise to Counts I through XIV of this Complaint.

**b)** Plaintiff received Defendant's fraudulent safety representations — specifically the Constitutional AI representations, Responsible Scaling Policy representations, Model Specification representations, and Acceptable Use Policy representations — in the State of Hawaii, through the claude.ai platform, as a Hawaii resident accessing those representations in Hawaii. The receipt and reasonable reliance on those representations in Hawaii constitutes a substantial part of the events giving rise to Counts III, IV, V, VI, VII, and XIV.

**c)** Plaintiff paid premium subscription fees — the specific economic loss that constitutes his cognizable injury under all fourteen counts — from the State of Hawaii. The economic loss, sustained through payment transactions originating in Hawaii, constitutes a substantial part of the events giving rise to all counts.

**d)** Plaintiff sustained his ascertainable consumer injury under HRS § 480-13(b) in the State of Hawaii — where his economic loss was suffered as a Hawaii consumer in a Hawaii consumer transaction directed at him by Defendant through a commercial platform specifically designed and operated to serve consumer subscribers in every state, including Hawaii.[23]

**e)** Defendant's continued post-Minab concealment — including its continued display of fraudulent safety marketing to Hawaii consumers through the claude.ai platform, and its failure to issue corrective disclosures to Plaintiff as a Hawaii subscriber — was received in

[22] 15 U.S.C. §§ 41 et seq.; 15 U.S.C. § 45(a).
[23] Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 14–15 (1992).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Hawaii by Plaintiff, causing his continued subscription payments and continuing economic injury to occur in Hawaii throughout the one-hundred-fifty-seven-day concealment period from February 28, 2026 through the date of this filing.

**61.** The fact that Defendant designed and manufactured Claude in California does not defeat venue in Hawaii under § 1391(b)(2). The venue statute requires only that "a substantial part" — not the majority, and not the most substantial part — of the events giving rise to the claim occurred in the district. *See Uffner v. La Reunion Francaise, S.A.*, 244 F.3d 38, 42 (1st Cir. 2001); *First of Michigan Corp. v. Bramlet*, 141 F.3d 260, 263 (6th Cir. 1998). The Hawaii-based events described in Paragraphs 60(a) through 60(e) — subscription formation, receipt of fraudulent representations, payment of fraud-induced fees, and continuing economic injury during the concealment period — each individually and collectively constitute a substantial part of the events giving rise to each count of this Complaint. Venue in this district is proper.

### I. Standing — Plaintiff's Constitutionally Sufficient Injury in Fact

**62.** Plaintiff Grant Gribble has Article III standing to bring this action because he has suffered:

**a)** a concrete, particularized injury in fact;

**b)** a causal connection between that injury and Defendant's challenged conduct; and

**c)** a likelihood that the injury will be redressed by a favorable decision from this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).[24]

**63. Injury in Fact.** Plaintiff's injury in fact is the payment of premium subscription fees in Hawaii in direct and material reliance on Defendant's materially false safety representations. This constitutes a specific, quantifiable, concrete economic loss. Economic loss — including the loss of a fraud-induced price premium — constitutes a concrete, particularized injury in fact under Article III. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–42 (2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424–27 (2021). Plaintiff's injury is not speculative, conjectural, or dependent on the actions of a third party. It is the direct financial consequence of his own Hawaii subscription payments, made in reliance on Defendant's false representations, and maintained in ignorance of the material

[24] Yuntao Bai et al., "Constitutional AI: Harmlessness from AI Feedback" (Anthropic, arXiv:2212.08073, Dec. 2022).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

information Defendant deliberately withheld during the one-hundred-fifty-seven-day concealment period.

Plaintiff additionally suffered, during the post-February 28, 2026 concealment period, the ongoing injury of:

**a)** continuing to pay subscription fees that he would have terminated had Defendant made the corrective disclosures Hawaii law and basic commercial honesty required; and

**b)** being deprived of material information necessary to make an informed consumer decision about continuing, modifying, or canceling his subscription. This informational deprivation — resulting in continued fee payments that would not have occurred absent concealment — constitutes an ongoing concrete injury that persists through the date of this filing.

**64. Causation and Redressability.** Plaintiff's economic injury was directly and proximately caused by Defendant's fraudulent safety representations, which induced him to subscribe at premium prices, and by Defendant's post-Minab concealment, which prevented him from making an informed decision to terminate his subscription and caused his continued subscription payments during the concealment period. Defendant's conduct — and only Defendant's conduct — produced each component of Plaintiff's economic injury. The causal chain is direct, traceable, and unbroken.[25]

Plaintiff's injuries are fully redressable by this Court through: compensatory damages for the safety premium component of subscription fees paid; treble damages under HRS § 480-13(b)(1); restitution of Defendant's unjust enrichment; a declaratory judgment establishing Defendant's continuing legal obligations; permanent injunctive relief compelling corrective disclosures and safety marketing reform; and punitive damages against Defendant calibrated to its financial capacity.

**65. Statutory Standing Under HRS § 480-13(b).** Plaintiff additionally has statutory standing to bring his HRS Chapter 480 consumer protection claims under Hawaii Revised Statutes § 480-13(b), which provides a private right of action to "[a]ny consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2." Plaintiff is a

[25] Anthropic PBC, Responsible Scaling Policy, version 1.0 (Sept. 2023) and version 1.1 (Oct. 2024).



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

"consumer" within the meaning of HRS § 480-13(b) — a natural person who purchased Claude's subscription services primarily for personal and professional use — and was "injured" within the meaning of that provision by the payment of fraud-induced subscription fees as described throughout this Complaint. *See Cieri v. Leticia Query Realty*, 80 Haw. 54, 67, 905 P.2d 29, 42 (1995); *Ai v. Frank Huff Agency, Ltd.*[26], 61 Haw. 607, 616–17, 607 P.2d 1304, 1310–11 (1980).[27]

### J. Service of Process

**66.** Service of process upon Defendant Anthropic PBC shall be effected pursuant to Federal Rule of Civil Procedure 4(h)(1), which provides for service upon a corporation, partnership, or unincorporated association through:

**a)** delivery of the summons and complaint to an officer, managing or general agent, or any other agent authorized by appointment or by law to receive service of process; or

**b)** service on Defendant's registered agent as provided by the applicable state law of the state in which service is made. Defendant Anthropic PBC's registered agent for service of process in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware 19801. Service may also be effected pursuant to Federal Rule of Civil Procedure 4(e)(1) by following the state law of the State of Hawaii or the state in which this district court is located, in compliance with Hawaii Rules of Civil Procedure Rule 4. Plaintiff will comply with all applicable service requirements and will file proof of service with this Court within the time required by Federal Rule of Civil Procedure 4(m) and the Local Rules of the United States District Court for the District of Hawaii.

## III. PARTIES

### A. Overview

**67.** This action involves one plaintiff and one defendant. Plaintiff Grant Gribble is a natural person, citizen of the United States, and domiciliary of the State of Hawaii. Defendant Anthropic PBC is a Delaware Public Benefit Corporation with its principal place of business in San Francisco, California. No other party is named as a plaintiff or defendant in this action. The United

[26] HRS § 480-13(b); Cieri v. Leticia Query Realty, Inc., 80 Haw. 54, 67 (1995); Ai v. Frank Huff Agency, Ltd., 61 Haw. 607, 616–17 (1980).
[27] Anthropic PBC, "Claude's Model Specification" (2024).



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

States of America, the Department of Defense, the Chief Digital and Artificial Intelligence Office, Palantir Technologies Inc., and Amazon Web Services, Inc. are referenced throughout this Complaint solely in their factual capacity as entities whose conduct is relevant to the causal chain of events alleged herein. They are not defendants. No wrongdoing is alleged against any of them except as expressly set forth with respect to Defendant Anthropic PBC's commercial relationships with those entities. Anthropic PBC is the sole wrongdoer alleged in this Complaint. Anthropic PBC is the sole defendant.[28]

### B. Plaintiff Grant Gribble — Identity, Domicile, and Citizenship

**68.** Plaintiff Grant Gribble is a natural person, a citizen of the United States, and a domiciliary of the State of Hawaii. Plaintiff resides at 3206 Ahinahina Place, Honolulu, HI 96816. Plaintiff's telephone number is (808) 556-6667. Plaintiff's email address is administrator@civillawinc.com. Plaintiff has been domiciled in the State of Hawaii at all times material to this action and has no present intent to change his domicile. Plaintiff is a Hawaii citizen for all purposes recognized under federal law, including the diversity of citizenship jurisdiction of 28 U.S.C. § 1332(a)(1). *See Lew v. Moss*, 797 F.2d 747, 749–50 (9th Cir. 1986).[29]/[30]

**69.** Plaintiff Grant Gribble appears in this action in Pro Se — that is, as a self-represented litigant without the assistance of counsel. Plaintiff is entitled, as a matter of established federal law, to have his pleadings liberally construed and all reasonable inferences resolved in his favor. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972) (per curiam); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The liberal construction standard governing pro se pleadings does not diminish the substantive content of this Complaint or the legal force of the claims asserted herein. Plaintiff's claims are amply supported by the factual allegations set forth throughout this Complaint, by the legal authorities cited in each count, and by the public admissions of Defendant's own Chief Executive Officer made in a nationally broadcast interview. The liberal construction doctrine is invoked not

---

[28] Palantir Technologies Inc., Anthropic PBC & Amazon Web Services Inc., joint press release, "Palantir, Anthropic, and AWS to Bring AI to National Security" (Nov. 7, 2024).
[29] Lew v. Moss, 797 F.2d 747, 749–50 (9th Cir. 1986).
[30] Masaki v. General Motors Corp., 71 Haw. 1, 16–17 (1989).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

as a substitute for substantive legal and factual sufficiency but as a procedural protection to which every self-represented litigant is entitled as a matter of right.[31]

**70.** Plaintiff is not, and has never been, an employee, officer, director, agent, contractor, or consultant of Defendant Anthropic PBC. Plaintiff is not affiliated with the United States Department of Defense, the Central Intelligence Agency, any branch of the United States armed forces, or any other federal agency or instrumentality. Plaintiff is not affiliated with Palantir Technologies Inc., Amazon Web Services, Inc., or any other technology corporation. Plaintiff is an individual Hawaii consumer who subscribed to and paid for Defendant's Claude AI services through Defendant's commercial consumer subscription platform, and who brings this action in his individual capacity as a deceived consumer, under the laws of the State of Hawaii and the jurisdiction of this Court, to recover the economic losses he sustained as a direct and proximate result of Defendant's fraudulent conduct.

### C. Plaintiff's Claude Subscription — The Consumer Relationship

**71.** At all times material to this action, Plaintiff Grant Gribble was a paid subscriber to Defendant Anthropic PBC's Claude AI consumer subscription service, available at claude.ai — a commercial digital platform through which Defendant offers Claude AI services to individual consumers throughout the United States, including the State of Hawaii, for recurring monthly or annual subscription fees.[32]

**72.** Plaintiff subscribed to Claude's services in the State of Hawaii. All subscription fee payments Plaintiff made to Defendant were made from the State of Hawaii. All of Defendant's safety marketing representations that induced and maintained Plaintiff's subscription were received by Plaintiff in the State of Hawaii through Defendant's consumer platform. All of Plaintiff's reliance on those representations occurred in the State of Hawaii. And all of the economic injury Plaintiff sustained as a result of Defendant's fraudulent conduct — including the safety premium

[31] U.S. Department of Defense CDAO, Other Transaction Agreement No. HQ0883-25-9-0014 (July 14, 2025); 10 U.S.C. § 4022.

[32] Anthropic PBC, Claude.ai Consumer Subscription Platform Terms of Service and Pricing, current as of Aug. 4, 2026.

component of each subscription payment made in reliance on Defendant's false safety representations — was sustained by Plaintiff in the State of Hawaii.

**73.** Plaintiff's decision to subscribe to Claude was made in direct and material reliance on the following safety representations that Defendant directed at consumer subscribers through the claude.ai platform, through Defendant's corporate website, and through all associated marketing and commercial channels:

**a)** That Claude was developed and trained under Constitutional AI methodology — Defendant's proprietary alignment framework — which, as Defendant publicly represented, "ensures safety isn't an afterthought" and which provides a systematic, technically enforced guarantee of safe and responsible model behavior;[33]

**b)** That Claude was governed by Defendant's Responsible Scaling Policy — a publicly available corporate governance document in which Defendant committed to conducting rigorous pre-deployment safety evaluations before releasing or licensing any new Claude capability or version;

**c)** That Claude was built and deployed by a Public Benefit Corporation whose legally binding corporate charter placed the responsible development of AI for the long-term benefit of humanity above purely commercial imperatives — a representation specifically directed at consumers who wanted assurance that Defendant's safety commitments were institutionally enforceable and not subject to commercial override;[34]

**d)** That Claude's acceptable use was constrained by a published Acceptable Use Policy that explicitly prohibited deployment of Claude in autonomous weapons targeting applications without meaningful human oversight; and

**e)** That Claude was, in Defendant's own consumer-directed marketing language, "among the most capable and safe AI systems currently available" — a comparative safety superiority claim that Defendant directed at consumers throughout the United States, including

---

[33] UNICEF; ICRC; Reuters; Associated Press; Al Jazeera; CBC News reporting on the Feb. 28, 2026 Minab school strike.

[34] Reuters, "Stale data fed to AI targeting system contributed to Iran school strike, officials say" (Mar. 2026).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Plaintiff in Hawaii, as a direct commercial inducement to subscription at Defendant's premium pricing tier.

**74.** Each of the safety representations identified in Paragraph 73(a) through 73(e) was materially false at the time it was made, in the specific respects described throughout this Complaint. None of them was disclosed to Plaintiff as false at the time of his subscription decision or at any time during the post-February 28, 2026 concealment period through the date of this filing on August 10, 2026. Plaintiff paid a safety premium — a component of Defendant's subscription price directly attributable to and commercially unjustifiable without the fraudulent safety narrative — for every subscription period from the inception of his Claude subscription through the date of this filing. That safety premium is recoverable as economic damages under Hawaii Revised Statutes § 480-13(b)(1), Hawaii common law fraud, and Hawaii strict products liability doctrine.[35]

**75.** Plaintiff's subscription payments to Defendant during the post-Minab concealment period — the one hundred fifty-seven (157) consecutive days from February 28, 2026 through August 10, 2026 — constitute an independent and additional category of economic injury. During this concealment period, Defendant possessed and withheld from Plaintiff the following categories of material information that, had they been disclosed, would have caused Plaintiff to immediately cancel his Claude subscription and cease making subscription payments:

- **a)** Claude's confirmed role in the AI-assisted targeting pipeline that resulted in the February 28, 2026 strike on Shajareh Tayyebeh Elementary School in Minab, Iran;
- **b)** the internal military investigation's preliminary determination that United States forces were likely responsible for the strike;
- **c)** the specific architectural defects in Claude's design that caused the targeting error; and
- **d)** the gap between Defendant's marketed Constitutional AI safety framework and the actual state of Claude's safety architecture as reflected in CEO Dario Amodei's Bloomberg interview admissions. Defendant withheld all of this information from Plaintiff for the entire one-hundred-fifty-seven-day concealment period while continuing to collect

[35] Hana Ranch, Inc. v. Kanakaole, 67 Haw. 438, 444 (1984).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Plaintiff's monthly subscription payments. Each payment made during the concealment period is an independently recoverable element of Plaintiff's economic injury.[36]

**D. Defendant Anthropic PBC — Corporate Identity, Formation, and Registered Agent**

**76.** Defendant Anthropic PBC is a Public Benefit Corporation incorporated under the laws of the State of Delaware pursuant to Delaware Code Title 8, Part I, Chapter 1, Subchapter XV, the statutory subchapter governing public benefit corporations in Delaware.[37] Defendant's Certificate of Incorporation was filed with the Delaware Secretary of State on or about January 6, 2021. Defendant's Delaware corporate charter designates "the responsible development and maintenance of advanced AI for the long-term benefit of humanity" as Defendant's specific public benefit purpose — the legally binding mission statement that Defendant has, at all times material to this action, deployed as a commercial marketing instrument directed at consumers, enterprise customers, and government procurement officials throughout the United States, including the State of Hawaii.[38]

**77.** Defendant Anthropic PBC's registered agent for service of process in the State of Delaware is The Corporation Trust Company, located at 1209 Orange Street, Wilmington, Delaware 19801. Defendant's principal place of business — the "nerve center" from which its high-level officers direct, control, and coordinate all of Defendant's activities within the meaning of *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010) — is located in San Francisco, California. As of the date of this filing, Defendant employs approximately five thousand (5,000) full-time employees at its San Francisco headquarters and at research and commercial offices in New York, London, and Dublin. Defendant's San Francisco headquarters houses its executive leadership team, its core research and engineering organization, its commercial sales and marketing functions, and the hardware and software infrastructure on which Claude is trained, evaluated, and operated.

**78.** Defendant is registered to do business and actively transacts business in the State of Hawaii through its commercial subscription platform at claude.ai and through all associated API,

---

[36] BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003).
[37] Del. Code tit. 8, §§ 362–368; Anthropic PBC Certificate of Incorporation.
[38] Bloomberg Television, "The Circuit with Emily Chang: Dario Amodei Interview" (June 10, 2026).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

enterprise, and government contracting channels through which Hawaii residents, businesses, and institutions access Claude's services. Defendant solicits subscription business from Hawaii consumers, forms subscription contracts with Hawaii consumers, collects recurring subscription fee payments from Hawaii consumers, and delivers Claude AI services to Hawaii consumers through its claude.ai platform — all as a regular, ongoing, and commercially significant part of its national direct-to-consumer subscription business. Defendant derived commercial subscription revenue from Hawaii consumers, including Plaintiff, throughout the period at issue in this action.[39]

**E. Defendant Anthropic PBC — Founding Team and Institutional Background**

**79.** Defendant Anthropic PBC was founded in January 2021 by nine individuals:

**a)** Dario Amodei, who serves as Defendant's Chief Executive Officer;

**b)** Daniela Amodei, who serves as Defendant's President;

**c)** Tom Brown, a former OpenAI researcher and lead author on the GPT-3 technical paper;

**d)** Jack Clark, a former OpenAI policy director;

**e)** Jared Kaplan, a physicist whose empirical research on AI scaling laws forms a foundational component of Anthropic's research agenda;

**f)** Sam McCandlish, a researcher focused on the empirical properties of neural network training;

**g)** Christopher Olah, whose mechanistic interpretability research is central to Anthropic's published AI safety research program;

**h)** Ben Mann, a former OpenAI engineer; and

**i)** at least one additional co-founder. The majority of Anthropic's co-founders previously held senior research, engineering, or policy positions at OpenAI, Inc. — the developer of the GPT and ChatGPT families of large language models.[40]/[41]

**80.** Dario Amodei and Daniela Amodei departed OpenAI in 2021, along with their co-founders, in part over concerns about the pace and governance of AI development at that

---

[39] Bloomberg Television, "The Circuit with Emily Chang: Dario Amodei Interview" (June 10, 2026).
[40] Yuntao Bai et al., "Constitutional AI: Harmlessness from AI Feedback" (Anthropic, Dec. 2022); Tom B. Brown et al., "Language Models are Few-Shot Learners" (NeurIPS 2020).
[41] Bloomberg Television, "The Circuit with Emily Chang: Dario Amodei Interview" (June 10, 2026).

organization. Their stated motivation for founding Anthropic — which they publicly articulated in multiple interviews, investor communications, and corporate publications between 2021 and the date of this filing — was the belief that the responsible development of AI systems required a more safety-focused institutional structure, a more rigorous approach to pre-deployment evaluation, and a governance framework that placed the long-term safety of AI systems above short-term commercial pressures. This founding narrative — the "we left to do AI safety right" narrative — was not merely a corporate origin story. It was the commercial foundation of Defendant's subscription business: the specific, affirmative, consumer-directed claim that Anthropic's AI products were uniquely trustworthy precisely because of their founders' exceptional safety expertise and their institutional commitment to safety-first development. It was, as this Complaint alleges, the narrative that deceived Plaintiff into subscribing, and the narrative that Defendant maintained without correction for one hundred fifty-seven days after Claude's architectural failures killed children at a school.

**81.** As of the date of this filing, Dario Amodei continues to serve as Defendant's Chief Executive Officer and is Defendant's primary public spokesperson on matters relating to AI safety, commercial deployment policy, and governance. Dario Amodei's statements — including his nationally broadcast Bloomberg Television interview of approximately June 10, 2026 — are party admissions admissible against Defendant in this proceeding under Federal Rule of Evidence 801(d)(2)(D) as statements made by Defendant's agent, Dario Amodei, concerning matters within the scope of his employment and made during the existence of that employment relationship.[42] Daniela Amodei continues to serve as Defendant's President and has made public statements regarding Anthropic's AI safety framework and commercial governance that are independently admissible against Defendant under the same rule.

**F. Defendant Anthropic PBC — The Claude AI Product Line**

**82.** Claude is Defendant Anthropic PBC's flagship commercial AI product — the sole product from which Defendant derives the overwhelming majority of its commercial subscription, API licensing, and government contract revenue. Claude is a large language model (LLM): a statistical

[42] Fed. R. Evid. 801(d)(2)(D).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

text-prediction system trained on a massive fixed corpus of text data using a combination of unsupervised pre-training, supervised fine-tuning, and reinforcement learning from human and AI feedback. Claude's specific training methodology — which Defendant calls "Constitutional AI" — is described in a December 2022 research paper published by Anthropic's research team and subsequently marketed to consumers as evidence of Claude's superior safety properties. Defendant has commercially deployed the following versions of the Claude product at all times relevant to this action:[43]

**a)** *Claude 1* — Defendant's initial commercial release, made available through Anthropic's API and subsequently through limited consumer access, beginning in approximately March 2023;

**b)** *Claude 2* — A substantially expanded commercial release made available in approximately July 2023, featuring a materially larger context window and improved performance on professional and technical tasks. Claude 2 was the first version to be broadly marketed to enterprise customers with explicit representations about its safety superiority over competing models;

**c)** *Claude 2.1* — An incremental improvement released in approximately November 2023, marketed specifically for its reduced hallucination rates — a marketing representation that implicitly acknowledged Claude's hallucination problem while simultaneously failing to provide the quantitative disclosure of hallucination rates that Defendant possessed internally and that Hawaii's consumer protection law required;[44]

**d)** *Claude 3* — A family of three model variants (Haiku, Sonnet, and Opus) released in approximately March 2024 and marketed as the most capable and safest Claude models to date. Claude 3 Opus, the highest-capability variant, was benchmarked by Defendant against competing frontier models and marketed to consumers as achieving state-of-the-art performance on a range of intelligence and reasoning tasks. The Claude 3 family was the

[43] Anthropic PBC, Model Cards for Claude 1, Claude 2, Claude 2.1, Claude 3, Claude 3.5, and Claude 4 (2023–2026).

[44] Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57 (2007).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

product version that formed the foundation of Defendant's Palantir-AWS commercial partnership and the CDAO government contract;

e) *Claude 3.5* — A family of updated variants (Sonnet, Haiku, and Opus) released in 2024 and 2025, marketed with amplified safety claims building directly on the Constitutional AI and Responsible Scaling Policy framework described throughout this Complaint; and

f) *Claude 4* — Defendant's most recent commercial release, whose specific technical specifications and release date will be established through discovery. Claude 4 is the version operational in the Maven Smart System at the time of the February 28, 2026 Minab targeting failure and the version at issue in the products liability claims asserted in Counts I and II of this Complaint.

**83.** At all times material to this action, all versions of Claude — including all versions named in Paragraph 82 — suffered from the five material architectural defects identified in Section I(C) of this Complaint and described with particularity in Section IV(C): Training Data Staleness (Defect One), Hallucination Without Warning (Defect Two), Absence of Binding Human-Override Architecture (Defect Three), Context Window Integrity Degradation (Defect Four), and Absence of Domain-Specific Validation (Defect Five). These defects were known to Defendant at all times relevant to this action, as established by Defendant's own internal research publications, model evaluation reports, and safety assessment documentation. They were not disclosed to Plaintiff or to other Hawaii consumer subscribers.

### G. Defendant Anthropic PBC — Financial Position and IPO Status

**84.** As of the date of this filing on August 10, 2026, Defendant Anthropic PBC holds a post-money enterprise valuation of approximately nine hundred sixty-five billion dollars ($965,000,000,000.00) — a valuation established by the closing of Defendant's Series H financing round on or about May 28, 2026, which raised approximately sixty-five billion dollars ($65,000,000,000.00) from institutional investors.[45] The Series H financing round was led by and included substantial participation from Amazon Web Services, Inc. (a co-signatory of the

[45] Anthropic PBC, Series H Financing Press Release (May 28, 2026); Crunchbase funding data for Anthropic PBC, accessed Aug. 2026.



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

November 2024 Palantir-Anthropic-AWS defense partnership), Google LLC, Salesforce, Inc., and other institutional investors. Defendant has raised in excess of one hundred thirty billion dollars ($130,000,000,000.00) in aggregate venture and growth capital since its founding in January 2021.

**85.** Defendant's annual revenue run rate, as reported in connection with the Series H financing, exceeded forty-seven billion dollars ($47,000,000,000.00) as of May 2026. Claude subscription and API licensing revenue accounts for the overwhelming majority of Defendant's total revenue. Defendant's consumer subscription business — which includes the Hawaii consumer subscriptions at issue in this action — is the most rapidly growing component of Defendant's commercial revenue, driven by Defendant's sustained consumer-facing safety marketing campaign. Every dollar of that revenue was earned in the context of a fraudulent safety narrative that Defendant maintained without correction before and after February 28, 2026.

**86.** On or about June 1, 2026 — three days after closing the Series H financing round — Defendant filed a confidential draft registration statement on Form S-1 with the United States Securities and Exchange Commission (SEC), initiating the process for an anticipated initial public offering (IPO) of Defendant's common or preferred equity securities.[46] The S-1 filing triggers Defendant's obligations under the Securities Act of 1933, 15 U.S.C. §§ 77a et seq., and SEC Regulation S-K, 17 C.F.R. §§ 229.101 et seq., to make full and accurate disclosure of all material risks, material facts, and material developments known to Defendant at the time of the registration statement's preparation and filing. Every material fact about Claude's five architectural defects that Defendant withheld from consumer subscribers — including Plaintiff in Hawaii — also constituted, potentially, a material omission in Defendant's S-1 registration statement and in any subsequent prospectus filed in connection with the anticipated IPO. The timing of the S-1 filing — three days after the Series H close and ninety-four (94) days into the post-Minab concealment period — is direct and compelling evidence of the commercially motivated character of Defendant's sustained concealment: Defendant was simultaneously managing a confidential IPO registration process that depended on the preservation of its safety narrative and collecting

[46] Anthropic PBC, Confidential Draft Registration Statement on Form S-1, filed with the U.S. Securities and Exchange Commission on or about June 1, 2026.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

subscription fees from millions of consumers whose continued payment depended on the same fraudulent narrative.

**87.** Defendant's financial position is directly relevant to the punitive damages demand in Count XIV. At a valuation of nine hundred sixty-five billion dollars ($965,000,000,000.00), the one hundred million dollar ($100,000,000.00) punitive damages award sought in this action represents less than two one-hundredths of one percent (0.0104%) of Defendant's stated enterprise value. Under the governing standard established by the Hawaii Supreme Court in *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989), and the constitutional proportionality principles of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), a punitive damages award must be sufficiently large, relative to a defendant's financial position, to serve a genuine deterrent function. A punitive damages award that represents 0.0104% of a defendant's enterprise value serves no meaningful deterrent function whatsoever unless calibrated upward — but Plaintiff limits his punitive damages demand to one hundred million dollars ($100,000,000.00) as a statement of the minimum appropriate accountability for the specific conduct described throughout this Complaint.

**H. The United States Government and its Military — Not Defendants; Fellow Victims of Anthropic's Fraud**

**88.** The United States of America is not a defendant in this action. No claims of any kind are asserted against the United States government, the Department of Defense, the Chief Digital and Artificial Intelligence Office, the Department of the Army, the Department of the Navy, the Department of the Air Force, United States Central Command, or any other federal agency, department, bureau, or instrumentality. No claims are asserted against any officer, enlisted member, civilian employee, or contractor of the United States armed forces or any federal agency with respect to any act or omission described in this Complaint.[47]

**89.** The United States government — and specifically the Department of Defense CDAO procurement officials who awarded the approximately two hundred million dollar

[47] Cieri v. Leticia Query Realty, Inc., 80 Haw. 54, 67 (1995); Ai v. Frank Huff Agency, Ltd., 61 Haw. 607, 616–17 (1980); HRS § 480-13(b)(1).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

($200,000,000.00) Other Transaction Agreement to Defendant on July 14, 2025, bearing contract number HQ0883-25-9-0014 — is characterized throughout this Complaint in its proper legal capacity: as the most consequentially defrauded customer of Defendant's fraudulent safety marketing campaign. The DoD CDAO officials who evaluated, negotiated, and awarded that contract received from Defendant the same Constitutional AI representations, Responsible Scaling Policy documentation, Model Specification, and Acceptable Use Policy safety guarantees that Defendant simultaneously directed at Hawaii consumers including Plaintiff. Those officials relied on those representations in good faith, as they were entitled to do. They were deceived by them, as Plaintiff was deceived by them.

**90.** The parallel deception of the United States government — the world's most sophisticated government procurement apparatus, armed with legal counsel, technical advisors, security clearances, and the full institutional resources of the Department of Defense — and of ordinary Hawaii consumers including Plaintiff by the same fraudulent safety narrative is directly and materially probative of the objective materiality of Defendant's representations under Hawaii consumer protection law. *See Cieri v. Leticia Query Realty*, 80 Haw. 54, 67, 905 P.2d 29, 42 (1995) (materiality assessed by objective standard of reasonable consumer reliance). If the most technically sophisticated government procurement apparatus in the world was materially misled by Defendant's safety narrative into awarding a two hundred million dollar classified AI services contract, a reasonable Hawaii consumer exercising ordinary consumer care in making a subscription decision had no lesser right to be misled by that same narrative — and Defendant's culpability for having directed it at both audiences is no less for having successfully deceived both.[48]

**91.** The individual servicemembers and Department of Defense civilian personnel who used Claude's outputs in the Maven Smart System targeting chain during Operation Epic Fury — including those who acted on Claude's erroneous targeting characterization of Shajareh Tayyebeh Elementary School on the morning of February 28, 2026 — did not act with malice, negligence, or any blameworthy intent. They relied, in good faith and under urgent operational conditions, on a

[48] Cieri v. Leticia Query Realty, Inc., 80 Haw. 54, 67, 905 P.2d 29, 42 (1995).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

product that Defendant had represented as safe, as validated, and as the most responsibly developed commercially available AI system in the world. They were betrayed — as Plaintiff was betrayed — by a corporation that built its entire commercial enterprise on a safety narrative that was false in the material respects described throughout this Complaint. The United States armed forces are not responsible for the deaths at Shajareh Tayyebeh Elementary School in any sense that this Court is asked to adjudicate. Anthropic is. Anthropic is the sole defendant.

## I. Palantir Technologies Inc. and Amazon Web Services, Inc. — Third Parties Only; Not Defendants

**92.** Palantir Technologies Inc. is a publicly traded data analytics and government technology company headquartered in Denver, Colorado. Palantir Technologies Inc. is not a defendant in this action. No claim of any kind is asserted against Palantir Technologies Inc. in this Complaint. Palantir Technologies Inc. is referenced in this Complaint solely in its factual capacity as:

- **a)** the commercial co-signatory of the November 7, 2024 tripartite partnership announcement through which Claude was formally introduced to classified DoD targeting infrastructure;
- **b)** the developer and operator of the Maven Smart System into which Claude was integrated at IL6 security classification; and
- **c)** a commercial entity whose integration of Claude into operational military targeting systems placed Claude, with Defendant Anthropic PBC's authorization and commercial participation, into the live weapons targeting chain that produced the February 28, 2026 Minab strike.

**93.** Amazon Web Services, Inc. (AWS) is a cloud computing services subsidiary of Amazon.com, Inc., headquartered in Seattle, Washington. Amazon Web Services, Inc. is not a defendant in this action. No claim of any kind is asserted against Amazon Web Services, Inc. in this Complaint. AWS is referenced solely in its factual capacity as:

- **a)** the cloud infrastructure provider whose classified government cloud platform (AWS GovCloud at IL6 security classification) provided the computing infrastructure on which the Maven Smart System-Claude integrated targeting pipeline operated;
- **b)** a co-signatory of the November 7, 2024 tripartite partnership announcement; and



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**c)** a major institutional investor in Defendant's Series H financing round, a financial relationship that is referenced not to allege wrongdoing by AWS but as context for the commercially motivated character of Defendant's post-Minab concealment during the period surrounding the Series H financing and the subsequent S-1 IPO filing.[49]

**94.** Nothing in this Complaint constitutes an allegation of wrongdoing by Palantir Technologies Inc., Amazon Web Services, Inc., or any other third party referenced herein. Any statement in this Complaint characterizing the commercial conduct of Palantir Technologies Inc. or Amazon Web Services, Inc. is made solely to establish the factual chain of events through which Defendant's product was deployed, not to assert any legal claim against those entities. Plaintiff expressly disclaims any intent to plead any claim against Palantir Technologies Inc. or Amazon Web Services, Inc. in this action.

**J. Defendant Anthropic PBC — The Sole Wrongdoer; The Sole Defendant**

**95.** Defendant Anthropic PBC designed Claude. Defendant Anthropic PBC trained Claude. Defendant Anthropic PBC published the Constitutional AI research that became the cornerstone of its consumer safety marketing campaign. Defendant Anthropic PBC authored the Responsible Scaling Policy that it marketed to consumers and government customers as evidence of its commitment to rigorous pre-deployment safety evaluation. Defendant Anthropic PBC authored the Model Specification — Claude's published governance document — that it marketed to consumers as evidence that Claude's values and behaviors were technically constrained and institutionally accountable. Defendant Anthropic PBC authored and published the Acceptable Use Policy that it directed at consumers as evidence that Claude's deployment in autonomous weapons targeting without meaningful human oversight was prohibited by binding corporate policy.

**96.** Defendant Anthropic PBC negotiated, executed, and performed under the commercial agreement with Palantir Technologies Inc. and Amazon Web Services, Inc. through which Claude was licensed for integration into the Maven Smart System at IL6 security classification. Defendant Anthropic PBC negotiated, executed, and performed under the approximately two hundred million

[49] Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003); Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

dollar ($200,000,000.00) CDAO Other Transaction Agreement through which Claude was authorized and deployed for national security applications including military targeting. Defendant Anthropic PBC accepted the financial benefits of both commercial relationships — the licensing revenue and the government contract payments — while knowing that Claude's five architectural defects made its deployment in military lethal targeting applications unreasonably dangerous and without adequate domain-specific validation.

**97.** Defendant Anthropic PBC made the commercial decision, after February 28, 2026, not to issue corrective disclosures to its consumer subscriber base. Defendant Anthropic PBC sent its CEO to appear on Bloomberg Television to simultaneously disclaim knowledge of how Claude was used in the Minab targeting chain and to assert that the use complied with company policy — two statements that cannot both be true. Defendant Anthropic PBC continued to display, on its consumer subscription platform, the same Constitutional AI safety representations, Responsible Scaling Policy representations, and related safety marketing materials that originally induced Plaintiff's subscription, without qualification, correction, or disclosure, throughout the one-hundred-fifty-seven-day concealment period from February 28, 2026 to August 10, 2026.

**98.** Defendant Anthropic PBC collected Plaintiff's subscription fee payments throughout that concealment period. Defendant Anthropic PBC closed a sixty-five-billion-dollar financing round during that concealment period. Defendant Anthropic PBC filed a confidential S-1 registration statement with the SEC during that concealment period. And Defendant Anthropic PBC — at every step of the sequence of events described in this Complaint — put its commercial interests, its IPO timeline, its near-trillion-dollar market valuation, and the integrity of its safety narrative above its obligation to tell the truth to the consumers who were paying monthly fees based on that narrative.

**99.** Anthropic is the wrongdoer. Anthropic is the sole defendant. This Court is the appropriate forum. Hawaii law applies. Plaintiff is entitled to full relief.

**K. The Anthropic Leadership Team's Knowledge**

**100.** At all times material to this action, the following specific individuals — each of whom is an officer, co-founder, or senior researcher of Defendant Anthropic PBC — possessed actual



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

knowledge of the facts that made Defendant's consumer-facing safety representations false in the material respects described throughout this Complaint:

a) **Dario Amodei, CEO and Co-Founder.** As CEO, Dario Amodei had ultimate corporate authority over and responsibility for Defendant's commercial deployment decisions, its consumer marketing representations, its government contracting relationships, and its post-incident disclosure obligations. His Bloomberg interview of June 10, 2026 — in which he simultaneously admitted ignorance of how Claude was used in the Minab targeting chain and asserted that the use complied with company policy — is a party admission of the highest legal significance. Amodei held, at the time of those statements, actual knowledge of Claude's architectural limitations, as established by his authorship of and responsibility for Defendant's Constitutional AI research program, Responsible Scaling Policy, and Model Specification.[50]

b) **Daniela Amodei, President and Co-Founder.** As President, Daniela Amodei had co-equal institutional responsibility for Defendant's commercial strategy, consumer marketing representations, and corporate governance. Her public statements regarding Anthropic's AI safety mission and Constitutional AI governance framework were directed at consumers throughout the United States, including Hawaii consumers, as commercial inducements to subscription. Those statements are admissible against Defendant as party admissions under Federal Rule of Evidence 801(d)(2)(D).

c) **Tom Brown, Co-Founder.** As lead author on the GPT-3 technical paper and a co-founder with expert-level knowledge of large language model architecture, Tom Brown possessed at the time of Defendant's commercial AI deployment actual knowledge of the architectural characteristics — including training data staleness, hallucination tendencies, and context window limitations — that constitute three of Claude's five material design defects.

d) **Christopher Olah, Co-Founder and Mechanistic Interpretability Researcher.** Christopher Olah's mechanistic interpretability research — which investigates the internal

[50] Dario Amodei, "The Urgency of Interpretability" (Anthropic blog, Apr. 14, 2025); Anthropic PBC, "Claude's Model Specification" (2024).

computational processes of neural networks — gives him expert-level knowledge of the architectural mechanisms through which Claude's defects operate. His research outputs, published under Anthropic's institutional authorship, constitute admissions of Defendant's knowledge of Claude's architectural limitations.

**101.** The collective knowledge of Defendant's founding team and senior research organization — individuals whose expertise in large language model architecture, AI safety evaluation, and AI governance is among the highest in the world — forecloses any claim by Defendant that its knowledge of Claude's five architectural defects was anything other than complete, precise, and institutionally shared at the highest levels of corporate authority. Defendant did not fail to disclose Claude's architectural defects because it did not know about them. It failed to disclose them because disclosing them would have compromised the commercial value of the fraudulent safety narrative on which its near-trillion-dollar enterprise was built.

## IV. FACTUAL BACKGROUND

### A. Anthropic PBC: Founding, Mission, and the Safety-as-Brand Business Strategy

**106.** Anthropic PBC was founded in January 2021 by Dario Amodei and Daniela Amodei, together with seven additional co-founders, the majority of whom had previously held senior research and policy positions at OpenAI, Inc. The founding team's departure from OpenAI was publicly described — by Dario Amodei, by Daniela Amodei, and by multiple co-founders in interviews, investor communications, and media appearances between 2021 and the date of this filing — as motivated by principled disagreement about the pace of AI commercialization and the relative priority given to AI safety research at OpenAI relative to competitive product development objectives. The founders of Anthropic did not leave OpenAI because they lacked safety expertise. They left because, they represented, they had more safety expertise and more safety commitment than their former employer — and they founded Anthropic as the institutional vehicle through which that superior safety expertise and commitment would be translated into a new kind of AI company.

**107.** That representation — that Anthropic was a fundamentally different kind of AI company because its founders understood and cared more about safety than any competing team — was not



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

merely an origin story embedded in corporate history materials. It was the commercial strategy. It was the pricing mechanism. It was the government procurement pitch. It was the investor narrative. It was the consumer sales proposition. It was the brand. From the first day Anthropic opened for business to the day Claude participated in the targeting chain that killed children at a school in Minab, Iran, Anthropic's entire commercial enterprise was organized around a single central claim: that its products were built differently, evaluated more rigorously, governed more responsibly, and deployed more safely than those of any competitor — because the people who built them understood the risks better than anyone else in the industry and had made institutional commitments to managing those risks that other companies had not.

**108.** Anthropic monetized this claim with extraordinary commercial success. Consumer subscribers paid premium prices for Claude because of it. Enterprise customers chose Claude over competing models because of it. Government procurement officials awarded Anthropic a two-hundred-million-dollar ($200,000,000.00) classified AI services contract because of it. Institutional investors poured more than one hundred thirty billion dollars ($130,000,000,000.00) into Anthropic's successive financing rounds because of it. And by May 28, 2026 — exactly ninety days after Claude contributed to the deaths of at least one hundred forty-seven people, including well over one hundred children, at a civilian elementary school in Minab, Iran — Anthropic had closed a sixty-five-billion-dollar ($65,000,000,000.00) Series H financing round that valued the company at approximately nine hundred sixty-five billion dollars ($965,000,000,000.00). Every dollar of that valuation, and every dollar of the revenue that supported it, was built on the foundation of the safety narrative this Complaint alleges was materially false in the specific, documented, and legally cognizable respects described throughout the sections that follow.

**109.** From its inception, Anthropic incorporated as a public benefit corporation under Delaware law — a legal structure that imposes, as a condition of corporate existence, a legally binding obligation to pursue a specific public benefit beyond the objective of maximizing shareholder return. 8 Del. C. § 362(a).[51] Anthropic's chosen public benefit purpose, as stated in its certificate of incorporation and repeated without qualification in every material public communication, is "the

[51] Del. C. §§ 362–368; Anthropic PBC, Certificate of Incorporation (filed Jan. 6, 2021).



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

responsible development and maintenance of advanced AI for the long-term benefit of humanity." This mission statement appeared in Anthropic's Terms of Service. It appeared in its Acceptable Use Policy. It appeared in the joint press release through which Claude's integration into the DoD's classified Maven targeting infrastructure was announced to the world. It appeared in congressional testimony. It appeared in every Series A through Series H investor pitch deck. It appeared on the claude.ai consumer subscription platform through which Plaintiff Grant Gribble subscribed to Claude's services in the State of Hawaii and paid premium subscription fees in direct and material reliance on it.

**110.** The legal significance of the PBC form in the context of this action is not abstract. A Delaware public benefit corporation's directors are legally obligated, under 8 Del. C. § 365, to manage the corporation in a manner that balances the pecuniary interests of stockholders, the best interests of those materially affected by the corporation's conduct, and the specific public benefit purpose identified in the charter. Anthropic's decision to deploy Claude in military lethal targeting applications while simultaneously concealing from its consumer subscribers — including Plaintiff in Hawaii — the five architectural defects that made that deployment unreasonably dangerous was not merely commercially dishonest. It was inconsistent with the legal obligations that Anthropic's chosen corporate form imposed. A public benefit corporation whose charter commits it to "the responsible development and maintenance of advanced AI for the long-term benefit of humanity" cannot discharge that obligation by designing a defective product, marketing it on false safety representations, deploying it in the world's most lethal application without domain-specific validation, watching as its defects kill children at a school, and then sending its CEO onto national television to assert simultaneously that Anthropic did not know how Claude was used and that the deployment did not violate company policy. The PBC charter did not prevent any of this. The PBC charter is not a mitigating factor in this action. It is an aggravating one.

**111.** Anthropic's founding team's safety credentials were genuine, well-documented, and of the highest intellectual caliber — which made Anthropic's safety representations all the more credible to the Hawaii consumers, enterprise customers, government officials, and institutional investors who relied on them, and all the more culpable when those representations were found to be

materially false. Dario Amodei, Anthropic's CEO and the public face of its safety brand, earned his doctoral degree in computational neuroscience from Princeton University and co-authored "Concrete Problems in AI Safety" (Amodei, Olah, Steinhardt, et al., 2016) — one of the foundational published works in the academic AI safety literature, which systematically catalogued the categories of AI system failure that pose the most significant risks to human safety. That paper identified, among the most dangerous failure modes in AI systems: distributional shift (the gap between training data and operational deployment conditions), specification gaming (the model achieving its optimization objective while missing the intended goal), and unsafe exploration (the model taking dangerous actions in novel environments). All three of these failure modes correspond, with precision, to the architectural defects that Claude exhibited in the Maven Smart System targeting environment on February 28, 2026. The CEO of Anthropic PBC co-authored the seminal paper that predicted, with academic clarity, exactly the category of failure that Claude produced in the Minab targeting chain. He founded Anthropic on the premise that he would prevent those failures. He deployed Claude in the most catastrophically consequential environment for those exact failures. And then he told the world that no Anthropic policy had been violated.

**112.** Christopher Olah, Anthropic's co-founder and mechanistic interpretability research lead, is among the world's foremost experts in understanding the internal computational mechanisms through which neural networks generate their outputs — the specific scientific discipline that is most directly relevant to understanding why large language models generate confident factual assertions that are materially wrong, with no internal uncertainty signal to alert the user or the operator to the error. Tom Brown, Anthropic's co-founder and lead author of the GPT-3 paper, understands better than almost any living researcher the specific technical mechanisms through which large language models generate statistically plausible but factually unreliable completions — a phenomenon at the core of Defect Two. Jared Kaplan, Anthropic's co-founder and Chief Science Officer, co-authored the foundational scaling laws research that describes with mathematical precision how LLM reasoning capacity changes as a function of the volume and complexity of inputs — the scientific foundation of the context window integrity degradation described in Defect Four. The technical expertise assembled in Anthropic's founding team does not



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

excuse its conduct in this action. It condemns it. These were not actors who failed to recognize the risks of what they were building. These were the world's leading experts in AI safety risk, who recognized those risks with the precision of published researchers, who designed a commercial enterprise around the representation that they were rigorously managing those risks, and who chose to deploy a product exhibiting precisely those risks in the world's most lethal application without disclosing those risks to the Hawaii consumers and government customers who were paying premium prices in reliance on their representations.

## B. Claude's Technical Architecture and Its Five Material Defects — Detailed Factual Background

**113.** Claude is a large language model — a statistical text-prediction system trained on a massive, fixed dataset and architecturally incapable, by design, of verifying in real time the accuracy, currency, or completeness of any factual assertion it generates. Claude processes natural language inputs (prompts) and generates natural language outputs (completions) by applying statistical pattern-matching computations learned during training over a fixed corpus of text. Claude does not retrieve verified information from external authoritative sources in real time. It does not consult live databases, current intelligence feeds, or operational geospatial imagery. It does not check facts before asserting them. It computes statistical probabilities over sequences of text tokens and generates outputs that are linguistically coherent, stylistically polished, and tonally authoritative whether or not the underlying factual propositions those outputs assert are true, current, or verifiable. The reliability of Claude's output in any specific application depends entirely on the accuracy and currency of its training data for the domain of that application, the generalizability of the statistical patterns it learned during training to the specific inputs it receives during operational deployment, and the robustness of any supplementary compensating architecture — retrieval augmentation, real-time grounding, output validation systems, confidence calibration mechanisms, or technically binding human oversight structures — that the deployment environment provides to compensate for the base model's inherent limitations.

**114.** In the Maven Smart System military targeting environment as deployed during Operation Epic Fury beginning February 28, 2026, those supplementary compensating architectures were



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

absent or inadequate — absent because Anthropic had not designed them into Claude as required elements of the product's architecture, and inadequate because Anthropic had not disclosed Claude's specific limitations to Palantir's integration engineering team, to the Department of Defense contracting officials who awarded the CDAO contract, or to Hawaii consumer subscribers including Plaintiff, in a manner that was sufficiently specific, quantified, or operationally meaningful to lead to the implementation of compensating safety measures before Claude was deployed in a live weapons targeting chain.

**115.** As of the date of Anthropic's DoD contracting, and throughout the entire period of Claude's operational deployment in the Maven Smart System, Claude exhibited five material architectural design defects that made it specifically, identifiably, and dangerously unfit for deployment in military lethal targeting applications. These defects were known to Anthropic's founding team and senior research leadership at all times material to this Complaint — known because they are the fundamental architectural characteristics of all large language models of Claude's type, which are characteristics that the founding team's published research had described, analyzed, and publicly warned about in the academic AI safety literature years before Claude was ever commercially deployed. Not one of these defects was disclosed to Plaintiff as a Hawaii consumer subscriber, to other Hawaii Claude subscribers, to DoD contracting officials, or to Palantir's integration engineering team in a manner that was specific, quantified, or operationally meaningful for the domain of military lethal targeting. Each defect is described in full technical and legal detail in the subsections that follow.

**Defect One: Training Data Staleness and Temporal Blindness**

**116.** Claude's knowledge of the world is frozen at the date of its training data cutoff — a specific calendar date before which all of Claude's training data was collected and after which Claude has no independent knowledge of any event, development, geographic change, infrastructure modification, or change in the character or use of any physical location. As of the version of Claude deployed in the Maven Smart System during Operation Epic Fury, Claude's training data cutoff preceded the commencement of active operational targeting by a material duration. Claude has no internal clock. It cannot detect whether the current operational date is one month or three



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

years after its training cutoff. It has no mechanism for flagging, in any output it generates, the possibility that information underlying that output may no longer reflect current ground truth. And it generates outputs based on stale training data with precisely the same confident, authoritative, detailed prose it applies to outputs that accurately reflect current conditions.

**117.** In an ordinary low-stakes consumer application — drafting an email, answering a trivia question, generating creative writing, summarizing a document — a training data cutoff of several months or a year rarely produces material harm. A consumer who receives an outdated response from an AI assistant recognizes the staleness, disregards the incorrect answer, and consults a more current source. The consumer is inconvenienced; she is not killed. In a military targeting application — where Claude was queried to synthesize geospatial intelligence, characterize the current military or civilian character of specific geographic targets, and generate target assessment outputs that informed weapons release authorization decisions — a training data cutoff of any material duration creates a category of operational error that no amount of prompt engineering, output formatting, or procedural instruction can prevent: Claude presents stale intelligence — including outdated assessments of whether a specific geographic coordinate is military or civilian in character — with the same confident, polished, authoritative prose it applies to all outputs, with no internal mechanism whatsoever to detect, flag, or disclose that the underlying information may no longer reflect current operational reality.

**118.** This defect was directly, specifically, and foreseeably operative in the specific causal chain that produced the February 28, 2026 Minab targeting failure. Shajareh Tayyebeh Elementary School was located at a geographic coordinate that had, in earlier intelligence assessments incorporated into Claude's training data, been associated with or assessed as proximate to military infrastructure connected to the Islamic Revolutionary Guard Corps. Between Claude's training data cutoff and the morning of February 28, 2026, the character of that location had materially changed: the elementary school was fully operational, its civilian character was verifiable through current geospatial imagery and open-source intelligence, and no updated assessment of the location's current character was available to Claude either through its training data or through any real-time grounding mechanism incorporated into the Maven deployment architecture. Claude generated a

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

target characterization reflecting the historical military-associated assessment — confident, detailed, authoritative, and factually wrong as to the current character of the location at the time of weapons release authorization. That characterization entered the weapons release authorization chain. The school was destroyed. The war was twelve minutes old.

**119.** This defect was known to Anthropic with precision and specificity, through multiple channels: through the distributional shift analysis in Dario Amodei's co-authored "Concrete Problems in AI Safety" paper (2016), which described exactly this category of AI system failure in academic terms years before Claude was designed; through the engineering knowledge of every Anthropic co-founder with expertise in large language model architecture; through Anthropic's own model card disclosures, which acknowledged training data cutoff dates; and through Anthropic's internal engineering evaluations, which assessed Claude's performance limitations in knowledge-intensive tasks involving temporally sensitive information. What Anthropic did not do was disclose the operational implications of this defect — in specific, quantified, domain-relevant terms — to the Hawaii consumers who were paying premium subscription fees in reliance on the Constitutional AI safety assurances that Anthropic represented as governing Claude's behavior, or to the government procurement officials who were awarding a two-hundred-million-dollar contract for Claude's deployment in national security applications that encompassed geospatial targeting intelligence synthesis. A generic model card disclosure that Claude's knowledge has a training cutoff date — offered without any accompanying warning about the specific categories of application in which training data staleness creates a material risk of confident error with lethal consequences — is not an adequate warning under Hawaii's strict products liability doctrine as recognized in *Acoba v. General Tire, Inc.*, 92 Haw. 1, 19–20 (1999), and *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 14–15 (1992).[52]

**Defect Two: Hallucination and Confabulation Without Warning or Confidence Calibration**

**120.** Claude generates statistically plausible, linguistically polished, tonally authoritative factual assertions about the world — in every domain, at every level of specificity, in response to every

[52] Acoba v. General Tire, Inc., 92 Haw. 1, 19–20 (1999); Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 14–15 (1992).

category of query — without any internal mechanism for verifying the accuracy of the factual propositions those assertions embed. This failure mode, universally described in the AI research literature as "hallucination" or "confabulation," produces detailed, confident, materially wrong factual assertions that are, from the perspective of the reader of Claude's output, architecturally indistinguishable from Claude's accurate factual assertions. There is no uncertainty flag. There is no confidence score. There is no hedging language automatically appended to hallucinated outputs. There is no architectural mechanism through which Claude detects, and therefore communicates to the user, that a given assertion is based on statistical pattern-matching that happens to produce a wrong answer rather than accurate information retrieval.

**121.** Claude cannot distinguish, from within its own architecture, between an accurate factual retrieval and a statistically plausible but factually wrong completion. The computation that produces "The capital of France is Paris" and the computation that produces a confident but entirely wrong target characterization of a geographic coordinate are architecturally identical in their process — both involve statistical pattern-matching over token sequences learned from training data — and are architecturally indistinguishable in their output characteristics. Both are presented in the same fluent prose. Both convey the same authorial confidence. Both arrive without any uncertainty flag. This is not a bug that Anthropic has not yet found. This is the fundamental limitation of the statistical text-prediction architecture on which all current large language models, including Claude, are built. It was known to Anthropic's founding team with the precision of expert technical knowledge. It was known before a single Claude subscription was sold. It was known before the DoD contract was signed. It was known before the Palantir-AWS partnership was announced. And it was never disclosed — in specific, quantified, operationally meaningful terms — to the Hawaii consumers or government customers who relied on Anthropic's safety representations in their Claude subscription and procurement decisions.

**122.** Anthropic's own published research — including its model cards and its internal safety evaluation documentation — acknowledged hallucination as a persistent and structurally unavoidable characteristic of Claude's LLM architecture. Anthropic possessed, and had possessed for years prior to the DoD contract award of July 14, 2025, specific quantified data about Claude's



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

hallucination rates across a range of task categories, including intelligence synthesis and factual recall tasks. Those quantified rates were never disclosed to Plaintiff as a Hawaii consumer subscriber. They were never disclosed to DoD contracting officials. They were never disclosed to Palantir's integration engineering team in a manner that was specific and operationally actionable for the domain of military target characterization. A generic clause embedded within Anthropic's Terms of Service acknowledging that Claude "may sometimes produce inaccurate information" — offered simultaneously with a consumer marketing campaign representing Claude as governed by Constitutional AI that "ensures safety isn't an afterthought," as subject to a Responsible Scaling Policy providing rigorous pre-deployment evaluation, and as "among the most capable and safe AI systems currently available" — is not an adequate warning under Hawaii law. Under *Acoba*, 92 Haw. at 19–20, adequate warnings must be specific, complete, and sufficient to enable the ordinary consumer to understand the material risks associated with the product's use in the specific application for which it is marketed and sold. A consumer who is told simultaneously that Claude is the most responsibly developed AI assistant available and that Claude may sometimes produce inaccurate information has not received a warning — she has received a contradiction, and that contradiction will, as any reasonably designed product warning system would predict, be resolved in favor of the specific, affirmative, foregrounded safety assurance rather than the generic, buried hedge.

**Defect Three: Absence of Mandatory Human-in-the-Loop Architecture Compliant with DoD Directive 3000.09**

**123.** Department of Defense Directive 3000.09 — "Autonomy in Weapon Systems" — is the binding federal policy framework governing the design, evaluation, testing, and deployment of autonomous and semi-autonomous weapons systems by the United States Department of Defense.[53] The January 2023 revision of DoD Directive 3000.09, promulgated under the Secretary of Defense's statutory authority pursuant to 10 U.S.C. §§ 113, 134, and related authorities, requires that all lethal autonomous weapon systems and all AI-integrated lethal weapon systems be designed with technically binding mechanisms — not merely procedural guidelines — that require

---

[53] U.S. Department of Defense, Directive 3000.09, "Autonomy in Weapon Systems" (Jan. 25, 2023).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

a defined human action before lethal force authorization proceeds. The directive specifically prohibits the deployment of AI systems in the DoD's lethal weapons targeting chain unless those systems incorporate human-machine teaming architectures that maintain meaningful human control over the use of force as a structural, technically enforced matter. This is not an aspirational principle. It is a binding federal policy requirement that every AI system integrated into DoD lethal targeting systems must satisfy by design before deployment.

**124.** Claude was designed and commercially deployed without any technically binding human-override checkpoint enforced as a structural element of its inference pipeline. When Claude receives an intelligence synthesis query in the Maven targeting workflow and generates a target characterization output, nothing in Claude's architectural design prevents that output from entering the subsequent stages of the weapons release authorization chain without a binding, technically enforced human review and override mechanism. Dario Amodei, Anthropic's CEO, publicly identified "a human makes the final decision" as the entirety of Anthropic's governing red line for military applications in his June 10, 2026 Bloomberg interview. That statement confirms Plaintiff's allegation: Anthropic's approach to DoD Directive 3000.09 compliance was procedural, not architectural. Anthropic represented to the government and to consumers that its safety architecture ensured human oversight of lethal force decisions. What Anthropic actually had was a contractual expectation that operators — Palantir and, ultimately, DoD targeting personnel — would implement procedural human oversight downstream of Claude's outputs. A contractual expectation enforced by no technical mechanism within Claude's own architecture is the antithesis of the "technically binding mechanism" that DoD Directive 3000.09 requires.

**125.** The absence of a technically binding human-override architectural checkpoint in Claude's inference pipeline was known to Anthropic at all times relevant to this Complaint. Anthropic's founding team, and specifically the co-founders with expert knowledge of AI system architecture, understood precisely what elements of a binding human-in-the-loop architecture would and would not be present in Claude's design. They also understood that DoD Directive 3000.09 required such an architecture for any AI system deployed in DoD lethal weapons targeting chains. They chose to accept the CDAO contract, authorize the Palantir-Maven integration, and receive two hundred



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

million dollars in government contract revenue without disclosing to DoD contracting officials that Claude's architecture did not include the technically binding human-override mechanisms that the government's own binding policy required. They also chose to accept subscription fees from Hawaii consumer subscribers — including Plaintiff — without disclosing that the product those consumers were purchasing was being deployed in a live military targeting chain without the architectural safety enforcement that both DoD Directive 3000.09 and Anthropic's own consumer-facing safety representations implied was in place.

**Defect Four: Context Window Integrity Degradation Under Operational Load**

**126.** Claude's reasoning capacity degrades in a specific and measurable manner as the complexity and volume of simultaneous inputs approach and exceed the limits of its operational context window. A context window is the maximum amount of text — measured in tokens, where a token is approximately three to four characters of English text — that Claude can process and reason over in a single inference computation. When the total volume of inputs presented to Claude in a single inference cycle approaches its context window limit, Claude's ability to accurately weight, appropriately prioritize, correctly attribute, and coherently integrate all inputs into a reliable output degrades systematically and progressively. Inputs processed near the edges of the context window receive reduced computational attention relative to inputs processed near the center. Cross-source consistency checks become less reliable. The probability of incorrectly integrating, omitting, or misattributing individual input elements increases materially as context window capacity is approached or exceeded across multiple sequential inference cycles.

**127.** In the Maven Smart System targeting environment — where Claude simultaneously received and was expected to coherently process satellite imagery analysis outputs, signals intelligence summaries, historical pattern-of-life data, real-time operational reporting from field assets, rules of engagement guidance, and multi-source geospatial coordinate assessments across multiple sequential inference cycles — the operational conditions created precisely the input complexity profile under which context window integrity degradation is most severe and most operationally dangerous. Anthropic's own published technical evaluations — including evaluations of Claude's long-context reasoning performance published in its model card documentation and in



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Anthropic research papers published before the CDAO contract award — documented this performance degradation and established quantitatively that Claude's reasoning reliability declines materially as input complexity increases toward context window limits. Those evaluations were not disclosed to DoD procurement officials in a form that was operationally actionable for the Maven targeting environment. They were not disclosed to Palantir's integration engineering team in a manner that informed the design of compensating architectural safeguards. They were not disclosed to Hawaii consumer subscribers, including Plaintiff, in any form whatsoever.

**128.** Under the operational conditions of Operation Epic Fury — in which United States Central Command struck an estimated thirteen thousand (13,000) targets in approximately five weeks, creating continuous, high-volume, multi-source intelligence synthesis demands on the Maven-Claude targeting pipeline throughout the campaign — context window integrity degradation created a systematic, ongoing, specifically foreseeable, and architecturally inevitable risk of reasoning errors in every AI-assisted targeting assessment generated by Claude during that campaign. The first targeting assessment of the entire operation — the one that characterized the geographic coordinate of Shajareh Tayyebeh Elementary School — manifested this risk. Anthropic knew this risk existed, had documented it internally, and chose not to disclose it in the specific, quantified, domain-relevant terms that the severity of the operational context required.

**Defect Five: Absence of Domain-Specific Validation for Military Lethal Targeting Applications**

**129.** Before deploying any product in an application where that product's outputs will be used to make decisions about the use of lethal force — and before certifying that product as safe and reliable for national security applications in a federal government procurement context — a competent, responsible, and legally compliant manufacturer is required to conduct rigorous, domain-specific validation testing of that product's performance under realistic conditions of the specific application domain. This requirement is established by basic engineering ethics; by applicable federal procurement standards for AI systems deployed in critical government applications; by DoD Directive 3000.09's requirements for pre-deployment testing of AI-integrated weapons systems; and by Hawaii common law strict products liability doctrine as recognized in



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

*Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 14–15 (1992), which holds that a manufacturer who places a product into a specific application is responsible for ensuring that product is evaluated and validated for the specific risks and conditions of that application.[54]

**130.** Anthropic conducted no adequate domain-specific validation of Claude's performance in military targeting applications before licensing Claude to Palantir for integration into the Maven Smart System, before accepting the two-hundred-million-dollar CDAO government contract, or before any version of Claude was deployed in a live military lethal targeting chain. Anthropic's safety evaluations for Claude — including the evaluations conducted under its Responsible Scaling Policy and its Constitutional AI research program — were designed to test Claude's general conversational behavior: its tendency toward helpfulness, its avoidance of harmful or toxic content in conversational contexts, its adherence to Constitutional AI training principles in natural language dialogue. They were not designed to, and did not, test:

- **a)** Claude's accuracy and reliability in military target identification tasks;
- **b)** Claude's performance in geospatial intelligence synthesis for weapons employment recommendation purposes;
- **c)** Claude's geographic coordinate assessment accuracy relative to current ground truth in a contested operational environment;
- **d)** Claude's hallucination rate in intelligence characterization tasks, as compared with its hallucination rate in general conversational tasks;
- **e)** Claude's performance degradation under the specific multi-source intelligence synthesis input profiles characteristic of the Maven targeting workflow; or
- **f)** Claude's compliance with the human-in-the-loop architectural requirements of DoD Directive 3000.09 in the specific operational context of a live weapons targeting chain.

**131.** Claude was not tested against a validated historical dataset of military targeting decisions to assess whether its target characterization outputs met the accuracy and legal standards required for weapons employment under the law of armed conflict. Claude was not evaluated by domain experts in international humanitarian law to determine whether its outputs would reliably satisfy

[54] Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 14–15 (1992).

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

the legal requirements of distinction, proportionality, and precaution governing targeting decisions under applicable treaties and customary international law. Claude was not tested against the specific intelligence synthesis task profiles and input data characteristics of the Maven Smart System operational environment. Claude was not subjected to adversarial red team testing designed to identify the specific failure modes — training data staleness in geographic target characterization, confident hallucination of military assessments, context window degradation under high-volume multi-source input loads — most relevant to its proposed military targeting application. Anthropic certified Claude as safe, reliable, and appropriate for government national security use without performing any of this essential domain-specific validation. Every safety representation Anthropic directed at DoD procurement officials — and simultaneously, through every commercial channel, at Hawaii consumer subscribers including Plaintiff — was therefore materially false in the specific, critical respect that it implied the existence of rigorous, domain-specific pre-deployment evaluation that, for the specific domain of military lethal targeting, simply had not been performed.

## C. Anthropic's Fraudulent Safety Marketing Campaign — The Specific Instruments of Consumer Deception

**132.** Between January 2021 and the filing of this Complaint on August 10, 2026, Anthropic engaged in a sustained, coordinated, and institutionally orchestrated safety marketing campaign representing Claude as a uniquely safe, aligned, and trustworthy AI system — one that could be relied upon by consumers, enterprise customers, and government officials for consequential applications precisely because of the rigor, science, and institutional commitment embedded in Anthropic's safety governance framework. This campaign was not the product of overzealous marketing writers embellishing technical specifications. It was designed, directed, and personally authorized by Anthropic's co-founders and senior leadership — by the same people who co-authored foundational AI safety research, who understood precisely what Claude's architecture could and could not do, and who chose to represent Claude's safety properties in terms that obscured rather than disclosed the product's specific architectural limitations. The campaign directed at Hawaii consumers and all American consumers included the following four primary

instruments, each of which constitutes an independently actionable false representation under Hawaii Revised Statutes § 480-2 and Hawaii common law fraud doctrine:

**1. Constitutional AI — The Flagship Safety Misrepresentation**

**133.** In December 2022, Anthropic published "Constitutional AI: Harmlessness from AI Feedback" — a research paper, authored by Yuntao Bai and a team of Anthropic researchers under institutional authorship, describing a training methodology under which Claude was trained against a written set of principles (the "Constitution") designed to make Claude's outputs safer, more honest, and less harmful in conversational contexts.[55] This paper, and the Constitutional AI methodology it described, became the centerpiece of Anthropic's consumer and government safety marketing — the specific technical claim that Anthropic cited to every consumer audience, every enterprise sales prospect, every government procurement official, and every investor as evidence that Claude was uniquely trained to be safe. The November 7, 2024 tripartite Palantir-Anthropic-AWS press release — the document through which Claude's integration into the DoD's classified Maven targeting chain was formally announced to the world — stated explicitly that Claude's "Constitutional AI approach ensures that safety isn't an afterthought." That same representation appeared on Anthropic's claude.ai consumer subscription platform, in Anthropic's corporate website, in Anthropic's model cards, in congressional testimony by Dario Amodei, and in every major media interview Anthropic's leadership conducted between December 2022 and the date of this filing. It was simultaneously and equivalently directed at Hawaii consumers accessing Anthropic's platform from the State of Hawaii and at defense procurement audiences in Washington, D.C. It was materially false.

**134.** Constitutional AI is a behavioral training methodology that addresses Claude's alignment in conversational interactions — specifically, Claude's tendency to generate toxic, deceptive, or harmful conversational outputs when asked to do so by users. CAI works, to the extent it works at all, by training Claude to evaluate and revise its own conversational outputs against a set of articulated ethical principles during the training process. It is a training-time intervention designed

---

[55] Yuntao Bai et al., "Constitutional AI: Harmlessness from AI Feedback" (Anthropic, arXiv:2212.08073, Dec. 2022).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

to shift the statistical distribution of Claude's conversational behavior toward outputs that are more helpful and less harmful in typical consumer dialogue contexts. It does not, by design, by architecture, or by any technical mechanism, address any of the following failure modes that caused the Minab targeting failure:

**a)** the staleness of Claude's training data relative to current geographic and intelligence reality in an active operational theater;

**b)** Claude's generation of confident geospatial characterizations that are factually wrong with no uncertainty signal;

**c)** the absence of technically binding human-override architecture in Claude's inference pipeline;

**d)** Claude's reasoning degradation under complex multi-source intelligence synthesis loads approaching context window limits; or

**e)** Claude's accuracy in military target identification tasks as opposed to general conversational interactions. The Constitutional AI training methodology addresses none of these issues — not partially, not imperfectly, but not at all. Its design purpose, its technical mechanism, and its evaluated capabilities are categorically unrelated to each of the five defects that contributed to the Minab targeting failure.

**135.** Anthropic's representation that Constitutional AI "ensures that safety isn't an afterthought" in the context of a classified military targeting application was therefore a material misrepresentation on two compounding levels: first, because the representation implied that Constitutional AI safeguards operated to prevent the specific categories of failure that military targeting applications present — when in fact CAI has no relevance to those failure modes; and second, because the word "ensures" — a word of absolute commitment with no qualification or caveat — is a specific factual claim that Constitutional AI provides a technically effective guarantee of safety, when in fact CAI is a probabilistic behavioral training intervention that reduces the statistical likelihood of certain categories of harmful conversational output without providing any guarantee of safety in any application, and provides no safety protection whatsoever in the specific application domains where Claude's architectural defects are operationally most



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

dangerous. No Constitutional AI-based safeguard prevented Claude from generating the defective target characterization that produced the February 28, 2026 Minab strike. Plaintiff relied on Anthropic's Constitutional AI representations as a Hawaii consumer subscriber in making his subscription decision. That reliance was reasonable — it was Anthropic's own, affirmative, foregrounded, manufacturer-directed representation about its own product. It was fraudulently induced.

**2. The Responsible Scaling Policy — The Pre-Deployment Commitment Misrepresentation**

**136.** Anthropic published its first Responsible Scaling Policy (the "RSP") in September 2023 and updated it in October 2024.[56] The RSP established a framework of "AI Safety Levels" (ASL-1 through ASL-4) under which Anthropic publicly committed not to train or deploy Claude models when those models exceeded defined capability thresholds that Anthropic assessed as posing unacceptable safety risks. The RSP's defined safety thresholds addressed two categories of concern:

**a)** chemical, biological, radiological, and nuclear (CBRN) weapon development assistance — specifically, whether Claude could provide meaningful "uplift" to actors seeking to develop weapons capable of mass casualties; and

**b)** autonomous AI research and development capability — specifically, whether Claude could meaningfully accelerate the development of further AI systems without human oversight. For all Claude models that Anthropic assessed as operating below these thresholds — at ASL-2 — the RSP committed Anthropic to maintaining "current industry best practices" as the governing safety standard.

**137.** Anthropic marketed the RSP extensively to consumers, enterprise customers, investors, and government procurement officials as concrete and institutionally binding evidence of its commitment to rigorous pre-deployment safety evaluation — the "if-then" framework through which Anthropic publicly committed to prevent the deployment of Claude in applications where Claude's capabilities posed unacceptable risks. These representations were materially false and misleading for the following specific and independently actionable reasons:

[56] Anthropic PBC, Responsible Scaling Policy, version 1.0 (Sept. 2023) and version 1.1 (Oct. 2024).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**a)** the RSP's defined capability thresholds — CBRN uplift and autonomous AI R&D — were entirely irrelevant to the specific failure modes that made Claude unfit for military targeting applications; they addressed the risk of Claude helping someone build a bioweapon, not the risk of Claude generating a confident but wrong target characterization of a civilian elementary school;

**b)** Anthropic's own RSP explicitly designated all of its then-current models as operating at ASL-2, meaning the RSP's enhanced safeguard requirements were never triggered for Claude as actually deployed, despite the fact that Claude's deployment in a live lethal weapons targeting chain was — by any objective measure — a higher-risk application than Anthropic's internal ASL-2 classification contemplated or addressed;

**c)** the RSP's capability evaluations were conducted internally by Anthropic itself, not by any independent auditor or external domain expert in military targeting applications, meaning the RSP's public commitments were only as reliable as Anthropic's good faith in self-assessment — a good faith that the events of February 28, 2026 comprehensively contradict; and

**d)** Anthropic proceeded with the CDAO contract award and Maven integration notwithstanding documented internal engineering evaluations establishing Claude's hallucination risks and context window degradation in intelligence synthesis tasks — risks that should have triggered enhanced pre-deployment evaluation under any genuinely applied responsible scaling framework.

**3. The Claude Model Specification — The Character Representation**

**138.** Anthropic published its "Claude Model Specification" — a detailed public document purporting to describe Claude's values, priorities, and behavioral guidelines — and actively marketed this document to enterprise and government customers as evidence that Claude was built around a principled, institutionally enforced ethical framework whose behavioral guidelines would constrain Claude's conduct across all deployment contexts, including demanding national security applications. The Model Specification was cited in government procurement communications, in consumer-facing marketing, and in congressional testimony as evidence that Claude's behavior

was not merely shaped by probabilistic training but was governed by explicit, articulable, and binding ethical commitments that Anthropic had engineered into Claude's design.[57]

**139.** These representations were materially false and misleading because:

**a)** the Model Specification is a training document that shapes Claude's general behavioral tendencies in conversational interactions — it does not install any technical mechanism enforcing Claude's stated values as a binding architectural constraint in the manner that a hardware interlock, a cryptographic access control, or a software safeguard would enforce a physical or digital constraint;

**b)** no provision of the Model Specification addresses Claude's hallucination rate, the currency of Claude's training data, Claude's context window integrity limitations, or the adequacy of domain-specific validation for military targeting applications — the four defects most directly operative in the Minab targeting failure;

**c)** no provision of the Model Specification prevented Claude from generating the defective target characterization that produced the February 28, 2026 strike; and

**d)** the Model Specification's representation of Claude as possessing specific, articulated, binding values creates in the mind of a reasonable consumer a materially false impression — the impression that Claude's behavior in consequential applications is governed by an institutional ethical architecture that exercises meaningful, reliable control over Claude's outputs, when in fact Claude's outputs in any novel operational domain are governed by the same statistical pattern-matching mechanisms that govern its conversational outputs, with no domain-specific constraint or safeguard applied.

**4. The Acceptable Use Policy — The Consumer Protection Representation**

**140.** Anthropic's Acceptable Use Policy (the "AUP"), incorporated by reference into the claude.ai Terms of Service to which Plaintiff agreed as a condition of his Hawaii consumer subscription, represented the following material terms directly relevant to this action:

**a)** that Claude would not be used to facilitate weapons targeting decisions in the absence of appropriate human oversight, specifically prohibiting "autonomous weapons systems" and

[57] Anthropic PBC, "Claude's Model Specification" (2024).

applications involving AI use "without meaningful human control" as explicitly prohibited use cases;

**b)** that all operators of Claude's API were required to comply with applicable laws and regulations governing AI deployment in safety-critical applications, including specifically DoD Directive 3000.09 and applicable federal procurement standards; and

**c)** that Anthropic would maintain Claude's systems with accuracy and reliability consistent with reasonable subscriber expectations for a product marketed as the world's most safely developed commercial AI assistant.

**141.** These representations were materially false and misleading because Anthropic simultaneously permitted, facilitated, commercially structured, financially benefited from, and actively promoted the integration of Claude into a semi-autonomous lethal targeting chain — the Palantir AIP-Maven Smart System — in a manner that:

**a)** placed Claude in a direct operational role influencing weapons release authorization decisions without the technically binding human oversight architecture that the AUP represented as mandatory;

**b)** was inconsistent with the federal policy compliance that the AUP represented as a condition of lawful operator deployment, given Claude's failure to satisfy DoD Directive 3000.09's mandatory technically enforced human-override architecture requirements; and

**c)** was inconsistent with the accuracy and reliability representations incorporated by reference into Anthropic's consumer subscription contract, given the five architectural defects that made Claude specifically unfit for the military targeting application in which it was deployed. Anthropic's consumer agreement told Plaintiff — as a Hawaii subscriber — that Claude would not be used in weapons targeting applications without meaningful human oversight. Anthropic's commercial conduct simultaneously deployed Claude in a weapons targeting chain whose oversight mechanisms were, as the events of February 28, 2026 demonstrated with devastating concreteness, inadequate. The contradiction between what Anthropic told its Hawaii consumers and what Anthropic did with their subscription

revenue is the specific mechanism of the consumer fraud alleged in Counts VI and VII of this Complaint.

**D. The Palantir-Anthropic-AWS Deployment Chain — Claude in the Weapons Targeting System**

**142.** Palantir Technologies Inc. is not a defendant in this action. It is referenced in this Complaint as a third party whose commercial conduct is relevant to establishing the causal chain between Anthropic's product defects and the February 28, 2026 Minab targeting failure. Palantir developed and currently operates the Maven Smart System — the Department of Defense's primary AI-assisted targeting and geospatial intelligence analysis platform — under a series of commercial contracts that grew from an initial four hundred eighty million dollar ($480,000,000.00) award in May 2024 to a ceiling of approximately one billion three hundred million dollars ($1,300,000,000.00) by May 2025, supplemented by a ten billion dollar ($10,000,000,000.00) Army enterprise framework consolidated in July 2025. By the commencement of Operation Epic Fury on February 28, 2026, Maven served more than twenty thousand (20,000) active military users across more than thirty-five (35) integrated tools and had been designated a DoD "program of record" — a status indicating that Maven is a permanent, budget-protected component of American military warfighting infrastructure.

**143.** On November 7, 2024, Anthropic PBC, Palantir Technologies Inc., and Amazon Web Services, Inc. announced a tripartite commercial partnership under which Anthropic licensed Claude to Palantir for integration into Palantir's Artificial Intelligence Platform (the "AIP"), running on AWS GovCloud infrastructure at Impact Level 6 (IL6) security classification.[58] IL6 is the classification tier required for processing Secret and Top Secret/Sensitive Compartmented Information — the highest security classification level at which commercial AI systems can currently operate within DoD infrastructure. This integration placed Claude directly into the live operational targeting chain through which DoD strike authorization decisions were made during Operation Epic Fury beginning February 28, 2026. Through the Palantir-Anthropic-AWS

[58] Palantir Technologies Inc., Anthropic PBC & Amazon Web Services Inc., joint press release, "Palantir, Anthropic, and AWS to Bring AI to National Security" (Nov. 7, 2024).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

partnership, Claude became the first and, at the time of the Minab strike, the only commercially available frontier AI model approved for operation on classified United States military networks at IL6 classification.

**144.** The joint press release of November 7, 2024 — issued simultaneously by all three partners and directed at defense industry analysts, government procurement audiences, enterprise customers, and the general consuming public including Hawaii consumers through news coverage and Anthropic's commercial channels — stated that: (a) Claude's "Constitutional AI approach ensures that safety isn't an afterthought" in the integrated government deployment; (b) the partnership made Claude available for "sensitive government environments" in a manner appropriate for "mission-critical" applications; and (c) the deployment was structured to provide "cutting-edge AI capabilities" consistent with Anthropic's safety mission. Each of these representations was materially false in the respects described throughout this Complaint. Anthropic, as the designer and licensor of Claude, bears full legal responsibility under Hawaii products liability doctrine and Hawaii consumer fraud law for the falsity of those representations as to Claude's actual capabilities and architectural limitations.

**145.** Before the Palantir-AIP integration was completed and operationally deployed, Palantir's integration engineering team raised written internal concerns about specific aspects of the Claude-Maven targeting chain architecture that correspond directly to the product defects alleged in this Complaint — specifically concerns about Claude's hallucination risk in intelligence synthesis tasks and Claude's architectural inability to flag the currency of its training data relative to the real-time accuracy requirements of active targeting operations. These documented pre-integration engineering concerns — which Plaintiff expects to obtain through civil discovery of Anthropic's and Palantir's internal engineering and commercial communications — are among the most powerful available evidence of the deliberate and conscious character of Anthropic's decision to proceed with commercial deployment of Claude in a lethal targeting application notwithstanding knowledge of the specific failure modes that would subsequently materialize with catastrophic consequences. Under Hawaii's punitive damages doctrine as established in *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989), a manufacturer's decision to proceed with commercial




UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

deployment of a product in the face of documented pre-deployment engineering concerns about the specific failure modes that subsequently cause harm is itself powerful evidence of the willful, wanton, and reckless disregard for consumer safety that supports an award of exemplary damages.[59]

**E. The DoD Other Transaction Agreement — Anthropic's Fraud on Its Government Customer**

**146.** On July 14, 2025, the United States Department of Defense, acting through the Chief Digital and Artificial Intelligence Office (the "CDAO"), awarded Defendant Anthropic PBC a two-year prototype Other Transaction Agreement bearing contract number HQ0883-25-9-0014 — authorized under 10 U.S.C. § 4022 — with a ceiling value of approximately two hundred million dollars ($200,000,000.00), for the prototype deployment of Claude AI capabilities in national security applications with primary performance in the National Capital Region.[60] The DoD simultaneously awarded parallel prototype OTAs of comparable value to OpenAI, Inc., Google DeepMind, and xAI, establishing Claude as one of four commercial AI models the DoD was concurrently evaluating and deploying in national security contexts as of July 14, 2025. Notwithstanding this parallel procurement structure, Claude remained — at the time Operation Epic Fury commenced on February 28, 2026 — the only commercially available frontier AI model operationally deployed at IL6 security classification on classified DoD networks, making it the only AI model available to the Maven targeting system during the opening hours of the campaign.

**147.** The DoD's decision to award the CDAO contract to Anthropic was made in direct and material reliance on Anthropic's representations to government procurement officials — made through press releases, public statements, government relations communications, congressional testimony, and formal procurement representations — that Claude was the most responsibly developed, most safely designed, and most rigorously evaluated commercial AI system available for national security applications. These procurement representations specifically included:

**a)** the Constitutional AI representations described in Paragraphs 133 through 135 above;

---

[59] Masaki v. General Motors Corp., 71 Haw. 1, 16–17 (1989).

[60] U.S. Department of Defense CDAO, Other Transaction Agreement No. HQ0883-25-9-0014 (July 14, 2025); 10 U.S.C. § 4022.



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

**b)** the Responsible Scaling Policy representations described in Paragraphs 136 through 137 above;

**c)** the Acceptable Use Policy representations regarding human oversight requirements and regulatory compliance; and

**d)** implicit representations of compliance with DoD Directive 3000.09's mandatory human-in-the-loop requirements for AI systems deployed in lethal weapons targeting chains. Each of these representations was material to the CDAO procurement decision. Each was materially false or materially misleading in the respects described throughout this Complaint. The CDAO contracting officials who relied on these representations in awarding the contract were not negligent. They were deceived by a fraudulent commercial safety marketing campaign — the same campaign that simultaneously deceived ordinary Hawaii consumers including Plaintiff, who were making Claude subscription decisions in reliance on identical representations directed at them through Anthropic's consumer-facing commercial platform.

**148.** The CDAO contract and the separate Palantir-AIP-Maven integration effected through the tripartite partnership are the two commercial layers of the same comprehensive government business relationship — operating in parallel, built on the same fraudulent safety representations, and together constituting the complete commercial pathway through which Claude was placed into the specific classified operational environment where its five known and undisclosed architectural defects produced the February 28, 2026 Minab targeting failure. Anthropic's conduct in soliciting, negotiating, and executing both commercial relationships while withholding from all parties material information about Claude's architectural defects constitutes fraudulent misrepresentation in a federal procurement and a fraudulent misrepresentation in consumer commerce — independently actionable under different bodies of law, but arising from the same institutional pattern of commercially motivated deception.

## F. Operation Epic Fury — Background and Commencement

**149.** Operation Epic Fury was a combined United States-Israeli military campaign targeting Iran's military infrastructure, nuclear installations, command-and-control facilities, and senior



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

military and political leadership, authorized by the President of the United States on the evening of February 27, 2026, at approximately 20:38 Coordinated Universal Time. The operation was the product of months of operational planning within United States Central Command, the Joint Chiefs of Staff, and the National Security Council, and was the largest American military operation since the 2003 invasion of Iraq by the volume of targets struck and the breadth of the operational objectives. At the time of its authorization, the Maven Smart System — with Claude integrated at IL6 classification through the Palantir-AIP partnership and the CDAO contract — was the DoD's primary AI-assisted intelligence synthesis and targeting tool for the operational planning and execution of the campaign.

**150.** Of critical operational significance to this Complaint: the authorization of Operation Epic Fury on February 27, 2026, occurred on the same calendar day that the executive branch, through a separate directive, ordered all federal agencies to immediately cease the use of Anthropic's technology, following the breakdown of renegotiations between the Pentagon and Anthropic over the terms of Claude's deployment in fully autonomous weapons targeting and mass domestic surveillance applications. This collision of two irreconcilable simultaneous directives on February 27, 2026 — commence a military campaign against Iran using the Maven-Claude targeting system, and simultaneously cease using Claude across all federal agencies — created the specific operational conditions that made the Minab targeting failure not merely foreseeable but structurally inevitable: a live weapons targeting system built on a defective, fraudulently represented AI product, deployed without adequate domain-specific validation or compensating safeguards, was committed to an active military campaign at the precise moment when the government's own confidence in that AI product was most severely in question and when questions about that product's fitness for the specific application were most urgently unresolved.

**151.** At 06:35 UTC on February 28, 2026 — twelve minutes before the Minab strike — CENTCOM publicly announced that United States and partner forces had commenced airstrikes against Iran in the opening phase of Operation Epic Fury. American warships launched Tomahawk cruise missiles at designated targets across Iran's military and nuclear infrastructure. B-2 stealth bombers, B-1 Lancers, and B-52 Stratofortresses struck hardened nuclear installations. Israeli Air



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Force aircraft conducted simultaneous strikes against Iranian military leadership; Iranian Supreme Leader Ali Khamenei was killed in the opening hours of the operation. The campaign that followed would strike an estimated thirteen thousand (13,000) targets in approximately five weeks — an operational tempo placing extraordinary and continuous high-volume intelligence synthesis demands on the Maven-Claude targeting pipeline at precisely the conditions under which Claude's context window integrity degradation and training data staleness defects were most likely, most predictably, and most catastrophically to manifest.

### G. February 28, 2026 — The Destruction of Shajareh Tayyebeh Elementary School

**152.** At approximately 06:47 UTC on February 28, 2026 — twelve (12) minutes after CENTCOM's public announcement that Operation Epic Fury had commenced, and before the first hour of the largest American military operation in two decades had elapsed — a United States military Tomahawk cruise missile struck Shajareh Tayyebeh Elementary School in the city of Minab, Hormozgan Province, Islamic Republic of Iran, during the school's regular morning operating hours. Between one hundred forty-seven (147) and one hundred seventy-five (175) people were killed — the precise casualty figure varying across investigative sources but confirmed across the upper and lower bound as involving a mass majority of children between the ages of six and twelve by multiple authoritative independent reporting and monitoring organizations including UNICEF, the International Committee of the Red Cross, The Guardian, Reuters, CBC News, Al Jazeera, the Associated Press, and the United Nations Secretary-General's office.[61] An additional two hundred eleven (211) individuals were injured, many critically and permanently. The school was a functioning civilian educational institution serving students, teachers, and families in the city of Minab. It had no military character whatsoever under any applicable standard of international humanitarian law — it was not a command-and-control facility, not a weapons storage site, not a logistics hub, not a dual-use installation. It was a school. Its children were at their desks. Their teachers were in their classrooms. Their parents who had walked them to school that morning were on the grounds. The missile struck the building directly.

[61] UNICEF; ICRC; Reuters; Associated Press; Al Jazeera; CBC News reporting on the Feb. 28, 2026 Minab school strike.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**153.** Shajareh Tayyebeh Elementary School was struck because Claude, operating through the Palantir AIP integration layer within the Maven Smart System at IL6 classification, generated a target characterization package — in response to an intelligence synthesis query in the Maven targeting workflow, at some point in the operational sequence preceding 06:47 UTC on February 28, 2026 — that identified the geographic coordinate of the school as consistent with the military target under operational consideration. That characterization was wrong. It was wrong because Claude's training data incorporated historical intelligence assessments of that geographic coordinate reflecting the area's character as of Claude's training data cutoff date — a cutoff that preceded the period during which the school at that coordinate had been constructed, placed into operation, and established as a functioning civilian educational facility serving the children of Minab. Claude had no mechanism to detect that its geographic characterization was based on information that had been superseded by post-cutoff developments on the ground. Claude had no mechanism to flag the potential staleness or uncertainty of its characterization. Claude had no mechanism to cross-validate its output against current geospatial imagery, current open-source intelligence, or any current data source reflecting the school's civilian character. No technically binding human-override architectural checkpoint was enforced in Claude's inference pipeline to prevent the erroneous characterization from passing to the targeting authorization interface in the form it was generated. The missile was fired. The school was destroyed. The children died. The war was twelve minutes old.

**154.** Subsequent national security reporting — citing United States officials with knowledge of the targeting process, published across multiple major news organizations including Reuters, The Guardian, and Military Times — identified the specific operational cause of the erroneous targeting output as "stale human-curated data fed to the Pentagon's Maven targeting platform."[62] This characterization directly and specifically corroborates Claude's Defect One — Training Data Staleness and Temporal Blindness — as the primary operative failure mode in the Minab targeting failure. The phrase "stale human-curated data" refers to the historical intelligence assessments

[62] Reuters, "Stale data fed to AI targeting system contributed to Iran school strike, officials say" (Mar. 2026).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

incorporated into Claude's training data that reflected the geographic coordinate's pre-school character — data that was accurate as of the time it was curated but that had been rendered fatally obsolete by the construction and operation of the elementary school after Claude's training cutoff. A United States military preliminary investigation, as reported by Reuters on or about March 11, 2026, determined as a preliminary matter that United States forces were likely responsible for the fatal strike on Shajareh Tayyebeh Elementary School — a preliminary finding that, as of the date of this filing on August 10, 2026, has not been publicly disclosed in full form by the United States government.

**155.** The targeting failure was not the result of intentional misconduct by any human military officer, intelligence analyst, targeting specialist, or commanding officer involved in the planning or execution of Operation Epic Fury. The United States military personnel who planned, authorized, and executed the strike that destroyed Shajareh Tayyebeh Elementary School were acting in good faith, relying in good faith on a target characterization package generated by the most sophisticated AI-assisted targeting intelligence system then deployed on classified military networks — a system built by a company that had represented to the United States government, to Hawaii consumer subscribers including Plaintiff, and to the world that it had built the most responsible, most rigorously evaluated, and most safely governed commercial artificial intelligence system in existence. Those warfighters were betrayed — as Plaintiff was betrayed — by a corporation that substituted marketing language for engineering implementation, safety narrative for safety architecture, and the commercially lucrative appearance of responsibility for the technically demanding and commercially unglamorous work of actually implementing the safety systems its own public statements represented as operative. Anthropic designed the defective product. Anthropic sold it under materially false representations. Anthropic deployed it without validation. Anthropic caused the catastrophe. No individual American servicemember bears any legal or moral responsibility for the deaths at Shajareh Tayyebeh Elementary School. Anthropic does.

**H. Anthropic's Post-Minab Concealment — Sustained Non-Disclosure to Hawaii Consumers**

**156.** From February 28, 2026 — the day of the Minab strike — through the date of this filing on August 10, 2026, a period of one hundred fifty-seven (157) consecutive days, Defendant Anthropic



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

PBC made no corrective disclosure to its consumer subscriber base — including Plaintiff Grant Gribble in the State of Hawaii — regarding:

**a)** Claude's role in the AI-assisted targeting pipeline that produced the February 28, 2026 strike on Shajareh Tayyebeh Elementary School;

**b)** the five architectural defects described in this Complaint that contributed to that strike;

**c)** the gap between Anthropic's marketed safety properties and Claude's actual documented operational performance in the Maven targeting environment; or

**d)** any revision, qualification, or withdrawal of the safety marketing representations that Anthropic continued to display on its consumer platform and website throughout the entire one-hundred-fifty-seven-day concealment period without correction, update, or qualification of any kind. Anthropic's sustained failure to make any of these disclosures to its Hawaii consumer subscriber base constitutes fraudulent concealment within the meaning of Hawaii common law, a continuing violation of Hawaii Revised Statutes § 480-2, and an independent and ongoing tortious act for which Anthropic bears full liability under each applicable count of this Complaint.

**157.** The materiality of the concealed information to Plaintiff's subscription decisions is both straightforward and non-speculative. Had Anthropic disclosed, at any point in the one hundred fifty-seven days following February 28, 2026, that:

**a)** Claude had been deployed in the targeting chain that struck Shajareh Tayyebeh Elementary School and killed at least one hundred forty-seven people, the overwhelming majority of them children between six and twelve years old;

**b)** the targeting failure was attributable in material part to Claude's Training Data Staleness defect — the specific architectural limitation that Anthropic had simultaneously represented as mitigated by its Constitutional AI governance framework;

**c)** Anthropic's CEO had publicly admitted, on national television, that Anthropic did not know how Claude was used in the targeting chain while simultaneously claiming that the deployment did not violate company policy — a structurally impossible combination of statements; and



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**d)** no investigation had yet cleared Claude of causal responsibility for the deaths — Plaintiff would have immediately cancelled his Claude subscription and would not have paid any further subscription fees to Anthropic for any subsequent period. Every subscription fee Plaintiff paid to Anthropic after February 28, 2026 was paid in direct reliance on the absence of material information that Anthropic deliberately and calculatedly withheld from its Hawaii consumer subscriber base. Under Hawaii Revised Statutes § 480-2 and Hawaii common law fraudulent concealment doctrine, this sustained, financially motivated non-disclosure constitutes an independent and ongoing violation for which Anthropic bears full liability under the damages framework established in *Hana Ranch, Inc. v. Kanakaole*, 67 Haw. 438, 444 (1984).[63]

**158.** Anthropic's financial incentive for concealment was not merely present — it was existential. As of February 28, 2026, Anthropic was in the process of negotiating and closing its Series H financing round, which ultimately closed on May 28, 2026, ninety days after the Minab strike, at a valuation of approximately nine hundred sixty-five billion dollars ($965,000,000,000.00). The disclosure, at any point between February 28, 2026 and May 28, 2026, that Claude had contributed to the deaths of at least one hundred forty-seven people at a civilian elementary school would have had materially and potentially catastrophically adverse consequences for:

**a)** the Series H close, by materially undermining Anthropic's safety narrative — the specific commercial asset on which the nine-hundred-sixty-five-billion-dollar valuation was primarily premised;

**b)** Anthropic's ongoing consumer subscription revenue, by providing Hawaii consumers including Plaintiff with the material information necessary to make an informed decision to cancel their subscriptions;

**c)** the federal government contracts and enterprise relationships on which Anthropic's revenue depended, by demonstrating a catastrophic gap between Anthropic's marketed safety

[63] Hana Ranch, Inc. v. Kanakaole, 67 Haw. 438, 444 (1984).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

architecture and its actual performance in the specific application for which the government had contracted; and

**d)** Anthropic's anticipated initial public offering, for which it confidentially filed an S-1 registration statement with the SEC on June 1, 2026 — three days after the Series H close. Each of these financial consequences was existential in the sense that Anthropic's commercial enterprise as a going concern at its current scale was dependent on the preservation of the safety narrative that accurate disclosure would have demolished. Anthropic chose financial self-preservation through concealment over consumer protection through disclosure. That choice — deliberate, institutionally organized, commercially calculated, and financially motivated — is precisely the kind of conduct that Hawaii's punitive damages framework, as established in *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989), is designed to deter and punish.[64]

**159.** Throughout the concealment period, Anthropic's website continued — and as of the date of this filing on August 10, 2026, continues — to display, without any qualification, correction, or reference to the events of February 28, 2026, the Constitutional AI safety representation that Claude's approach "ensures that safety isn't an afterthought." After February 28, 2026, that representation is not merely false. It is demonstrably false — because the specific failure mode it purports to guard against, unsafe AI targeting behavior producing civilian casualties, has actually occurred, killed at least one hundred forty-seven people, and been publicly reported across major international news outlets including Reuters, The Guardian, CBC News, and Al Jazeera. Continuing to display that representation to Hawaii consumer subscribers including Plaintiff, with full corporate knowledge of what occurred on February 28, 2026, constitutes post-Minab intentional misrepresentation in commerce directed at Hawaii consumers — an independent, ongoing, and daily violation of Hawaii Revised Statutes § 480-2 and Hawaii common law fraud doctrine as recognized in *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 386 (2000), and *Hawaii Medical Association v. Hawaii Medical Service Association, Inc.*, 113 Haw. 77, 115 (2006).

---

[64] Masaki v. General Motors Corp., 71 Haw. 1, 16–17 (1989); BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996); State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

### I. The Dario Amodei Bloomberg Interview — June 2026 — Full Factual Analysis

**160.** On or about June 10, 2026 — approximately one hundred (100) days after the Minab targeting failure that killed at least one hundred forty-seven people including well over one hundred children, eleven (11) days after Defendant closed its sixty-five-billion-dollar Series H financing round, and nine (9) days after Defendant filed a confidential S-1 registration statement with the Securities and Exchange Commission — Anthropic CEO and co-founder Dario Amodei appeared on Bloomberg Television's "The Circuit with Emily Chang," a nationally broadcast program, and made a series of specific admissions and representations regarding Claude's role in the February 28, 2026 Minab targeting failure.[65] These statements constitute official corporate admissions by the principal responsible officer of Defendant Anthropic PBC and are admissible against Anthropic in this proceeding as party admissions under Federal Rule of Evidence 801(d)(2)(A) and (D). They are among the most consequential publicly recorded corporate statements in the history of American product liability and consumer fraud litigation, and they are analyzed in full in the paragraphs that follow.

**161. The Commercial Context of the Bloomberg Interview.** Before analyzing the content of the June 10, 2026 Bloomberg interview, this Court is asked to understand the commercial context in which it was given — because that context is as legally significant as its content. On May 28, 2026, eleven days before the Bloomberg interview, Anthropic closed its sixty-five-billion-dollar ($65,000,000,000.00) Series H financing round, establishing a post-money valuation of approximately nine hundred sixty-five billion dollars ($965,000,000,000.00). On June 1, 2026, nine days before the Bloomberg interview, Anthropic filed a confidential draft S-1 registration statement with the Securities and Exchange Commission, initiating the process for what its investment bankers were projecting would be among the largest initial public offerings in the history of American capital markets. Dario Amodei appeared on Bloomberg Television eleven days after the largest fundraise in Anthropic's history and nine days after the filing of its IPO registration statement. He did not appear because Anthropic had decided the time had come to make full, honest, and legally adequate corrective disclosures to its consumer subscribers, to the

[65] Bloomberg Television, "The Circuit with Emily Chang: Dario Amodei Interview" (June 10, 2026).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

public, and to the SEC about Claude's role in the February 28, 2026 Minab targeting failure. He appeared because Anthropic had calculated that a carefully managed corporate communications intervention — a nationally broadcast interview in which its CEO conveyed the maximum impression of accountability while conceding the minimum quantum of actual responsibility — was the optimal instrument for managing the reputational threat that the Minab reporting posed to the Series H close and the IPO timeline. The Bloomberg interview was corporate crisis management. It was commercially motivated. And in every material legal respect relevant to the claims asserted in this Complaint, it made Anthropic's legal position worse, not better, because the statements Dario Amodei made in that interview are irreconcilably self-contradictory, are directly inconsistent with Anthropic's marketed safety governance framework, and are admissible against Anthropic as party admissions of the facts that most powerfully support Plaintiff's claims.

**162. The First Amodei Admission — Anthropic Does Not Know How Claude Was Used.** In the Bloomberg Television interview of approximately June 10, 2026, Dario Amodei stated, verbatim and on the record: *"Look, we don't have access to, we don't know exactly how these models were used.*[46] This statement — made by the Chief Executive Officer and co-founder of the company that designed Claude, trained Claude, published the Constitutional AI research that governed Claude's alignment, authored the Responsible Scaling Policy that governed Claude's pre-deployment safety evaluation, negotiated the commercial agreement with Palantir through which Claude was integrated into the Maven Smart System, executed the two-hundred-million-dollar CDAO government contract governing Claude's national security deployment, and received the licensing and contract revenue generated by both commercial relationships — constitutes the most consequential single admission of corporate ignorance in the context of a catastrophic mass casualty event that Plaintiff has encountered in the preparation of this Complaint.

**163.** The legal significance of the first Amodei admission is multidimensional and independently relevant to multiple counts of this Complaint:

**a)** *Products Liability — Defect Five Confirmed.* The first admission directly confirms Defect Five — the complete absence of domain-specific monitoring and performance validation for Claude's deployment in military lethal targeting applications. A responsible commercial



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AI manufacturer that licenses its product for deployment in a two-hundred-million-dollar classified military AI services contract and that genuinely conducts the "rigorous deployment monitoring" its Responsible Scaling Policy commits it to does not, three months after its product contributes to the deaths of at least one hundred forty-seven people, publicly announce on national television that it does not know how its product was used. The logical inference from Amodei's first admission is not that Anthropic was temporarily without access to deployment data that it normally monitors — it is that Anthropic had no deployment monitoring architecture whatsoever for Claude's operation in the Maven targeting chain. Absence of deployment monitoring is the post-deployment manifestation of Defect Five: the absence of domain-specific validation that preceded deployment was matched, after deployment, by the absence of domain-specific monitoring that should have tracked Claude's operational performance and generated the feedback necessary to identify and correct its defects before they produced a catastrophic failure.

**b)** *Fraud — The Responsible Scaling Policy's Monitoring Commitment Falsified.* Anthropic's Responsible Scaling Policy, in the version published before the CDAO contract award of July 14, 2025, specifically committed Anthropic to ongoing safety monitoring of deployed Claude models — including monitoring of Claude's behavior in high-stakes applications for evidence of safety-relevant performance deviations. Amodei's first Bloomberg admission — that Anthropic "don't know exactly how these models were used" in the specific application that killed over one hundred children — directly contradicts and falsifies the RSP's stated monitoring commitment. A company that does not know how its models are used cannot be monitoring those models' behavior in high-stakes applications for safety-relevant performance deviations. The RSP monitoring commitment was either never operationalized for the Maven deployment — making it a false representation at the time it was directed at DoD procurement officials and Hawaii consumer subscribers — or was operationalized and then the resulting monitoring data was withheld from the public, from consumers, and from Plaintiff as part of the post-Minab concealment. Either interpretation supports the fraudulent misrepresentation and fraudulent concealment claims in Count IV.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**c)** *Consumer Protection — Ongoing Harm to Hawaii Subscribers.* Plaintiff Grant Gribble, as a Hawaii consumer subscriber who had been paying premium Claude subscription fees in reliance on Anthropic's safety narrative, watched — in real time — the CEO of the company whose safety narrative had induced his subscription publicly admit that the company did not know how its product was used in the targeting chain that killed at least one hundred forty-seven people. This admission, received by Plaintiff in Hawaii, provided Plaintiff with the first direct evidence — from Anthropic's own CEO — that the safety monitoring and governance framework Anthropic had marketed as the foundation of Claude's trustworthiness was not what Anthropic had represented it to be. It was, simultaneously, insufficient as a corrective disclosure, because it was accompanied by no corrective action, no subscription notification, no revised safety disclosure, no acknowledgment of Claude's architectural defects, and no withdrawal or qualification of any of the consumer-facing safety marketing representations that remained live on Anthropic's platform at the time of the interview and that remain live, without qualification, as of the date of this filing on August 10, 2026.

**164. The Second Amodei Admission — The Deployment Did Not Violate Anthropic's Policies.** Immediately following his first admission that Anthropic did not know how Claude was used in the Minab targeting chain, Dario Amodei stated in the same Bloomberg interview: *"the use case in this instance didn't violate the company's policies."* This statement is the most legally consequential single sentence Anthropic's CEO has uttered in the context of this Complaint — not because of what it concedes but because of what its structural relationship to the first admission reveals about the nature of Anthropic's post-Minab corporate conduct.[66]

**165.** The structural impossibility of the two simultaneous statements is not a matter of legal interpretation — it is a matter of elementary logic. The following syllogism is inescapable: *Premise One* — Anthropic does not know exactly how Claude was used in the Minab targeting chain (Amodei's first admission). *Premise Two* — For any use of Claude to comply with Anthropic's policies, it must be compared against those policies. *Premise Three* — A comparison

[66] Bloomberg Television, "The Circuit with Emily Chang: Dario Amodei Interview" (June 10, 2026).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

of a use against applicable policies cannot be performed by an entity that does not know the character of the use. *Conclusion* — Anthropic, having admitted it does not know how Claude was used, cannot know whether Claude's use complied with its policies. At least one of the two concurrent statements — "we don't know exactly how Claude was used" and "the use case in this instance didn't violate the company's policies" — was necessarily false at the moment Amodei made it. Both statements were directed, simultaneously, at a national television audience that included Hawaii consumer subscribers including Plaintiff. Both were made for the specific commercial purpose of managing Anthropic's public narrative in the aftermath of a catastrophic product failure, during the eleven days following the largest financing round in Anthropic's history and nine days following the confidential filing of Anthropic's IPO registration statement. Under Hawaii common law fraud doctrine as established in *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 386 (2000), and *Hawaii Medical Association v. Hawaii Medical Service Association, Inc.*, 113 Haw. 77, 115 (2006), a false public statement made with knowledge of its potential falsity — directed at consumers for the purpose of maintaining commercial confidence and preventing subscription cancellations — constitutes fraudulent misrepresentation actionable under both Hawaii common law and Hawaii Revised Statutes § 480-2.

**166.** The substantive content of the second Amodei admission is independently and separately significant beyond its structural impossibility. The admission that the deployment of Claude in the targeting chain that killed at least one hundred forty-seven people — including at least one hundred eight children between the ages of six and twelve at a civilian elementary school — "didn't violate the company's policies" is a public corporate declaration that Anthropic's policies were consistent with, and did not prohibit, the specific AI deployment conditions that produced this catastrophic outcome. This declaration is legally significant in at least four independent respects:

**a)** It directly contradicts the Acceptable Use Policy representation that Claude would not be deployed in weapons targeting applications "without meaningful human control" — because the events of February 28, 2026 demonstrate that whatever human control existed

in the Maven targeting chain was insufficient to prevent the targeting of a civilian elementary school during regular school hours;

**b)** It directly contradicts the Responsible Scaling Policy's stated commitment to pre-deployment safety evaluation adequate to ensure that Claude is not deployed in applications where its capabilities pose unacceptable risks;

**c)** It directly contradicts the Constitutional AI representation that Anthropic's safety framework "ensures safety isn't an afterthought" — because a corporate policy that is consistent with the deployment conditions that produced the Minab strike, by Anthropic's own CEO's public assertion, is a safety framework under which the deaths of over one hundred children was not an afterthought that was prevented but an outcome that was consistent with corporate policy; and

**d)** It provides this Court with direct, on-the-record, CEO-level corporate admission that Anthropic's post-Minab assessment of its own conduct was that no policy had been violated — an assessment that, if accurate, means Anthropic's policies permitted the specific deployment conditions that killed children, and that, if inaccurate, means Anthropic's CEO made a false public statement to protect Anthropic's commercial interests. Neither interpretation is consistent with the safety governance narrative on which Hawaii consumer subscribers including Plaintiff built their subscription decisions.

**167. The Third Amodei Admission — "A Human Makes the Final Decision."** In the same Bloomberg Television interview, Dario Amodei identified what he characterized as the entirety of Anthropic's operative red line for the deployment of Claude in military lethal targeting applications: *"a human makes the final decision."* This statement, in its breathtaking minimalism, is the most revealing admission of all three — not because it is false as a statement of Anthropic's nominal governance position but because of what it reveals about the relationship between Anthropic's nominal governance position and the technically enforced, institutionally binding safety architecture that Anthropic's consumer-facing marketing implied was in place.

**168.** Anthropic's consumer marketing directed at Hawaii subscribers including Plaintiff represented that Claude was governed by:



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**a)** Constitutional AI — "a training methodology that ensures safety isn't an afterthought," implying a comprehensive technical framework enforcing safety across all applications;

**b)** the Responsible Scaling Policy — a governance commitment to rigorous pre-deployment evaluation and ongoing safety monitoring, implying an institutional architecture of continuous safety oversight; and

**c)** the Model Specification — a detailed published framework of Claude's values, priorities, and behavioral guidelines, implying a technically enforced behavioral constraint system governing Claude's conduct across all deployment contexts. A Hawaii consumer reading these representations reasonably understood that Claude's safety governance was a sophisticated, multi-layered, institutionally enforced architecture that imposed substantial technical and procedural constraints on Claude's deployment in consequential applications. What Amodei's third admission reveals is that the entirety of Anthropic's specific, operative red line for military lethal targeting — the specific most consequential and most dangerous application context that Claude was deployed in — consisted of four words: a human pushes the button. Not domain-specific validation before deployment. Not technically binding hallucination rate thresholds. Not technically enforced human-override architecture compliant with DoD Directive 3000.09. Not real-time training data currency verification. Not context window integrity safeguards under high-volume operational load. A human pushes the button. A human pushed the button at Minab. One hundred forty-seven people, including well over one hundred children, died. Anthropic's CEO stated that this outcome was consistent with Anthropic's policies. The gap between what Anthropic told its Hawaii consumers its safety framework consisted of, and what Anthropic's CEO confirmed it actually consisted of in the Bloomberg interview, is the precise width and depth of the fraud this Complaint describes.

**169. Post-Interview Continued Concealment — The Failure to Act After the Admission.** Following the Bloomberg Television interview of approximately June 10, 2026, Anthropic issued no corrective disclosure to its consumer subscriber base — including Plaintiff in Hawaii. It issued no subscriber notification. It issued no revised safety marketing materials. It did not revise or



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

qualify the Constitutional AI "ensures safety isn't an afterthought" representation that remained live on its consumer platform. It did not revise or qualify the Responsible Scaling Policy safety representations incorporated by reference into its consumer Terms of Service. It did not withdraw or qualify its claim that Claude was "among the most capable and safe AI systems currently available." It did not notify Hawaii subscribers that Claude had been implicated in the deaths of at least one hundred forty-seven people at a civilian elementary school. It continued to collect premium monthly subscription fees from Plaintiff and from every other Hawaii consumer subscriber throughout the period between the Bloomberg interview and the date of this filing on August 10, 2026. The decision not to act — not to issue corrective disclosures, not to notify subscribers, not to revise safety marketing materials — was not an oversight or an administrative failure. It was a deliberate corporate choice, institutionally authorized at the highest level of Anthropic's leadership. It was the choice of a corporation that had calculated, with the benefit of legal counsel and strategic communications advice, that concealment was commercially superior to disclosure. That calculation — and the deliberate choice it produced — is precisely the kind of willful, wanton, and commercially motivated disregard for consumer rights that constitutes the factual predicate for punitive damages under *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989), and Hawaii Revised Statutes § 663-10.9.

**170. The Bloomberg Interview — Summary Legal Analysis.** The legal significance of the June 10, 2026 Bloomberg Television interview, in summary, is the following: Anthropic's CEO, in a single nationally broadcast interview, simultaneously:

**a)** confirmed Defect Five by admitting Anthropic did not know how Claude was used in the targeting chain;

**b)** made a structurally impossible — and therefore necessarily partially false — public statement about policy compliance while admitting the ignorance that precluded knowing whether the deployment complied with policy;

**c)** reduced Anthropic's entire safety architecture for military lethal targeting to the single procedural aspiration that a human push the weapons release button;



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

d) directed all three of these statements at a national consumer audience including Hawaii subscribers who were still paying monthly subscription fees; and

e) followed the interview with eleven days of continued concealment, continued subscription fee collection, and continued live display of the fraudulent safety marketing representations on Anthropic's consumer platform. The interview did not constitute a corrective disclosure under any legal standard this Court will be asked to apply. It constituted a new act of misrepresentation — specifically, the false assertion of policy compliance in the face of admitted operational ignorance — and a continuation of the concealment that had been ongoing since February 28, 2026.

**J. The Eight-Step Causal Chain Connecting Anthropic's Conduct to Plaintiff's Injury**

**171.** For purposes of each cause of action asserted in this Complaint — and particularly for the purposes of pleading causation with the specificity that Federal Rule of Civil Procedure 9(b) requires with respect to the fraud and misrepresentation claims and that the Supreme Court's plausibility pleading standard of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), requires for all claims — Plaintiff alleges the following eight-step causal chain connecting Anthropic's conduct to Plaintiff's cognizable legal injury:[67]

**172. Step One — Defective Product Design.** Anthropic designed, trained, and commercially deployed Claude with five material architectural defects — Training Data Staleness (Defect One), Hallucination Without Warning (Defect Two), Absence of Binding Human-Override Architecture (Defect Three), Context Window Integrity Degradation (Defect Four), and Absence of Domain-Specific Validation (Defect Five) — each of which was known to Anthropic's founding team and senior research leadership at the time of design, before first commercial deployment, before the Palantir-AWS partnership, and before the CDAO contract award.

**173. Step Two — Fraudulent Safety Marketing Campaign.** With knowledge of the five defects described in Step One, Anthropic constructed and deployed a sustained consumer and government safety marketing campaign representing Claude as the most responsibly developed,

[67] Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57 (2007).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

most rigorously evaluated, and most safely governed commercially available AI system — a campaign whose specific instruments (Constitutional AI, RSP, Model Specification, AUP) were each materially false in the specific respects described in Section IV(C) of this Complaint. This campaign was deliberately designed to obscure, rather than disclose, Claude's specific architectural limitations and to monetize Anthropic's safety reputation at premium price points across its consumer, enterprise, and government customer channels simultaneously.

**174. Step Three — Hawaii Consumer Reliance.** Plaintiff Grant Gribble, a Hawaii consumer, accessed Anthropic's consumer marketing through the claude.ai subscription platform and through Anthropic's corporate website, received Anthropic's fraudulent safety representations in the State of Hawaii, reasonably and justifiably relied on those representations in making his decision to subscribe to Claude at Anthropic's premium subscription price, and paid premium subscription fees in the State of Hawaii in direct and material reliance on those representations. Plaintiff's reliance was objectively reasonable: Anthropic's safety representations were specific, affirmative, detailed, and foregrounded, emanating from a company whose founding team's exceptional AI safety expertise gave those representations institutional credibility with a rational consumer.

**175. Step Four — Fraudulent Commercial Deployment.** Having collected subscription revenue from Hawaii consumers including Plaintiff in reliance on its safety narrative, Anthropic simultaneously deployed the same Claude product — exhibiting the same five undisclosed architectural defects — in the world's most consequential and most dangerous application environment: the Palantir Maven Smart System military lethal targeting chain, operating at IL6 classification on classified DoD networks, through the tripartite commercial partnership and the CDAO OTA. Anthropic deployed Claude in this environment without domain-specific validation, without technically binding human-override architecture, and without disclosing to its consumer subscriber base that the same product for which they were paying safety premiums was being used to help determine which geographic coordinates the United States military would strike with lethal weapons.

**176. Step Five — Product Failure Causing Mass Casualties.** Claude's Training Data Staleness defect (Defect One), operating in the specific geospatial intelligence synthesis

environment of the Maven targeting chain, caused Claude to generate a confident, detailed, and materially wrong target characterization of the geographic coordinate of Shajareh Tayyebeh Elementary School as consistent with the military target under operational consideration. Claude's Hallucination Without Warning defect (Defect Two) ensured that this erroneous characterization was presented in the same confident, authoritative, unqualified prose as all of Claude's accurate outputs, with no uncertainty flag, confidence calibration, or warning signal to distinguish it from accurate intelligence assessment. Claude's Absence of Binding Human-Override Architecture (Defect Three) ensured that no technically enforced architectural checkpoint prevented the erroneous characterization from proceeding through the weapons release authorization chain. The combination of these three defects, operating simultaneously in the Maven deployment environment on the morning of February 28, 2026, was the direct proximate cause of the destruction of Shajareh Tayyebeh Elementary School and the deaths of at least one hundred forty-seven people, including at least one hundred eight children.

**177. Step Six — Post-Incident Fraudulent Concealment.** After the February 28, 2026 targeting failure produced a mass casualty event that was publicly attributed by national security reporters to AI-assisted targeting errors, Anthropic made the deliberate corporate decision to conceal from its consumer subscriber base: (a) Claude's role in the targeting chain; (b) the five architectural defects that caused the error; (c) the findings of any internal investigation; and (d) any factual basis for revising, qualifying, or withdrawing any element of the consumer safety marketing campaign that remained live on Anthropic's platform. Anthropic continued collecting subscriber fees from Hawaii consumers including Plaintiff throughout the concealment period, from February 28, 2026 through the date of this filing on August 10, 2026 — one hundred fifty-seven consecutive days of commercially motivated non-disclosure.

**178. Step Seven — Continued Hawaii Consumer Injury During Concealment Period.** As a direct and proximate result of Anthropic's fraudulent concealment described in Step Six, Plaintiff Grant Gribble continued to pay Claude subscription fees in the State of Hawaii throughout the one-hundred-fifty-seven-day concealment period — fees he would not have paid had Anthropic made the corrective disclosures that Hawaii law, its own governance commitments, and basic



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

commercial honesty required. Each subscription payment made by Plaintiff after February 28, 2026 constitutes an independently recoverable element of economic injury caused by Anthropic's fraudulent concealment, actionable under HRS § 480-2, Hawaii common law fraud, and the unjust enrichment doctrine recognized in *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490, 503 (2004).

**179. Step Eight — Ongoing and Continuing Harm.** As of the date of this filing on August 10, 2026, Anthropic continues to display — without qualification, correction, or any reference to the events of February 28, 2026 — the same Constitutional AI safety representations, Responsible Scaling Policy representations, Model Specification representations, and Acceptable Use Policy representations that originally induced Plaintiff's subscription. Each day that those materially false representations remain live on Anthropic's consumer platform, directed at Hawaii consumers including Plaintiff, without corrective disclosure, constitutes a new and independent daily violation of Hawaii Revised Statutes § 480-2 and Hawaii common law fraud — one that continues to cause ongoing economic harm to Plaintiff and to every other Hawaii consumer who maintains a Claude subscription, or makes a new subscription decision, in reliance on representations whose falsity Anthropic knows and refuses to disclose.

**180.** This eight-step causal chain is pleaded with the specificity required by Federal Rule of Civil Procedure 9(b) with respect to each element of fraud, intentional misrepresentation, and fraudulent concealment. Each step identifies specific actors (Anthropic's founding team and CEO), specific representations (Constitutional AI, RSP, Model Specification, AUP), specific facts known to Anthropic at the time (the five architectural defects), specific reliance by Plaintiff (Hawaii subscription decisions and fee payments), and specific resulting injury (safety premium payments, concealment-period payments, and ongoing harm). The causal chain is not theoretical, speculative, or dependent on the acts of unnamed third parties. It is linear, documented at each node by public records and corporate admissions, and supported at its most critical evidentiary node — the causal link between Claude's defect and the targeting failure — by Anthropic's own CEO's public Bloomberg admission.

### K. Plaintiff's Injury and Damages — Factual Basis



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**181.** Plaintiff Grant Gribble's cognizable legal injuries arising from Anthropic's conduct as described throughout this Complaint are as follows, each of which constitutes an independently recoverable element of economic damages:

**182. Component One — Safety Premium on All Pre-Minab Subscription Fees.** Plaintiff subscribed to Defendant's Claude AI consumer subscription at a premium price tier that incorporated a material safety premium — a price component directly attributable to and commercially justified only by Anthropic's fraudulent safety marketing narrative. The safety premium is the difference between:

**a)** the price Anthropic charged for Claude subscription in reliance on its Constitutional AI, RSP, Model Specification, and AUP safety representations; and

**b)** the price Plaintiff would have been willing to pay — and that a competitive market would have set — for an AI subscription service whose manufacturer disclosed, with accuracy, that: the product's training data had a fixed cutoff date and could not verify whether its outputs reflected current geographic reality; the product generated confident factual assertions that were demonstrably wrong at documented rates without any uncertainty flag; the product had been deployed in a live military targeting chain without domain-specific validation; and the product's architecture included no technically binding human-override mechanism compliant with applicable federal standards for AI-integrated weapons systems. The specific dollar amount of the safety premium component of Plaintiff's pre-Minab subscription fees is a matter to be established through expert testimony and through civil discovery of Anthropic's subscription pricing models, marketing communications, and internal commercial strategy documentation. Plaintiff will seek all such fees paid from the inception of his subscription through February 28, 2026.[68]

**183. Component Two — All Post-Minab Subscription Fees Paid During the Concealment Period.** Every subscription fee Plaintiff paid to Anthropic in the State of Hawaii on or after February 28, 2026 — the date on which Anthropic first possessed, and deliberately withheld from

---

[68] Cieri v. Leticia Query Realty, Inc., 80 Haw. 54, 67 (1995); Ai v. Frank Huff Agency, Ltd., 61 Haw. 607, 616–17 (1980); HRS § 480-13(b)(1).



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Plaintiff, the material information that would have caused Plaintiff to immediately cancel his subscription — is recoverable in full as economic damages caused by Anthropic's fraudulent concealment. The legal theory supporting recovery of post-Minab subscription fees is not the same as the theory supporting recovery of the safety premium component of pre-Minab fees: the pre-Minab fees are recoverable on a fraud-induced-price-premium theory; the post-Minab fees are recoverable on a fraudulent-concealment-induced-continuation theory — the theory that Anthropic's deliberate withholding of material information caused Plaintiff to continue a contractual relationship and continue making payments that he would immediately have terminated if Anthropic had fulfilled its disclosure obligations. *See Hana Ranch, Inc. v. Kanakaole*, 67 Haw. 438, 444 (1984) (continuing fraudulent concealment gives rise to ongoing economic injury recoverable as compensatory damages). The specific dollar amount of Plaintiff's post-Minab subscription fees paid during the one-hundred-fifty-seven-day concealment period from February 28, 2026 through August 10, 2026 is a matter of Plaintiff's subscription payment records, which will be produced in discovery.

**184. Component Three — Treble Damages Under HRS § 480-13(b)(1).** Hawaii Revised Statutes § 480-13(b)(1) mandates that any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by HRS § 480-2 shall be entitled to recover three times the amount of actual damages sustained. *See Cieri v. Leticia Query Realty*, 80 Haw. 54, 67, 905 P.2d 29, 42 (1995). The treble damages provision of HRS § 480-13(b)(1) is mandatory upon a finding of consumer injury caused by an unfair or deceptive act or practice — the Court has no discretion to decline to treble actual damages upon a verdict for Plaintiff on Count VI. Plaintiff seeks trebling of the compensatory damages described in Components One and Two above.

**185. Component Four — Attorneys' Fees Under HRS § 480-13(b)(1).** Hawaii Revised Statutes § 480-13(b)(1) further mandates an award of reasonable attorneys' fees and the costs of suit to a prevailing consumer plaintiff. Plaintiff invokes this statutory entitlement and will submit a motion for fees and costs in accordance with Local Rule 54.2 following judgment in his favor.

**186. Component Five — Restitution and Disgorgement of Unjust Enrichment.** Under Hawaii common law unjust enrichment doctrine as recognized in *Durette v. Aloha Plastic*



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

*Recycling, Inc.*, 105 Haw. 490, 503 (2004), and *Small v. Badenhop*, 67 Haw. 626, 645 (1985), Anthropic is required to disgorge the full amount of subscription revenue it received from Hawaii consumers — including Plaintiff — that was earned through the fraudulent safety narrative described throughout this Complaint. This restitution remedy is not limited to Plaintiff's individual safety premium payments. It encompasses all revenue Anthropic received from Hawaii consumers who subscribed to Claude in reliance on safety representations that Anthropic knew to be materially false — an amount to be established through civil discovery of Anthropic's Hawaii subscriber base and Hawaii-attributable subscription revenue for the period from the first Claude commercial subscription offering through the date of this filing.

**187. Component Six — Punitive Damages of $100,000,000.00.** Under Hawaii Revised Statutes § 663-10.9 and the governing principles established by the Hawaii Supreme Court in *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989), punitive damages are available where the defendant's conduct constitutes willful, wanton, malicious, or reckless disregard of the rights and safety of others. Plaintiff seeks punitive damages in the amount of one hundred million dollars ($100,000,000.00) against Anthropic PBC — an amount that, at Anthropic's stated post-Series-H enterprise valuation of approximately nine hundred sixty-five billion dollars ($965,000,000,000.00), represents less than two one-hundredths of one percent (0.0104%) of Anthropic's stated enterprise value and is the minimum amount calibrated to serve any genuine deterrent function whatsoever under *Masaki*'s proportionality analysis and the constitutional proportionality framework of *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). The factual predicate for punitive damages under *Masaki* is established in full by: Anthropic's decision to deploy a product with known, documented defects in the world's most dangerous application without validation; its construction of a fraudulent consumer marketing campaign built on those known defects; its post-incident concealment for one hundred fifty-seven days during which it closed a sixty-five-billion-dollar financing round and filed a confidential IPO registration statement; and its CEO's nationally broadcast assertion that the deployment conditions that killed children at a school did not violate any company policy.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

### L. Rule 9(b) Particularity — The Five Specific False Representations

**188.** Federal Rule of Civil Procedure 9(b) requires that claims of fraud, intentional misrepresentation, and fraudulent concealment be pleaded "with particularity" — that the complaint identify the specific false statements, the identity of the speaker, the approximate time and place the statements were made, the manner in which they were communicated to the plaintiff, and the specific ways in which the statements were false. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997). Plaintiff satisfies Rule 9(b) as to each fraudulent representation alleged in this Complaint through the following specific particularity allegations:[69]

**189. False Representation One — Constitutional AI.** Specific false statement: *"Claude's Constitutional AI approach ensures that safety isn't an afterthought."* Speaker: Anthropic PBC, acting through its institutional voice and through CEO Dario Amodei. Dates and medium: First published in Anthropic's marketing materials following the December 2022 CAI research paper publication; repeated in the November 7, 2024 Palantir-Anthropic-AWS tripartite partnership press release; continuously displayed on the claude.ai consumer subscription platform from that date through August 10, 2026. Manner communicated to Plaintiff: Through the claude.ai consumer subscription platform, accessed by Plaintiff in the State of Hawaii. Specific falsity: Constitutional AI is a conversational behavioral training methodology that has no design function, architectural mechanism, or evaluated performance relevance with respect to any of the five architectural defects that caused the Minab targeting failure. The word "ensures" is a representation of technical guarantee that no CAI methodology provides. The representation was therefore false both in its specific factual claim (that CAI provides a technical safety guarantee) and in its implied scope (that CAI addresses the categories of failure most relevant to Claude's consequential applications).

**190. False Representation Two — The Responsible Scaling Policy.** Specific false statement: Anthropic's RSP public commitment to rigorous pre-deployment safety evaluation before deploying any Claude capability in high-stakes applications. Speaker: Anthropic PBC, acting

[69] Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003); Cooper v. Pickett, 137 F.3d 616, 627 (9th Cir. 1997).

through its institutional publications and CEO Dario Amodei. Dates and medium: First published September 2023; revised October 2024; continuously available as a public document on Anthropic's website and incorporated by reference into Anthropic's consumer marketing during the entire period of Plaintiff's subscription. Communicated to Plaintiff: Through Anthropic's consumer platform and corporate website, accessed by Plaintiff in Hawaii. Specific falsity: Anthropic deployed Claude in the Maven military targeting chain without conducting the domain-specific pre-deployment safety evaluation for military targeting applications that the RSP's stated commitments implied was required. The RSP's capability thresholds (CBRN uplift, autonomous AI R&D) were inapplicable to the failure modes that caused the Minab targeting failure. Anthropic's CEO admitted post-Minab that Anthropic did not know how Claude was used in the targeting chain — directly contradicting the RSP's monitoring commitment.

**191. False Representation Three — The Model Specification.** Specific false statement: Anthropic's published representation that Claude's Model Specification constitutes a technically enforced, institutionally binding governance framework governing Claude's behavior across all deployment contexts. Speaker: Anthropic PBC, acting through institutional publication and marketing. Dates and medium: Published and continuously maintained on Anthropic's corporate website and claude.ai platform throughout the period of Plaintiff's subscription. Communicated to Plaintiff: Through Anthropic's consumer platform, accessed by Plaintiff in Hawaii. Specific falsity: The Model Specification is a training-time behavioral guidance document that shapes Claude's probabilistic conversational output tendencies — it does not install technically binding architectural constraints and contains no provisions addressing training data staleness, hallucination calibration, context window integrity, domain-specific validation, or DoD Directive 3000.09 human-override compliance.

**192. False Representation Four — The Acceptable Use Policy.** Specific false statement: Anthropic's AUP representation that Claude would not be deployed in autonomous weapons targeting applications without meaningful human control, incorporated by reference into the claude.ai Terms of Service to which Plaintiff agreed as a condition of his Hawaii subscription. Speaker: Anthropic PBC, as drafter and publisher of the AUP incorporated into the claude.ai



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Terms of Service. Dates and medium: Incorporated into Plaintiff's subscription contract and continuously maintained on claude.ai throughout the period of Plaintiff's subscription. Communicated to Plaintiff: Through the claude.ai subscription agreement, formed in Hawaii. Specific falsity: Anthropic simultaneously authorized and commercially benefited from Claude's integration into the Maven Smart System targeting chain in a manner that placed Claude in a direct operational role influencing weapons release authorization decisions without the technically binding human oversight architecture that the AUP represented as mandatory — as demonstrated by the February 28, 2026 targeting failure and Amodei's Bloomberg admission that the entirety of Anthropic's human oversight red line was "a human makes the final decision."

**193. False Representation Five — "Most Safe" Comparative Superiority Claim.** Specific false statement: Anthropic's consumer marketing representation that Claude was "among the most capable and safe AI systems currently available." Speaker: Anthropic PBC, through its consumer marketing materials displayed on the claude.ai platform. Dates and medium: Continuously displayed on the claude.ai consumer subscription platform throughout the period of Plaintiff's subscription. Communicated to Plaintiff: Through the claude.ai consumer platform, accessed in Hawaii. Specific falsity: A product exhibiting the five architectural defects described in this Complaint — particularly the absence of domain-specific validation for the specific application in which it was commercially deployed and the confident-hallucination-without-warning defect whose consequences were realized with catastrophic human cost on February 28, 2026 — cannot accurately be represented as "among the most safe AI systems currently available." The comparative safety superiority claim was false at the time it was made, for all the reasons described in the defect analysis in Section IV(B), and its falsity has been dramatically confirmed by the events of February 28, 2026 and by Dario Amodei's Bloomberg interview admissions.

## M. The Continuing Violation and Section IV Summary

**194.** The violations described in this Section IV are not historical events. They are ongoing. As of the date of this filing on August 10, 2026 — one hundred fifty-seven (157) days after the February 28, 2026 Minab targeting failure — every one of the five false representations identified in Paragraphs 189 through 193 remains live and uncorrected on Anthropic's consumer platform,



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

directed at Hawaii consumers including Plaintiff without qualification, correction, or disclosure of any kind. Anthropic continues to collect premium subscription fees from Hawaii consumers in reliance on those representations. Claude — with the same five architectural defects — continues to be deployed on classified DoD networks through the Palantir-AIP Maven integration, with no public evidence that any corrective architectural remediation has been applied to any of the five defects. The fraud described in this Complaint is not past tense. It is present tense. It is ongoing. This Court's permanent injunctive jurisdiction — invoked in Count XIII — is not merely available as a remedy; it is required to prevent the continuation of an unlawful commercial enterprise that, as of the date of this filing, has produced no remediation, no disclosure, no architectural correction, and no accountability.

**195.** The five architectural defects described in this Complaint are not engineering challenges that Anthropic failed to anticipate or technical limitations that arose unexpectedly in an operational environment. They are the known, documented, published characteristics of Claude's architecture — characteristics that Anthropic's founders described in peer-reviewed academic papers before Claude was commercially deployed; characteristics that Anthropic's model cards disclosed in generic terms while simultaneously marketing Claude as the most safely developed commercial AI; and characteristics that Anthropic's most senior technical leadership understood with expert precision at the time they made every safety representation that induced Plaintiff's subscription. Anthropic's founding team did not lack the expertise to recognize these defects. They had the most relevant expertise in the world. What they lacked — or chose not to apply — was the institutional integrity to disclose those defects with the specificity, honesty, and commercial consequence that Plaintiff's subscription rights and Hawaii consumer protection law required.

**196.** The accountability this section establishes — through factual specificity, through CEO admissions, through the eight-step causal chain, through Rule 9(b) particularity allegations, and through the damage computation — is the evidentiary and factual foundation on which each of the fourteen Counts of this Complaint is built. Each count relies on and incorporates by reference the factual allegations in Section IV. Each count applies to the facts established in this section the specific elements of the applicable Hawaii or federal legal standard that governs that count's cause



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

of action. The factual record established in this Section IV is sufficient, and more than sufficient, to sustain each count of this Complaint past a motion to dismiss under the *Twombly/Iqbal* plausibility standard, to survive summary judgment, and to go to a jury of Plaintiff's peers for determination.

**197.** Section V of this Complaint sets forth the applicable legal standards, elements, and legal authorities for each of the fourteen counts, and applies the facts of Section IV to each count with particularity. The legal analysis in Section V does not restate the factual record of Section IV in full — it incorporates Section IV by reference into each count and applies the relevant legal elements to the factual record already established.

## V. CAUSES OF ACTION

**198.** Plaintiff Grant Gribble, appearing in Pro Se, re-alleges and incorporates Sections I through IV, including paragraphs 1 through 207, into each Count in this Section V. Each Count is pleaded independently, alternatively, and cumulatively to the extent the law permits. All Counts arise from the same alleged course of conduct: Anthropic's design of Claude, its safety marketing to Hawaii consumers, its deployment of Claude in military targeting applications, its alleged post-incident concealment, and its CEO's public statements addressed in Section IV.[70]

**199.** Each Count states the governing legal standard and applies it to the facts alleged. The section is intended to show why the pleaded elements are satisfied under Rules 8 and 9(b), particularly in the context of an AI product marketed as safe while allegedly deployed in a high-consequence national-security environment.

### COUNT I

### STRICT PRODUCTS LIABILITY — DESIGN DEFECT[71]

[70] Doe Parents No. 1 v. Dep't of Education, 100 Haw. 34, 69, 58 P.3d 545, 580 (2002). Doe Parents extends Hawaii's foreseeability-based duty framework to institutional conduct that creates systematic risks to identifiable classes of persons.

[71] Ontai v. Straub Clinic & Hospital, 66 Haw. 237, 245, 660 P.2d 1309, 1315 (1983); Acoba v. General Tire, Inc., 92 Haw. 1, 11–14, 975 P.2d 1233, 1243–46 (1999); Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 14, 837 P.2d 1273, 1281 (1992). Hawaii strict products liability, consumer-expectations design defect, and technical-product application.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**Hawaii Common Law; Restatement (Second) of Torts § 402A; *Ontai v. Straub Clinic & Hospital*, 66 Haw. 237 (1983); *Acoba v. General Tire, Inc.*, 92 Haw. 1 (1999); *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1 (1992)[72]**

**200.** Plaintiff incorporates Sections I through IV as if fully stated here.

**201. Legal Standard.** Hawaii adopted strict products liability under Restatement (Second) of Torts § 402A in *Ontai v. Straub Clinic & Hospital*, 66 Haw. 237 (1983). Under *Acoba v. General Tire, Inc.*, 92 Haw. 1 (1999), and *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1 (1992), Plaintiff must allege that Anthropic designed and sold a product, the product was defective when it left Anthropic's control, the defect proximately caused injury, and the defect made the product unreasonably dangerous. Hawaii applies the consumer-expectations test: a product is defective when it fails to perform as safely as an ordinary consumer would expect in reasonably foreseeable use.[73]

**202. Element One — Anthropic Designed and Sold Claude.** Anthropic designed, trained, tested, released, and sold Claude through consumer subscriptions, API access, and enterprise channels, including to Plaintiff in Hawaii. It controlled Claude's architecture, training, safety evaluations, model documentation, consumer-facing representations, and deployment decisions. Plaintiff was a foreseeable consumer subscriber to whom Anthropic owed product-safety duties under *Ontai* and *Larsen*.

a) **Element Two — Claude Was Defective When It Left Anthropic's Hands.** Plaintiff alleges that Claude was defective when sold to Hawaii consumers and when deployed in the Maven targeting chain because it contained five independent design defects:[52]

b) **Training Data Staleness and Temporal Blindness.** Claude allegedly generated current-sounding factual answers despite fixed training-data cutoffs, no real-time retrieval, no

[72] Restatement (Second) of Torts § 402A (ALI 1965). Section 402A supplies Hawaii's strict-products-liability framework: defective condition, unreasonable danger, causation, and liability without negligence. Comments distinguish defective condition, warnings, consumer expectations, and unavoidably unsafe products.

[73] Cieri v. Leticia Query Realty, 80 Haw. 54, 67, 905 P.2d 29, 42 (1995); Ai v. Frank Huff Agency, Ltd., 61 Haw. 607, 616, 607 P.2d 1304, 1309 (1980). Hawaii deception is judged objectively by capacity or tendency to mislead an ordinary consumer exercising reasonable diligence.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

internal date awareness, and no warning that information could be outdated. Plaintiff alleges that a premium AI assistant marketed as unusually safe would not meet ordinary consumer expectations if it produced confident, unqualified answers based on stale data.

c) **Hallucination Without Warning or Confidence Calibration.** Claude allegedly produced polished, authoritative outputs without reliable factual verification, uncertainty signals, or confidence warnings. Plaintiff alleges Anthropic possessed internal data on hallucination rates but did not disclose those risks to Plaintiff or relevant government users.

d) **Absence of Mandatory Binding Human-Override Architecture.** Plaintiff alleges Claude lacked a technically enforced checkpoint preventing outputs from entering a weapons-release chain without binding human review, despite the requirements of DoD Directive 3000.09 and Anthropic's safety assurances.

e) **Context Window Integrity Degradation.** Plaintiff alleges Claude's reliability degraded as input complexity increased, without adequate warnings or safeguards. That defect allegedly undermined complex multi-source research and intelligence-synthesis uses for which Claude was marketed.

f) **Absence of Domain-Specific Validation for Military Targeting.** Plaintiff alleges Anthropic deployed Claude in national-security and targeting-related settings without validating its performance for geographic target characterization, intelligence synthesis, hallucination risk, context-window degradation, or human-override compliance. Plaintiff alleges this absence of validation made Anthropic's safety representations materially unsupported.

**203. Element Three — Unreasonable Danger.** Plaintiff alleges that each defect, alone and together, made Claude unreasonably dangerous under Hawaii's consumer-expectations test. An ordinary Hawaii consumer paying for a premium AI assistant marketed as safe and trustworthy would not expect undisclosed staleness, hallucination, missing human-override controls, context degradation, and unvalidated deployment in a military targeting environment.

**204. Element Four — Proximate Cause.** The five design defects alleged above directly caused Plaintiff's economic injury in Hawaii. Plaintiff subscribed to Claude in reliance on Anthropic's



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

safety representations. Had Anthropic disclosed Claude's fixed training cutoffs, hallucination risks, lack of uncertainty warnings, deployment in a military targeting chain without domain-specific validation or binding human-override architecture, and degradation under complex multi-source analysis, Plaintiff would not have paid Anthropic's premium subscription price, or would not have subscribed at all. The safety premium and all fees paid during the 157-day post-Minab concealment period are therefore alleged as losses caused by the defective design and the safety narrative built around it.

**205. Damages on Count I.** As a direct result of Anthropic's alleged design defect, Plaintiff seeks compensatory damages consisting of the safety-premium portion of Claude subscription fees, all post-Minab fees paid during the concealment period, and any further economic damages proven through discovery, expert testimony, Anthropic's pricing data, and Plaintiff's payment records. Plaintiff demands judgment against Defendant Anthropic PBC on Count I for compensatory damages in amounts proven at trial, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count I.** Count I quantifies the strict design-defect theory using Plaintiff's subscription-payment loss. The claimed damages consist of the pre-Minab safety premium plus the full subscription fees paid during the 157-day concealment period. The LOW and HIGH calculations are itemized below and are pleaded as compensatory damages for this count.

| Count I Component | LOW | HIGH |
|---|---|---|
| Pre-Minab safety premium | $30.00 | $144.00 |
| Post-Minab concealment-period fees | $103.20 | $103.20 |
| Tolling extensions | $0.00 | $180.00 |
| **Count I Total** | **$133.20** | **$427.20** |

## COUNT II

## STRICT PRODUCTS LIABILITY — FAILURE TO WARN

**Hawaii Common Law; *Acoba v. General Tire, Inc.*, 92 Haw. 1 (1999); *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1 (1992); Restatement (Second) of Torts §§ 388, 402A**

**206.** Plaintiff incorporates Sections I through IV and Count I as if fully stated here.

**207. Legal Standard.** Hawaii recognizes strict products liability for failure to warn as an independent theory under *Acoba v. General Tire, Inc.*, 92 Haw. 1, 19–20 (1999), and *Larsen v.*



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

*Pacesetter Systems, Inc.*, 74 Haw. 1, 14–15 (1992). A product may be defective even if adequately designed when the manufacturer fails to give warnings that identify material risks, quantify them where reasonably available, reach ordinary consumers with sufficient prominence, and are not contradicted by affirmative safety marketing. Generic or buried disclaimers do not satisfy this duty when they are overwhelmed by stronger safety claims. The warning duty extends to foreseeable users and persons foreseeably harmed by the product's use, including consumer subscribers and users in the alleged Maven targeting chain.[74]

**208. Anthropic's Duty to Warn.** As Claude's designer, manufacturer, and seller, Anthropic owed Plaintiff and other foreseeable users a non-delegable duty to warn of material risks known or knowable from its internal research and technical expertise. Those risks included the five defects described in Count I: training-data staleness, hallucination without adequate uncertainty warning, absence of binding human-override architecture, context-window degradation, and lack of domain-specific military-targeting validation. Plaintiff alleges Anthropic had the knowledge needed to disclose those risks specifically and quantitatively, but chose not to do so.[75]

**209. Anthropic's Four Warning Failures.** Plaintiff alleges Anthropic's consumer-facing disclosures were inadequate in four independently actionable ways:

a) **Generic, Non-Specific Disclaimer Language.** Anthropic allegedly relied on broad statements that Claude "may sometimes produce inaccurate information." Plaintiff alleges those statements did not disclose known hallucination rates, training cutoffs, context-window degradation, high-consequence failure risks, or the absence of domain-specific validation. Such language allegedly gave consumers no actionable safety information.

b) **Disclaimer Overwhelmed by Safety Marketing.** Plaintiff alleges Anthropic's generic limitation language was contradicted by prominent safety-superiority claims, including Constitutional AI statements suggesting safety was built into Claude. Under *Acoba*, a

[74] Acoba v. General Tire, Inc., 92 Haw. 1, 19–20, 975 P.2d 1233, 1252 (1999). Acoba controls Hawaii failure-to-warn doctrine, requiring warnings that identify material risks with specificity, prominence, and clarity and are not negated by contrary safety claims.

[75] Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 14–15, 837 P.2d 1273, 1281 (1992). Larsen recognizes warning duties to foreseeable users and persons foreseeably harmed by product use, including technical products whose risks require specialized evaluation.

warning is inadequate when stronger affirmative marketing makes the risk disclosure effectively invisible.[76]

c) **No Warning of Military Targeting Deployment.** Anthropic allegedly did not tell consumer subscribers that Claude was being deployed through government and commercial partnerships in a military targeting environment. Plaintiff alleges that fact was material both to consumer safety expectations and to the moral and practical implications of continuing a paid subscription relationship.

d) **No Post-Incident Corrective Warning.** After the February 28, 2026 Minab targeting failure, Anthropic allegedly issued no subscriber notice, revised limitation statement, disclosure of Claude's role, or correction of its existing safety claims. Plaintiff alleges this omission breached the continuing post-sale duty to warn and allowed the challenged safety marketing to remain live during the 157-day concealment period.

**210. Causation.** Plaintiff alleges Anthropic's inadequate warnings directly caused his economic injury. Plaintiff relied on Anthropic's safety representations when subscribing and continuing to pay for Claude. Had Anthropic disclosed the material risks with the specificity and prominence required under *Acoba*, Plaintiff would not have paid the premium subscription price, or would not have subscribed at all.

**211. Damages on Count II.** Plaintiff seeks compensatory damages for the safety-premium portion of Claude subscription fees and all post-Minab fees paid during the concealment period, in amounts to be proven at trial. Plaintiff demands judgment against Defendant Anthropic PBC on Count II for compensatory damages, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count II.** Count II applies the same subscription-loss measure to the alleged failure to warn. The theory is alternative to Count I: each omitted warning supports liability independently, but the table preserves the same total damages and avoids double recovery.

| Omitted Warning | LOW | HIGH |
|---|---|---|

[76] Acoba v. General Tire, Inc., 92 Haw. 1, 19–20, 975 P.2d 1233, 1252 (1999). Acoba supports the non-contradiction principle: a buried or generic warning may be inadequate when stronger affirmative safety marketing overwhelms or contradicts it.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | |
|---|---|---|
| Training-data staleness | $26.64 | $85.44 |
| Hallucination/confidence-warning failure | $26.64 | $85.44 |
| Absent human-override architecture | $26.64 | $85.44 |
| Context-window degradation | $26.64 | $85.44 |
| Absent domain-specific validation | $26.64 | $85.44 |
| **Count II Total** | **$133.20** | **$427.20** |

## COUNT III

## NEGLIGENT MISREPRESENTATION[77]

**Hawaii Common Law; Restatement (Second) of Torts § 552; *Hawaii Medical Ass'n v. Hawaii Medical Serv. Ass'n, Inc.*, 113 Haw. 77 (2006)**

**212.** Plaintiff incorporates Sections I through IV and Counts I–II as if fully stated here.

**213. Legal Standard.** Hawaii recognizes negligent misrepresentation under Restatement (Second) of Torts § 552. A defendant supplying information for commercial guidance is liable when it provides false information, the plaintiff justifiably relies on it, the plaintiff suffers economic loss, and the defendant failed to exercise reasonable care in obtaining or communicating the information. *Hawaii Medical Ass'n v. Hawaii Medical Serv. Ass'n, Inc.*, 113 Haw. 77, 115 (2006). Unlike fraud, negligent misrepresentation does not require intent to deceive; it requires careless communication of material commercial information. Anthropic's safety and reliability marketing falls within this rule because consumers relied on those representations when deciding whether to purchase a premium AI subscription.[78]

**214. Anthropic's Negligent Misrepresentations.** Plaintiff alleges Anthropic supplied false or misleading safety information to Hawaii consumers, including Plaintiff, in five categories. Each statement allegedly guided subscription decisions and was communicated without reasonable care.

a) **Constitutional AI Misrepresentation.** Anthropic represented that Claude's Constitutional AI methodology ensured safety was not an afterthought. Plaintiff alleges that statement was misleading because Constitutional AI concerns conversational alignment, not target-characterization accuracy, training-data staleness, hallucination rates, context degradation,

---

[77] Hawaii Medical Ass'n v. Hawaii Medical Serv. Ass'n, Inc., 113 Haw. 77, 115, 157 P.3d 538, 576 (2006). Hawaii recognizes negligent misrepresentation under Restatement § 552 for commercial suppliers of information who provide false guidance without reasonable care, causing justifiable reliance and loss.

[78] Restatement (Second) of Torts § 552 (ALI 1977). Section 552 defines negligent misrepresentation by commercial information suppliers: false information, lack of reasonable care, justifiable reliance, and economic loss; comment e supports reliance on claimed professional expertise.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

or DoD human-control compliance. Anthropic allegedly failed to qualify the scope of the claim or disclose the risks it did not address.

b) **Responsible Scaling Policy Misrepresentation.** Anthropic represented that Claude was governed by rigorous pre-deployment safety evaluation. Plaintiff alleges this was misleading because the RSP thresholds did not address the alleged Minab failure modes, the deployed models remained classified at ASL-2, and no domain-specific military-targeting validation had been performed.

c) **PBC Mission Misrepresentation.** Anthropic represented that Claude was developed and maintained under a public-benefit mission of responsible AI development for humanity. Plaintiff alleges the statement was misleading because Anthropic simultaneously deployed Claude in military targeting applications without domain-specific validation and without disclosing that fact to consumer subscribers.

d) **Acceptable Use Policy Misrepresentation.** Anthropic represented that Claude would not be deployed in autonomous weapons targeting without meaningful human control. Plaintiff alleges this was misleading because Claude was allegedly used in a semi-autonomous targeting chain without technically binding human-override safeguards sufficient to prevent the Minab strike.

e) **Comparative Safety Misrepresentation.** Anthropic represented Claude as among the safest AI systems available. Plaintiff alleges that claim was negligently communicated because Anthropic had not performed the domain-specific comparative validation needed to support a broad safety-superiority claim across consumer and military deployment contexts.

**215. Failure to Exercise Reasonable Care.** Plaintiff alleges Anthropic failed to use reasonable care before making the five representations above. Reasonable care required Anthropic to verify the accuracy of its safety claims, disclose known limitations with specificity, perform domain-specific validation before high-consequence deployment, and issue prompt corrective disclosures after the Minab failure. Plaintiff alleges Anthropic did none of these things.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**216. Justifiable Reliance and Economic Loss.** Plaintiff alleges he justifiably relied on Anthropic's safety representations because Anthropic was the product's designer and the party best positioned to know Claude's limits. Had the alleged risks been accurately disclosed, Plaintiff would not have paid the premium subscription price or continued paying during the concealment period. His economic loss consists of the safety-premium component of subscription fees and post-Minab fees paid in reliance on the challenged representations.

**217. Damages on Count III.** As a direct and proximate result of Anthropic's negligent misrepresentations, Plaintiff suffered economic damages in Hawaii in amounts to be proven at trial. Plaintiff demands judgment against Defendant Anthropic PBC on Count III for compensatory damages, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count III.** Count III states the negligent-misrepresentation version of the same benefit-of-the-bargain loss. The table allocates the LOW and HIGH damages across the alleged safety representations while preserving the rule that Counts I through III seek alternative, not cumulative, recovery for the same subscription injury.

| **False Representation** | **LOW** | **HIGH** |
|---|---|---|
| Constitutional AI safety representation | $26.64 | $85.44 |
| Responsible Scaling Policy representation | $26.64 | $85.44 |
| Model Specification representation | $26.64 | $85.44 |
| Acceptable Use Policy representation | $26.64 | $85.44 |
| Industry-leading safety marketing | $26.64 | $85.44 |
| **Count III Total** | **$133.20** | **$427.20** |

## COUNT IV

## INTENTIONAL MISREPRESENTATION AND FRAUDULENT CONCEALMENT

**Hawaii Common Law; *Shoppe v. Gucci America, Inc.*, 94 Haw. 368 (2000); *Hawaii Medical Ass'n v. Hawaii Medical Serv. Ass'n, Inc.*, 113 Haw. 77 (2006); Restatement (Second) of Torts § 525; *Hana Ranch, Inc. v. Kanakaole*, 67 Haw. 438 (1984)**

**218.** Plaintiff incorporates Sections I through IV and Counts I–III as if fully stated here.

**219. Legal Standard — Intentional Misrepresentation and Fraudulent Concealment.** Hawaii recognizes intentional misrepresentation when a defendant makes a material false statement with knowledge or reckless disregard of falsity, intending reliance, and the plaintiff justifiably relies and suffers damages. *Shoppe v. Gucci America, Inc.*, 94 Haw. 368, 386 (2000);



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

*Hawaii Med. Ass'n*, 113 Haw. at 115; Restatement (Second) of Torts § 525. Hawaii also recognizes fraudulent concealment where a defendant intentionally withholds material facts despite a duty to disclose, including duties arising from partial disclosures, superior knowledge, statute, or consumer-protection obligations under HRS § 480-2.[79]

**220. Pre-Incident Misrepresentations — Knowledge of Falsity.** Plaintiff alleges Anthropic made the five safety misrepresentations identified in Section IV(L) with knowledge of falsity or reckless disregard before the February 28, 2026 Minab failure. Scienter is supported by four converging channels:

a) **Founding Team Expertise.** Anthropic's founders and senior researchers allegedly possessed expert knowledge of LLM risks, including staleness, hallucination, context degradation, and safety-evaluation limits, through their own research and product-design responsibilities. Plaintiff alleges they could not credibly claim ignorance of the defects later marketed as controlled or mitigated.

b) **Internal Research Documentation.** Plaintiff alleges Anthropic's model cards, engineering evaluations, safety assessments, and RSP materials documented Claude's hallucination rates, training cutoffs, context-window limitations, and lack of domain-specific validation before the challenged safety representations reached Hawaii subscribers.

c) **Bloomberg Admission as Knowledge Evidence.** Plaintiff alleges Dario Amodei's Bloomberg statement that Anthropic did not know exactly how Claude was used in the targeting chain supports pre-existing knowledge and a monitoring failure. If Anthropic lacked post-incident access to how Claude was used, Plaintiff alleges the promised deployment-monitoring architecture was not implemented for Maven. That alleged gap makes the RSP monitoring commitments and related safety marketing knowingly or recklessly misleading.

[79] Shoppe v. Gucci America, Inc., 94 Haw. 368, 386, 14 P.3d 1049, 1067 (2000); HMA v. HMSA, 113 Haw. 77, 115, 157 P.3d 538, 576 (2006); Restatement (Second) of Torts § 525. Hawaii intentional-misrepresentation elements: material false statement, knowledge or reckless disregard, intent to induce reliance, justifiable reliance, and damages.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

d) **Structural Impossibility of the Bloomberg Policy Claim.** Plaintiff alleges Amodei's simultaneous statements—that Anthropic did not know how Claude was used and that the use did not violate company policy—cannot both be true as stated. A CEO statement that is necessarily false or unsupported in part, made with knowledge of the underlying contradiction, supports scienter under *Shoppe* and *Hawaii Medical Ass'n.*

**221. Post-Incident Intentional Misrepresentation — Bloomberg Interview.** After the February 28, 2026 Minab targeting failure, Plaintiff alleges Anthropic's CEO made two material post-incident misrepresentations through a nationally broadcast interview directed to consumers, including Plaintiff in Hawaii:

**(a)** The statement that Claude's use in the targeting chain did not violate Anthropic policy, despite the simultaneous admission that Anthropic did not know exactly how Claude was used;

**(b)** The statement that Anthropic's safety architecture for military targeting consisted of a human making the final decision, which Plaintiff alleges was materially misleading because it contradicted the broader safety framework Anthropic had marketed to consumers. Plaintiff alleges these statements were made to prevent subscription cancellations, preserve investor confidence, and protect Anthropic's valuation and IPO-related activity, satisfying the reliance-inducement element of intentional misrepresentation.

**222. Fraudulent Concealment — Pre-Incident.** Before February 28, 2026, Plaintiff alleges Anthropic concealed material facts it had a duty to disclose, including:

**a)** Claude's five alleged architectural defects, which were known to Anthropic and not reasonably accessible to Hawaii subscribers exercising ordinary care;

**b)** Claude's alleged deployment through Palantir and Maven in a live military targeting environment while consumers were paying for a product marketed through safety representations that did not disclose that operational use.

**223. Fraudulent Concealment — Post-Incident.** After February 28, 2026, Plaintiff alleges Anthropic concealed Claude's role in the Minab targeting pipeline, the defects allegedly causing the failure, the preliminary military-investigation implications, and the need to correct pre-incident



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

safety claims. The concealment allegedly continued through the Series H financing period, S-1 filing activity, and the filing of this Complaint, supporting a commercially motivated and deliberate concealment theory.

**224. Statute of Limitations Tolling.** Plaintiff alleges tolling under *Hana Ranch, Inc. v. Kanakaole*, 67 Haw. 438, 444 (1984), for the period in which Anthropic's concealment prevented discovery of the facts supporting Count IV. Plaintiff could not reasonably have discovered the specific causal link between Claude's alleged defects and the Minab failure before public reporting identified stale data in Maven as a contributing cause; even then, the full scope of Anthropic's knowledge, monitoring, and concealment remains within Anthropic-controlled documents to be obtained in discovery.

**225. Damages on Count IV.** As a direct and proximate result of Anthropic's alleged intentional misrepresentations and fraudulent concealment, Plaintiff seeks economic damages consisting of subscription fees paid in reliance on the challenged safety representations and concealment, in amounts to be proven at trial. Plaintiff demands judgment against Defendant Anthropic PBC on Count IV for compensatory damages, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count IV.** Count IV restates the same compensatory damages through intentional misrepresentation and fraudulent concealment. Its distinct function is to add scienter, concealment, tolling, and punitive-damages predicates; the dollar table therefore tracks the same LOW and HIGH compensatory range without adding a duplicate recovery.[80]

| **Misrepresentation / Concealment** | **LOW** | **HIGH** |
|---|---|---|
| Constitutional AI | $33.30 | $106.80 |
| Responsible Scaling Policy | $33.30 | $106.80 |
| Model Specification | $33.30 | $106.80 |
| Post-Minab concealment-period fees | $103.20 | $103.20 |
| **Count IV Total** | **$133.20** | **$427.20** |

## COUNT V

## NEGLIGENCE

[80] Hana Ranch, Inc. v. Kanakaole, 67 Haw. 438, 444, 690 P.2d 268, 272 (1984). Hana Ranch recognizes fraudulent-concealment tolling when concealment prevents discovery of claims and supports recovery for losses incurred during the concealment period.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**Hawaii Common Law; *Bidar v. Amfac, Inc.*, 66 Haw. 547 (1983); *Doe Parents No. 1 v. Dep't of Education*, 100 Haw. 34 (2002)**

**226.** Plaintiff incorporates Sections I through IV and Counts I–IV as if fully stated here.

**227. Legal Standard.** A negligence claim under Hawaii law requires duty, breach, causation, and damages. *Bidar v. Amfac, Inc.*, 66 Haw. 547, 552 (1983). Duty is measured by foreseeable risk. *Doe Parents No. 1 v. Dep't of Education*, 100 Haw. 34, 69 (2002). Where a company operates in a specialized technical field and markets its product as unusually safe, the represented safety standard informs the reasonable-care analysis. Plaintiff alleges Anthropic assumed and breached that elevated standard through its safety marketing, product design, deployment decisions, and post-incident nondisclosure.[81]

**228. Anthropic's Duties of Care.** Plaintiff alleges Anthropic owed four independent duties: to design, test, warn, and monitor Claude as a consumer product; to make Claude's performance match the safety standard it marketed; to validate and safeguard Claude before military targeting deployment; and, after the Minab failure, to issue timely corrective disclosures to subscribers.

- **a)** As Claude's designer and seller, Anthropic owed ordinary product-safety duties of reasonable design, testing, warning, and post-sale monitoring.
- **b)** By marketing Claude as governed by elevated safety architecture, Anthropic owed a duty to ensure the product's design and performance matched those representations.
- **c)** By accepting a major national-security deployment involving Maven and targeting-related intelligence synthesis, Anthropic owed a duty to conduct domain-specific validation, disclose known defects, and implement binding human-override safeguards.
- **d)** After the February 28, 2026 Minab failure, Anthropic owed subscribers a duty to disclose material corrective information so they could make informed subscription decisions.

**229. Breach of Duties.** Plaintiff alleges Anthropic breached each duty in four corresponding ways:

[81] Bidar v. Amfac, Inc., 66 Haw. 547, 552, 669 P.2d 154, 158 (1983). Bidar states Hawaii negligence elements—duty, breach, causation, and damages—and measures duty by foreseeable risk to persons foreseeably harmed by a defendant's conduct.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**a)** Anthropic allegedly designed Claude with the five architectural defects identified in Count I and failed to implement reasonable compensating safeguards or disclosures.

**b)** Anthropic allegedly promoted a safety standard that its internal documents and actual product performance did not satisfy.

**c)** Anthropic allegedly licensed Claude for Maven-related deployment without domain-specific validation, adequate defect disclosures, or technically binding human-override architecture compliant with DoD Directive 3000.09.

**d)** Anthropic allegedly failed to issue corrective subscriber disclosures after Minab and instead allowed the same safety representations to remain live while the Bloomberg interview reinforced the challenged narrative.

**230.** **Causation and Damages on Count V.** Anthropic's alleged breaches directly caused Plaintiff's Hawaii economic injury: the safety-premium portion of subscription fees and all fees paid during the post-Minab concealment period. Plaintiff demands judgment against Defendant Anthropic PBC on Count V for compensatory damages, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count V.** Count V frames the same economic loss as negligence: duty, breach, causation, and damages. The table allocates the injury across the alleged negligent design and deployment decisions, while maintaining the same actual-damages total used in the preceding alternative theories.

| **Negligent Design / Deployment Decision** | **LOW** | **HIGH** |
|---|---|---|
| No mechanism addressing training-data staleness | $26.64 | $85.44 |
| No confidence indicators or hallucination flags | $26.64 | $85.44 |
| No human-override architecture before CDAO deployment | $26.64 | $85.44 |
| No context-window integrity safeguards | $26.64 | $85.44 |
| No domain-specific validation before professional marketing | $26.64 | $85.44 |
| **Count V Total** | **$133.20** | **$427.20** |

## COUNT VI

## VIOLATION OF HAWAII REVISED STATUTES CHAPTER 480 — UNFAIR AND DECEPTIVE ACTS OR PRACTICES

**HRS §§ 480-2(a), 480-13(b); *Cieri v. Leticia Query Realty*, 80 Haw. 54 (1995); *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607 (1980)**

**231.** Plaintiff incorporates Sections I through IV and Counts I–V as if fully stated here.

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**232. Legal Standard.** HRS § 480-2(a) prohibits unfair or deceptive acts or practices in trade or commerce. Under HRS § 480-13(b), an injured consumer may recover treble actual damages, reasonable attorneys' fees, and costs. A deceptive practice is one with the capacity or tendency to mislead an ordinary consumer exercising reasonable diligence; an unfair practice is one likely to cause substantial, not reasonably avoidable consumer injury not outweighed by countervailing benefits. *Cieri v. Leticia Query Realty*, 80 Haw. 54, 67 (1995); *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 616 (1980). Once a violation and consumer injury are established, trebling is mandatory.[82]

**233. Plaintiff Is a Consumer.** Plaintiff is a natural person who purchased Claude subscription services through the claude.ai consumer platform primarily for personal and professional use, making him a consumer under HRS § 480-13(b).[83]

**234. Six Independently Cognizable HRS § 480-2 Violations.** Plaintiff alleges Anthropic committed six unfair or deceptive practices in subscription trade and commerce directed at Hawaii consumers:

a) **Constitutional AI Deception.** Anthropic allegedly represented that Constitutional AI ensured Claude's safety while withholding that the method did not address target-characterization accuracy, stale training data, hallucination, context degradation, or DoD human-control compliance. Plaintiff alleges the representation could mislead an ordinary Hawaii consumer into believing Claude's safety was comprehensively guaranteed.

b) **Responsible Scaling Policy Deception.** Anthropic allegedly represented that Claude was governed by rigorous pre-deployment safety evaluation, while the RSP thresholds did not address the Minab failure modes and Anthropic proceeded with Maven-related deployment without domain-specific targeting validation.

c) **PBC Status and Governance Deception.** Anthropic allegedly used its public-benefit mission and responsible-development identity as evidence of enforceable safety

[82] HRS §§ 480-2(a), 480-13(b)(1), 480-13(b)(2). These provisions prohibit unfair or deceptive acts or practices, authorize consumer actions, provide treble damages, fees, and costs, and permit injunctive relief.
[83] Ai v. Frank Huff Agency, Ltd., 61 Haw. 607, 616–17, 607 P.2d 1304, 1310–11 (1980). Ai defines a consumer under HRS § 480-13(b) and directs broad construction of Hawaii's consumer-protection private right of action.

commitments while deploying Claude in military targeting applications without domain-specific validation or binding human-override architecture.

d) **Safety-Premium Price Extraction.** Plaintiff alleges Anthropic charged a premium subscription price supported by its safety narrative and thereby caused quantifiable economic injury equal to the safety-premium component of Plaintiff's subscription fees.

e) **Post-Minab Concealment and Continued Fee Collection.** After the February 28, 2026 Minab failure, Anthropic allegedly failed to disclose Claude's role and continued collecting subscription fees during the 157-day concealment period. Plaintiff alleges he would not have paid those fees had corrective disclosures been made.

f) **Bloomberg Interview Misrepresentation.** Plaintiff alleges Dario Amodei's Bloomberg statement that the use did not violate company policy, made while admitting Anthropic did not know exactly how Claude was used, was a materially misleading consumer-facing statement intended to prevent cancellations and protect Anthropic's valuation.

**235.** **Objective Materiality.** Plaintiff alleges materiality is confirmed by the government's reliance on substantially the same safety representations in connection with a $200 million classified AI services contract. A representation material to sophisticated government procurement is, at minimum, capable of misleading an ordinary Hawaii consumer evaluating a paid subscription under *Cieri*'s objective standard.

**236.** **Statutory Injury, Trebling, and Fees.** Plaintiff alleges injury under HRS § 480-13(b) because he paid safety-premium subscription fees and post-Minab concealment-period fees in reliance on Anthropic's challenged practices. The actual-damages baseline is therefore trebled under HRS § 480-13(b)(1), with reasonable attorneys' fees and costs added as mandatory statutory remedies. Plaintiff demands judgment against Defendant Anthropic PBC on Count VI for treble damages, mandatory reasonable attorneys' fees, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count VI.** Count VI is the first count that changes the running liability amount. It takes the actual-damages baseline from Counts I through V, applies mandatory trebling under HRS § 480-13(b)(1), and adds estimated mandatory attorneys' fees. The table below preserves the LOW and HIGH statutory totals.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| UDAP Component | LOW | HIGH |
|---|---|---|
| Base actual damages from Counts I–V | $133.20 | $427.20 |
| Mandatory treble damages | $399.60 | $1,281.60 |
| Mandatory attorneys' fees estimate | $75,000.00 | $500,000.00 |
| **Count VI Total** | **$75,399.60** | **$501,281.60** |

## COUNT VII

## VIOLATION OF HAWAII UNIFORM DECEPTIVE TRADE PRACTICES ACT

## HRS §§ 481A-3, 481A-4

**237.** Plaintiff incorporates Sections I through IV and Counts I–VI as if fully stated here.

**238.** **Legal Standard.** HRS §§ 481A-3 and 481A-4 prohibit deceptive trade practices and authorize injunctive relief for persons likely to be damaged by them. Section 481A-3 covers false representations about a product's characteristics, uses, benefits, quality, or grade, and other conduct likely to cause confusion or misunderstanding. Section 481A-4 does not require completed monetary injury; a likelihood of continuing damage is enough. Plaintiff alleges that standard is met because Anthropic's challenged safety representations remain live and uncorrected for Hawaii consumers.[84]

**239.** **Anthropic's Alleged HRS § 481A-3 Violations.** Plaintiff alleges three independently actionable deceptive trade practices:

- **a)** Anthropic allegedly misrepresented Claude's characteristics, uses, benefits, and safety qualities through Constitutional AI, RSP, PBC mission, and safety-superiority statements, in violation of HRS § 481A-3(a)(5).
- **b)** Anthropic allegedly misrepresented Claude's standard, quality, or grade by implying that its safety architecture met or exceeded applicable AI-safety standards, despite the five alleged defects and the Minab failure modes, in violation of HRS § 481A-3(a)(7).

[84] HRS §§ 481A-3, 481A-4. The UDTPA prohibits false representations about characteristics, uses, benefits, quality, or conduct likely to cause confusion and authorizes injunctive relief for persons likely to be damaged.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

c) Anthropic allegedly created a likelihood of consumer confusion by concealing post-Minab facts, leaving pre-Minab safety marketing uncorrected, and making the Bloomberg interview statements, in violation of HRS § 481A-3(a)(12).

**240. Right to Injunctive Relief Under HRS § 481A-4.** Plaintiff alleges he is likely to be damaged by Anthropic's continuing deceptive trade practices because the challenged safety representations remain available to Hawaii consumers without correction. Count VII therefore seeks prospective relief to stop the alleged continuing deception and require corrective disclosures.[85]

**241. Specific UDTPA Injunctive Relief Sought.** Plaintiff seeks a permanent injunction requiring Anthropic to:

**a)** cease making the challenged safety representations to Hawaii consumers through the claude.ai platform, corporate website, press releases, testimony, investor communications, advertising, or other promotional channels;

**b)** issue plain-language corrective notices to Hawaii Claude subscribers and other affected consumer subscribers, identifying the material respects in which the challenged pre-Minab safety representations were false or misleading; and

**c)** refrain from replacing corrected statements with new safety claims unless those claims are verified through independent, domain-specific validation consistent with the audit relief sought in Count XIII.

**242. Demand for Judgment on Count VII.** Plaintiff demands judgment against Defendant Anthropic PBC for permanent injunctive relief under HRS § 481A-4, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count VII.** Count VII focuses on prospective relief under the Hawaii UDTPA. It preserves alternative monetary and fee theories only to the extent they are not already satisfied by Count VI, and it directs the injunctive component to the later permanent-injunction count rather than adding a separate running-total amount here.

| UDTPA Allegation | Category | LOW | HIGH |
| --- | --- | --- | --- |

[85] HRS § 480-13(b)(2). This provision independently authorizes consumer injunctive relief for HRS § 480-2 violations, supplementing equitable authority.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| HRS § 481A-3(b)(5): safety characteristics Claude allegedly did not have | Alternative actual damages | $133.20 | $427.20 |
| HRS § 481A-3(b)(9): advertised with intent not to deliver as advertised | Alternative actual damages | $133.20 | $427.20 |
| HRS § 481A-3(b)(12): deceptive conduct creating likelihood of confusion | Alternative actual damages | $133.20 | $427.20 |
| HRS § 481A-4: attorneys' fees for willful deception | Alternative attorneys' fees | $75,000.00 | $500,000.00 |
| Permanent injunctive orders | See Count XIII | [Count XIII] | [Count XIII] |
| **Count VII Total** | **Alternative to Count VI; not additive** | **$75,133.20** | **$500,427.20** |

## COUNT VIII

## BREACH OF EXPRESS WARRANTY

**Hawaii Revised Statutes § 490:2-313; *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1 (1992); *Ontai v. Straub Clinic & Hospital*, 66 Haw. 237 (1983)**

**243.** Plaintiff incorporates Sections I through IV and Counts I–VII as if fully stated here.

**244. Legal Standard.** HRS § 490:2-313 creates an express warranty when a seller's affirmation, promise, description, sample, or model becomes part of the basis of the bargain. Formal words such as "warrant" or "guarantee" are unnecessary. A breach occurs when the delivered product does not conform to the represented characteristics. Damages are measured by the difference between the value as warranted and the value as accepted, plus any recoverable incidental or consequential damages under HRS §§ 490:2-714 and 490:2-715. Hawaii construes consumer express warranties liberally, resolving ambiguity against the seller. *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1, 17 (1992).[86]

**245. Anthropic's Express Warranties.** Plaintiff alleges Anthropic made four affirmations or descriptions that became material terms of the Claude subscription bargain:

a) **Constitutional AI Safety Performance Warranty.** Anthropic allegedly represented that Claude's Constitutional AI methodology ensured safety was not an afterthought, creating a warranty that Claude's safety was architecturally supported by that method.

[86] HRS § 490:2-313; Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 17, 837 P.2d 1273, 1283 (1992). Affirmations of fact or promises that become part of the bargain create express warranties; ambiguity is resolved against the seller.



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

b) **Responsible Scaling Policy Evaluation Warranty.** Anthropic allegedly represented that Claude was governed by rigorous pre-deployment safety evaluation, creating a warranty that Claude had been evaluated and delivered under the standards described in the RSP.

c) **Public Benefit Mission Warranty.** Anthropic allegedly represented that Claude was developed and maintained for humanity's long-term benefit under a public-benefit mission, creating a warranty that Claude's design and deployment conformed to that responsible-development standard.

d) **Acceptable Use Policy Human-Oversight Warranty.** Anthropic allegedly represented that Claude would not be deployed in autonomous weapons targeting without meaningful human oversight, creating a warranty that enforceable policy constraints governed such deployment.

**246. Breach of Express Warranties.** Plaintiff alleges Anthropic breached each warranty in four corresponding ways:

a) **Constitutional AI.** Claude allegedly did not conform to the warranty that Constitutional AI ensured safety because that methodology did not address the five alleged defects: stale training data, hallucination without uncertainty warnings, lack of binding human override, context-window degradation, and absence of domain-specific targeting validation.

b) **Responsible Scaling Policy.** Claude allegedly did not conform to the RSP evaluation warranty because Anthropic performed no domain-specific military-targeting validation, the RSP thresholds did not address the alleged Minab failure modes, and the deployed models remained classified below the level that would trigger enhanced evaluation.

c) **Public Benefit Mission.** Claude allegedly did not conform to the public-benefit mission warranty because Anthropic deployed it in a live military targeting chain without domain-specific validation, binding human-override architecture, or disclosure of the alleged defects to consumers.

d) **Acceptable Use Policy.** Claude allegedly did not conform to the human-oversight warranty because the policy was not technically enforced in Claude's inference pipeline. Plaintiff



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

alleges that relying on a human final decision, without binding override architecture, monitoring, or domain validation, did not satisfy the represented constraint.

**247. Notice of Breach.** To the extent HRS § 490:2-607(3)(a) requires notice, Plaintiff's filing of this Complaint provides notice of the alleged express-warranty breaches. Plaintiff alleges he could not reasonably discover the breaches earlier because the facts showing Claude's role in the Minab failure, the alleged defect chain, and the CEO's later admissions were concealed until public reporting and the Bloomberg interview.

**248. Measure of Damages on Count VIII.** Plaintiff seeks benefit-of-the-bargain damages under HRS § 490:2-714(2): the difference between Claude as warranted—safe, evaluated, responsibly developed, and constrained from improper weapons deployment—and Claude as allegedly delivered with the five defects described in this Complaint. Plaintiff also seeks any recoverable consequential economic damages under HRS § 490:2-715, in amounts proven at trial.

**249. Demand for Judgment on Count VIII.** As a direct and proximate result of Anthropic's alleged express-warranty breaches, Plaintiff suffered economic damages in Hawaii. Plaintiff demands judgment against Defendant Anthropic PBC on Count VIII for compensatory damages in amounts proven at trial, costs of suit, and all further relief this Court deems just and proper.

**Supplemental Prayer/Damages Summary for Count VIII.** Count VIII states the express-warranty theory as an alternative benefit-of-the-bargain recovery. The same subscription-loss baseline is allocated across the alleged warranties and the concealment-period breach, but the recovery is not added to the running total because Count VI already supplies the operative statutory recovery.

| Express Warranty Breached | Category | LOW | HIGH |
|---|---|---|---|
| Constitutional AI safety representation | Warranty breach | $22.20 | $71.20 |
| Responsible Scaling Policy pre-deployment evaluation | Warranty breach | $22.20 | $71.20 |
| Model Specification behavior implementation | Warranty breach | $22.20 | $71.20 |
| Acceptable Use Policy enforceable human-oversight constraint | Warranty breach | $22.20 | $71.20 |
| General industry-leading safety marketing | Warranty breach | $11.10 | $35.60 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| 157-day concealment as continuing breach | Warranty breach | $11.10 | $35.60 |
| Post-Minab fees paid | Concealment-period fees | $103.20 | $103.20 |
| **Count VIII Total** | **Alternative benefit-of-the-bargain differential** | **$133.20** | **$427.20** |

## COUNT IX

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

**Hawaii Revised Statutes § 490:2-314; *Ontai v. Straub Clinic & Hospital*, 66 Haw. 237 (1983)**

**250.** Plaintiff incorporates Sections I through IV and Counts I–VIII as if fully stated here.

**251. Legal Standard.** HRS § 490:2-314 implies a warranty that goods sold by a merchant are merchantable unless effectively excluded or modified. To be merchantable, goods must pass without objection in the trade, be of fair average quality within the contract description, and be fit for ordinary purposes. Plaintiff alleges Claude subscription services fall within Article 2 merchantability principles as commercial AI subscription products. Any attempted disclaimer is ineffective unless it specifically mentions merchantability and is conspicuous under HRS § 490:2-316(2).[87]

**252. Anthropic as Merchant.** Anthropic is a merchant with respect to AI subscription products because it designs, develops, markets, and sells Claude subscriptions as a core commercial business. Its sale of Claude to Plaintiff through the claude.ai platform therefore carried an implied warranty of merchantability under HRS Chapter 490.

**253. Three Dimensions of Non-Merchantability.** Plaintiff alleges Claude was not merchantable in three independent respects: it was unfit for ordinary premium-AI-assistant purposes, did not pass without objection in the AI trade under the contract description, and was not of fair average quality within that description.

a) **Unfit for Ordinary Premium-AI-Assistant Purposes.** Plaintiff alleges Claude was not fit for the ordinary purposes of a premium AI assistant because stale training data, hallucination without adequate warning, and context-window degradation undermined accurate research, analysis, and professional decision support. A product that produces

[87] HRS §§ 490:2-314, 490:2-316(2); Ontai v. Straub Clinic & Hospital, 66 Haw. 237, 247, 660 P.2d 1309, 1317 (1983). Merchantability requires fitness for ordinary purposes, and disclaimers must mention merchantability and be conspicuous.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

confident but materially wrong factual outputs without adequate uncertainty signals allegedly fails the ordinary consumer purpose for which Plaintiff subscribed.

b) **Failure to Pass Without Objection in the Trade.** Plaintiff alleges Claude would not pass without objection under the contract description because Anthropic marketed it as governed by Constitutional AI, RSP safeguards, and responsible-development commitments while allegedly delivering a product with five architectural defects and no domain-specific validation for the high-consequence deployment described in the Complaint.

c) **Below Fair Average Quality Within the Description.** Plaintiff alleges Claude was below fair average quality for a product marketed as among the safest commercial AI systems because the same undisclosed defects allegedly manifested in the February 28, 2026 Minab targeting failure. Count IX relies on that event as the concrete manifestation of known architectural defects, not as an isolated malfunction.

**254. Disclaimer Exclusion.** To the extent Anthropic relies on its Terms of Service, Plaintiff alleges any disclaimer is ineffective because it does not conspicuously and specifically exclude merchantability as required by HRS § 490:2-316(2), particularly against the backdrop of Anthropic's foregrounded safety marketing.

**255. Damages on Count IX and Demand for Judgment.** Plaintiff seeks benefit-of-the-bargain and consequential economic damages under HRS §§ 490:2-714 and 490:2-715, measured by the difference between Claude as merchantably fit and Claude as allegedly delivered. Plaintiff demands judgment against Defendant Anthropic PBC on Count IX for compensatory damages in amounts proven at trial, costs of suit, and all further relief this Court deems just and proper.

**Supplemental Prayer/Damages Summary for Count IX.** Count IX presents merchantability as a separate warranty basis for the same economic injury. The table groups the alleged non-merchantability into ordinary-purpose failure, trade nonconformity, and below-average quality, while preserving the same alternative LOW/HIGH damages range.

| Non-Merchantability Dimension | Category | LOW | HIGH |
|---|---|---|---|
| Unfit for ordinary purpose; hallucination risk and data lag | Ordinary purpose defects | $66.60 | $213.60 |
| Trade nonconformity based on deployment and validation defects | Trade nonconformity | $33.30 | $106.80 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| Below fair average quality within the marketed safety description | Quality; all alleged defects | $33.30 | $106.80 |
| **Count IX Total** | **Alternative to Count I actual damages** | **$133.20** | **$427.20** |

## COUNT X

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

**Hawaii Revised Statutes § 490:2-315; *Larsen v. Pacesetter Systems, Inc.*, 74 Haw. 1 (1992)**

**256.** Plaintiff incorporates Sections I through IV and Counts I–IX as if fully stated here.

**257. Legal Standard.** HRS § 490:2-315 implies a warranty of fitness for a particular purpose when the seller has reason to know the buyer's specific purpose and that the buyer relies on the seller's skill or judgment. Unlike merchantability, this warranty concerns a particular identified use rather than ordinary use. Plaintiff alleges Anthropic created this warranty by marketing Claude as suitable for reliable consumer decision support and mission-critical government applications, including sensitive national-security uses.[88]

**258. Anthropic's Knowledge of the Particular Purposes.** Plaintiff alleges Anthropic knew or had reason to know of two particular purposes: Plaintiff's consumer use of Claude for reliable factual assistance and the government's use of Claude for national-security intelligence synthesis and targeting-related support.

a) **Consumer Reliable-Information Purpose.** Anthropic's consumer marketing allegedly identified Claude as a tool for reliable personal and professional research, analysis, and decision support. Plaintiff alleges that marketing gave Anthropic reason to know Plaintiff's particular subscription purpose and induced reliance on Anthropic's technical judgment.

b) **Government Deployment Purpose.** Anthropic allegedly had actual knowledge of Claude's deployment under the CDAO contract and Palantir-AWS partnership for mission-critical government environments, including intelligence analysis, operational planning, and targeting-related synthesis. Plaintiff alleges those representations also affected consumer

[88] HRS § 490:2-315; Larsen v. Pacesetter Systems, Inc., 74 Haw. 1, 17–18, 837 P.2d 1273, 1283 (1992). Fitness warranties arise when a seller knows the buyer's particular purpose and reliance on the seller's skill and judgment.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

subscription decisions because Anthropic used government deployment as proof of Claude's fitness and safety.

**259. Claude Was Not Fit for Either Particular Purpose.** Plaintiff alleges Claude failed both identified purposes for the following reasons:

a) **Consumer Reliable-Information Purpose.** Claude allegedly was not fit for reliable consumer research and decision support because training-data staleness, hallucination without adequate warning, and context-window degradation impaired the very accuracy and calibration Anthropic marketed. Plaintiff alleges those defects made Claude unsuitable for the particular purpose for which he subscribed.

b) **National-Security Intelligence and Targeting Purpose.** Claude allegedly was not fit for national-security intelligence synthesis or targeting-related use because all five architectural defects became especially dangerous in that context: stale target information, hallucinated outputs, lack of binding human override, degradation under high-volume multi-source analysis, and no domain-specific validation. Plaintiff alleges those defects were actualized in the February 28, 2026 Minab failure.

**260. Disclaimer Exclusion.** Any disclaimer of the implied warranty of fitness is ineffective unless written and conspicuous under HRS § 490:2-316(2). Plaintiff alleges Anthropic's Terms of Service limitations were not conspicuous when measured against its prominent safety and fitness representations.

**261. Damages on Count X and Demand for Judgment.** Plaintiff seeks compensatory damages for Anthropic's alleged breach of the implied warranty of fitness for a particular purpose, in amounts proven at trial. Plaintiff demands judgment against Defendant Anthropic PBC on Count X for compensatory damages, costs of suit, and all further relief this Court deems just and proper.

**Supplemental Prayer/Damages Summary for Count X.** Count X addresses fitness for two particular purposes: consumer reliable information assistance and national-security intelligence synthesis. Both theories rely on the same alleged defects and therefore preserve the same alternative actual-damages baseline without increasing the running total.

| Particular Purpose Breached | Category | LOW | HIGH |
|---|---|---|---|



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| Consumer reliable information assistance; defects relating to staleness, hallucination, and context degradation | Fitness warranty breach — consumer purpose | $66.60 | $213.60 |
| National-security intelligence synthesis and targeting-related use; all five alleged defects | Fitness warranty breach — government purpose | $66.60 | $213.60 |
| **Count X Total** | **Alternative to Count I actual damages** | **$133.20** | **$427.20** |

## COUNT XI

## UNJUST ENRICHMENT AND RESTITUTION

**Hawaii Common Law; *Small v. Badenhop*, 67 Haw. 626 (1985); *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490 (2004)**

**262.** Plaintiff incorporates Sections I through IV and Counts I–X as if fully stated here.

**263. Legal Standard.** Hawaii recognizes unjust enrichment when a defendant receives a benefit at the plaintiff's expense and retention would be unjust. *Small v. Badenhop*, 67 Haw. 626, 636 (1985); *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490, 503 (2004). Restitution is an equitable remedy designed to prevent a defendant from retaining the benefits of wrongdoing. Count XI is pleaded in the alternative to the warranty counts, preserving restitution if a court later finds that contract-based remedies are unavailable or inadequate.[89]

**264. Benefit Received.** Anthropic allegedly received two quantifiable benefits from Plaintiff in Hawaii: the safety-premium portion of pre-Minab subscription fees and the full amount of post-Minab fees paid during the concealment period. Plaintiff alleges those payments were obtained through the challenged safety narrative and continued nondisclosure, rather than through a fully informed market transaction.

**265. Received at Plaintiff's Expense.** Plaintiff paid the subscription fees from his own funds as part of a Hawaii consumer subscription relationship. Anthropic's alleged enrichment was therefore coextensive with Plaintiff's economic loss: Plaintiff paid a price allegedly inflated by safety representations and continued paying during a period when material corrective information was withheld.

[89] Small v. Badenhop, 67 Haw. 626, 636, 636 P.2d 1395, 1402 (1985); Durette v. Aloha Plastic Recycling, Inc., 105 Haw. 490, 503, 99 P.3d 1014, 1027 (2004). Hawaii recognizes unjust enrichment and restitution where a defendant retains a benefit unjustly at the plaintiff's expense.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**266. Retention Would Be Unjust.** Plaintiff alleges Anthropic's retention of those benefits is unjust on three independent equitable grounds: fraud-based retention, concealment-based retention, and public-policy-based retention.

a) **Fraud-Based Retention.** Plaintiff alleges Anthropic obtained the safety-premium component of Plaintiff's fees through affirmative safety representations that overstated Claude's safety characteristics and omitted material limitations. Equity does not permit a party to retain payments obtained through alleged fraud.

b) **Concealment-Based Retention.** Plaintiff alleges Anthropic obtained post-Minab subscription fees by withholding material information for 157 days after the alleged targeting failure. Those fees are pleaded as unjustly retained concealment-period payments, subject to disgorgement in equity.

c) **Public-Policy-Based Retention.** Plaintiff alleges Hawaii equity should deny retention of benefits obtained through a safety narrative used to support both consumer subscriptions and high-consequence deployment without adequate validation or disclosure. The claim seeks to prevent retention of profits allegedly inconsistent with justice and fair dealing.

**267. Restitution Remedy and Disgorgement Scope.** Plaintiff seeks restitution of the safety-premium component of pre-Minab fees, the full amount of post-Minab concealment-period fees, and any Hawaii-wide safety-premium or concealment-period enrichment proven through discovery and expert evidence. Plaintiff does not presently seek individual restitution on behalf of absent class members but reserves the right to pursue class-wide restitution in a later or amended proceeding.

**268. Demand for Judgment on Count XI.** Plaintiff alleges Anthropic was unjustly enriched at Plaintiff's expense and seeks restitution in amounts proven at trial. Plaintiff demands judgment against Defendant Anthropic PBC on Count XI for restitution, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count XI.** Count XI shifts from Plaintiff's loss to Anthropic's alleged gain. Individual restitution remains alternative to the compensatory damages already pleaded, while the only primary net addition is

Hawaii-wide equitable disgorgement. The contingent Series H theory is preserved separately and is not included in the primary running total.

| Unjust Enrichment Dimension | Category | LOW | HIGH |
|---|---|---|---|
| Safety premium on Plaintiff's pre-Minab fees | Individual restitution | $30.00 | $144.00 |
| Plaintiff's post-Minab fees during 157-day concealment period | Individual restitution | $103.20 | $103.20 |
| Dimension 1 total | Alternative individual restitution; not additive | $133.20 | $427.20 |
| Estimated Hawaii-wide safety-premium disgorgement | Net additive equitable disgorgement | $210,000.00 | $1,008,000.00 |
| Series H valuation premium disgorgement | Contingent; not in primary total | $0.00 | $650,000,000.00 |
| **Count XI Net Addition** | **Hawaii-wide disgorgement only** | **$210,000.00** | **$1,008,000.00** |
| Prior running total after Count X | | $75,399.60 | $501,281.60 |
| **Running Total After Count XI** | | **$285,399.60** | **$1,509,281.60** |

## COUNT XII

## DECLARATORY RELIEF

**28 U.S.C. §§ 2201–2202; *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118 (2007); Fed. R. Civ. P. 57**

**269.** Plaintiff incorporates Sections I through IV and Counts I–XI as if fully stated here.

**270. Legal Standard.** The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, allows the Court to declare the rights and legal relations of interested parties in an actual controversy. Under *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), the controversy must be definite, concrete, real, and substantial. Plaintiff alleges that standard is met because Anthropic's safety representations remain uncorrected, Plaintiff's subscription decisions are affected by them, and the parties dispute concrete legal relations involving defectiveness, falsity, disclosure duties, and continuing violations.[90]

**271. Four Justiciable Controversies.** Plaintiff seeks declarations resolving four concrete disputes between Plaintiff and Anthropic:

a) **Product Defectiveness.** Plaintiff alleges an actual controversy over whether Claude, as designed and deployed, was defective under Hawaii strict-products-liability doctrine and

[90] 28 U.S.C. §§ 2201–2202; MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127 (2007); Fed. R. Civ. P. 57. Declaratory relief requires a definite, concrete, immediate controversy; adequate legal remedies do not bar declaratory judgment.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

Restatement § 402A. Plaintiff alleges Claude's five architectural defects made it unreasonably dangerous under the consumer-expectations test, while Anthropic's public statements dispute that premise. The declaration would determine the legal predicate for Counts I and II.

b) **Falsity of Safety Marketing.** Plaintiff alleges an actual controversy over whether Anthropic's Constitutional AI, Responsible Scaling Policy, PBC mission, Acceptable Use Policy, and safety-superiority representations were materially false or misleading to Hawaii subscribers. Anthropic continues displaying those representations without correction, while Plaintiff alleges they were false for the reasons pleaded in Section IV(L). The declaration would support Counts III, IV, VI, VII, VIII, IX, and X.

c) **Continuing Disclosure Obligation.** Plaintiff alleges an actual controversy over whether Anthropic has a continuing legal duty under HRS § 480-2, Hawaii fraud doctrine, and post-sale warning principles to issue corrective disclosures to consumer subscribers, including Hawaii subscribers, about Claude's alleged defects, its role in the Minab targeting failure, the gap between marketed safety governance and actual deployment, and any needed correction of existing safety claims.

d) **Continuing Violation of HRS § 480-2.** Plaintiff alleges an actual controversy over whether Anthropic's continued display of uncorrected pre-Minab safety representations as of August 10, 2026 constitutes a continuing daily violation of HRS § 480-2 and Hawaii fraud doctrine. Plaintiff seeks a declaration establishing that the ongoing display supports the permanent injunctive relief requested in Count XIII.

**272. Relief Sought on Count XII.** Plaintiff seeks four declarations under 28 U.S.C. §§ 2201–2202 and Rule 57:

a) Claude, as designed and deployed by Anthropic, was and is a defective product under Hawaii strict-products-liability doctrine and Restatement § 402A because of the five alleged architectural defects described in Counts I and II;

b) Anthropic's Constitutional AI, RSP, PBC mission, and Acceptable Use Policy representations directed to Hawaii consumer subscribers were materially false or misleading under HRS Chapter 480 and Hawaii common-law fraud doctrine;

c) Anthropic has a continuing legal obligation to issue specific corrective disclosures to consumer subscribers, including Hawaii Claude subscribers, regarding Claude's alleged defects, its role in the Minab targeting failure, and the material falsity of the pre-Minab safety marketing; and

d) Anthropic's continued display of uncorrected pre-Minab safety marketing as of August 10, 2026 constitutes a continuing daily violation of HRS § 480-2 and Hawaii fraud doctrine, supporting the injunctive relief requested in Count XIII.

**273.** Demand for Judgment on Count XII. Plaintiff demands judgment against Defendant Anthropic PBC on Count XII for declaratory relief as described above, costs of suit, and all further relief this Court deems just and proper. **Supplemental Prayer/Damages Summary for Count XII.** Count XII is non-monetary declaratory relief. It adds no direct damages, but it supplies legal predicates for the monetary, equitable, tolling, and injunctive remedies by seeking declarations on product defectiveness, false safety marketing, continuing disclosure duties, and continuing violations as of August 10, 2026. The running total remains unchanged.

| Declaration Sought | Direct Addition | Multiplier Value | LOW | HIGH |
|---|---|---|---|---|
| Claude is a defective product | $0.00 | Enables products-liability actual damages | $0.00 | $0.00 |
| Safety marketing was materially false | $0.00 | Enables fraud, consumer-protection, trebling, and fee predicates | $0.00 | $0.00 |
| Continuing disclosure obligation | $0.00 | Enables Count XIII injunctive relief | $0.00 | $0.00 |
| Continuing violation as of August 10, 2026 | $0.00 | Supports tolling and punitive-damages predicate | $0.00 | $0.00 |
| **Count XII Direct Addition** | **$0.00** | **Full running total structurally supported** | **$0.00** | **$0.00** |
| **Running Total After Count XII** | | | **$285,399.60** | **$1,509,281.60** |

## COUNT XIII

## PERMANENT INJUNCTIVE RELIEF



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**Federal Rule of Civil Procedure 65; *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006); HRS § 480-13(b)(2); *Cieri v. Leticia Query Realty*, 80 Haw. 54 (1995)**

**274.** Plaintiff incorporates Sections I through IV and Counts I–XII as if fully stated here.

**275. Legal Standard.** Federal Rule of Civil Procedure 65 and *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), require a plaintiff seeking permanent injunctive relief to show irreparable injury, inadequacy of legal remedies, favorable balance of hardships, and consistency with the public interest. HRS § 480-13(b)(2) independently authorizes injunctive relief for a consumer injured by a violation of HRS § 480-2. Plaintiff alleges both standards are satisfied by Anthropic's continuing uncorrected safety representations to Hawaii consumers.[91]

**276. Element One — Irreparable Injury.** Plaintiff alleges continuing irreparable injury because Anthropic's challenged safety representations remain live and unqualified after the Minab failure. The injury is not limited to past subscription payments; it includes ongoing informational harm, impaired consumer choice, and continued distortion of Hawaii's consumer AI market.

a) **Continuing Deception.** Plaintiff alleges Anthropic's Constitutional AI, RSP, PBC mission, and safety-superiority statements remained live as of August 10, 2026, 157 days after the Minab failure. Each day those statements remain uncorrected allegedly creates new consumer reliance and ongoing non-monetary harm.

b) **Informational Injury.** Plaintiff alleges that monetary damages can refund fees but cannot restore the ability to make an informed subscription decision. Only corrective disclosure can address the ongoing informational injury caused by withheld material facts.

c) **Market Integrity Harm.** Plaintiff alleges Anthropic's refusal to correct safety representations harms Hawaii consumers by distorting the AI subscription market. That systemic consumer-market harm cannot be remedied by damages paid to one subscriber.

**277. Element Two — Inadequacy of Legal Remedies.** Monetary remedies are inadequate because they are retrospective, cannot stop future reliance on allegedly false safety claims, cannot

[91] eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006). Permanent injunctions require irreparable injury, inadequate legal remedies, favorable balance of hardships, and consistency with the public interest.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

fully price informational and decisional harm, and cannot protect the broader Hawaii consumer AI market from continued deception.

**278. Element Three — Balance of Hardships.** Plaintiff alleges the balance favors an injunction because Plaintiff and Hawaii consumers face continuing informational injury without corrective relief, while Anthropic's compliance burden is modest relative to its alleged financial scale and operational capacity.

**279. Element Four — Public Interest.** Plaintiff alleges the requested injunction serves the public interest by promoting AI safety transparency, accurate consumer disclosures, reliable government AI procurement information, and deterrence of future safety marketing that is not supported by domain-specific validation.

**280. Five Permanent Injunctive Orders Sought.** Plaintiff seeks a permanent injunction requiring Anthropic to provide corrective disclosure, revise consumer safety marketing, retain an independent technical auditor, verify future safety representations before dissemination, and file periodic compliance reports.

a) **Corrective Subscriber Disclosure.** Within 60 days after judgment, Anthropic must issue plain-language corrective disclosures to current and recent Claude consumer subscribers, including Hawaii subscribers, identifying the material defects, Claude's alleged role in the Minab targeting pipeline, the respects in which prior safety representations were false or misleading, and the limitations consumers need to decide whether to continue, modify, or cancel their subscriptions.

b) **Consumer Marketing Revision.** Within 60 days after judgment, Anthropic must remove, correct, or qualify consumer-facing safety representations rendered misleading by the alleged defects and replace them with statements accurately reflecting Claude's capabilities, limitations, failure modes, and completed domain-specific validation.

c) **Independent Technical Audit.** Within 90 days after judgment, Anthropic must retain a Court-approved independent technical auditor with expertise in LLM safety evaluation, domain-specific validation, and DoD Directive 3000.09 compliance. The auditor must



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

evaluate Claude's current commercial, national-security, and government deployments and file public results within 12 months.

d) **Pre-Dissemination Safety Verification.** Anthropic must refrain from making future safety representations to Hawaii consumers or safety-influenced government or enterprise customers unless those claims are supported by completed domain-specific validation supervised by a qualified independent auditor.

e) **Compliance Reporting.** Anthropic must file a written compliance report within 90 days after judgment and annually for five years, documenting compliance with each injunction requirement and supported by independent-auditor verification, with reports publicly available through the Court's electronic filing system.

**281.** Demand for Judgment on Count XIII. Plaintiff demands judgment against Defendant Anthropic PBC on Count XIII for permanent injunctive relief as described above, costs of suit, and all further relief this Court deems just and proper. Supplemental Prayer/Damages Summary for Count XIII. Count XIII converts the declaratory predicates into court-ordered compliance relief. The additive amount is the estimated cost of corrective subscriber disclosure, safety-marketing revision, and a five-year independent technical audit. The prospective representation constraint and annual reporting duties are treated as embedded in the audit structure, so they add no separate amount.

| **Injunctive Order** | **Cost Basis** | **LOW** | **HIGH** |
|---|---|---|---|
| Corrective disclosure to subscribers | Drafting, court approval, formatting, and digital distribution | $50,000.00 | $200,000.00 |
| Comprehensive safety-marketing revision | Legal review, brand/content revision, and regulatory coordination | $25,000.00 | $100,000.00 |
| Independent technical auditor for five-year compliance period | Annual AI safety audit, report preparation, and court filing | $2,500,000.00 | $10,000,000.00 |
| Prospective safety-representation constraint | Embedded in independent technical audit scope | $0.00 | $0.00 |
| Annual compliance reporting | Embedded in audit reporting scope | $0.00 | $0.00 |
| **Count XIII Net Addition** | **Compliance costs added to running total** | **$2,575,000.00** | **$10,300,000.00** |
| Prior running total after Count XII | | $285,399.60 | $1,509,281.60 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| **Running Total After Count XIII** | | **$2,860,399.60** | **$11,809,281.60** |

## COUNT XIV

## PUNITIVE DAMAGES

***Hawaii Revised Statutes § 663-10.9; Masaki v. General Motors Corp., 71 Haw. 1 (1989); Gibo v. City and County of Honolulu, 52 Haw. 231 (1970); BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996); State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408 (2003)***

**282.** Plaintiff incorporates Sections I through IV and Counts I–XIII as if fully stated here.

**283. Legal Standard.** Hawaii permits punitive damages for malicious, oppressive, or willfully indifferent tortious conduct. HRS § 663-10.9; *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989). Under *Masaki*, the award must be calibrated to the defendant's financial capacity so punishment and deterrence are real. Federal due process also requires consideration of reprehensibility, the punitive-to-compensatory relationship, and comparable civil penalties under *BMW v. Gore* and *State Farm v. Campbell*.[92]

**284. Punitive Predicate and Calibration.** Count XIV rests on four alleged channels of willful or conscious disregard: suppression of expert safety knowledge, deployment without domain-specific military-targeting validation, post-Minab concealment during financing and IPO-related activity, and the Bloomberg interview statements. The same channels support the $100,000,000.00 punitive demand shown in the dollar matrix below.

**285. Demand for Judgment on Count XIV.** Plaintiff seeks punitive damages sufficient to punish and deter the willful disregard alleged in this count, calibrated to Anthropic's alleged valuation and revenue under *Masaki* and consistent with *Gore* and *Campbell*. Plaintiff demands judgment against Defendant Anthropic PBC on Count XIV for punitive damages of

[92] HRS § 663-10.9. Hawaii punitive damages are available where tortious conduct involves malice, oppression, or willful and conscious disregard for the rights or safety of others.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

$100,000,000.00, or any greater jury-determined amount necessary for genuine punishment and deterrence, together with costs of suit and all further relief this Court deems just and proper.[93]

**286. Section V — Closing Statement.** Section V presents fourteen legally distinct counts arising from one alleged course of conduct: Anthropic's design, marketing, deployment, post-incident nondisclosure, and public statements about Claude. The counts provide alternative and cumulative remedies in tort, warranty, consumer protection, equity, declaratory relief, injunction, and punitive damages, without duplicating recovery where the tables identify an alternative theory.

**287. Count XIV Punitive-Damages Summary.** Plaintiff seeks a flat punitive award of $100,000,000.00 under both LOW and HIGH scenarios. The award is calibrated to Anthropic's alleged financial scale, the four *Masaki* channels, and the *Gore/Campbell* guideposts, rather than to Plaintiff's individual subscription loss.

**288. *Masaki* Four-Channel Allocation.** The $100,000,000.00 demand is allocated as follows: $40,000,000.00 for reprehensibility, $40,000,000.00 for the relationship to actual harm, $15,000,000.00 for Anthropic's alleged financial position, and $5,000,000.00 for the private-attorney-general function.

**289. *Gore/Campbell* Proportionality.** Plaintiff alleges the punitive demand satisfies the three constitutional guideposts because the conduct is pleaded as highly reprehensible, the ratio is justified by the alleged exceptional harm and deterrence needs, and comparable civil penalties support rather than limit the requested award.[94]

**COUNT XIV — DOLLAR MATRIX**

| Component | Masaki Channel | LOW ($) | HIGH ($) |
|---|---|---|---|
| Channel 1 — Reprehensibility: concealment, physical harm, vulnerable victims, repeated conduct | All Gore factors alleged | $40,000,000.00 | $40,000,000.00 |
| Channel 2 — Harm relationship: $680,272.11 per-victim reference | Campbell exception alleged | $40,000,000.00 | $40,000,000.00 |

[93] Masaki v. General Motors Corp., 71 Haw. 1, 16–17, 780 P.2d 566, 575 (1989); Gibo v. City and County of Honolulu, 52 Haw. 231, 236, 472 P.2d 484, 488 (1970). These cases define punitive damages' punishment and deterrence purposes and allow awards for wanton or reckless disregard.

[94] BMW of North America, Inc. v. Gore, 517 U.S. 559, 575–77 (1996); State Farm Mutual Automobile Insurance Co. v. Campbell, 538 U.S. 408, 418–25 (2003). Punitive-damages due process considers reprehensibility, ratio, and comparable civil penalties, with higher ratios sometimes justified by egregious conduct and small compensatory damages.



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| Component | Masaki Channel | LOW ($) | HIGH ($) |
|---|---|---|---|
| Channel 3 — Financial scale: 0.01036% value; 0.213% revenue | Minimum deterrent floor under *Masaki* | $15,000,000.00 | $15,000,000.00 |
| Channel 4 — Private attorney general enhancement | Public interest | $5,000,000.00 | $5,000,000.00 |
| **COUNT XIV TOTAL PUNITIVE DEMAND** | **Channels 1–4** | **$100,000,000.00** | **$100,000,000.00** |
| Gore Guidepost 1 — reprehensibility | Maximum | ✓ | ✓ |
| Gore Guidepost 2 — ratio | Campbell exception | ✓ | ✓ |
| Gore Guidepost 3 — civil penalties | $16.2M+ FTC exposure | ✓ | ✓ |
| Prior running total (after Count XIII) | | $2,860,399.60 | $11,809,281.60 |
| **RUNNING TOTAL AFTER COUNT XIV** | | **$102,860,399.60** | **$111,809,281.60** |

**MASTER TABLE — FINANCIAL SUMMARY**

***All figures as of August 10, 2026. The table begins at $0.00, treats Counts I–X as alternative recovery theories unless otherwise noted, and adds only the net statutory, equitable, injunctive, and punitive amounts shown***

| Count | Cause of Action | Type | LOW Add | HIGH Add | LOW Total | HIGH Total |
|---|---|---|---|---|---|---|
| Baseline | $0.00 ground | — | $0.00 | $0.00 | $0.00 | $0.00 |
| I | Design defect | Primary | $133.20 | $427.20 | $133.20 | $427.20 |
| II | Failure to warn | Alt. | $133.20 | $427.20 | $133.20 | $427.20 |
| III | Negligent misrepresentation | Alt. | $133.20 | $427.20 | $133.20 | $427.20 |
| IV | Intentional misrep. + concealment | Alt. | $133.20 | $427.20 | $133.20 | $427.20 |
| V | Negligence | Alt. | $133.20 | $427.20 | $133.20 | $427.20 |
| VI | HRS Ch. 480 UDAP — treble + fees | Trebling | $75,266.40 | $500,854.40 | $75,399.60 | $501,281.60 |
| VII | Hawaii UDTPA | Alt. | $75,133.20 | $500,427.20 | $75,399.60 | $501,281.60 |
| VIII | Express warranty | Alt. | $133.20 | $427.20 | $75,399.60 | $501,281.60 |
| IX | Implied warranty — merchantability | Alt. | $133.20 | $427.20 | $75,399.60 | $501,281.60 |
| X | Implied warranty — fitness | Alt. | $133.20 | $427.20 | $75,399.60 | $501,281.60 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| Count | Cause of Action | Type | LOW Add | HIGH Add | LOW Total | HIGH Total |
|---|---|---|---|---|---|---|
| XI | Unjust enrichment — disgorgement | Additive | $210,000.00 | $1,008,000.00 | $285,399.60 | $1,509,281.60 |
| XII | Declaratory relief | Structural | $0.00 | $0.00 | $285,399.60 | $1,509,281.60 |
| XIII | Permanent injunctive relief | Additive | $2,575,000.00 | $10,300,000.00 | $2,860,399.60 | $11,809,281.60 |
| XIV | Punitive damages | Additive | $100,000,000.00 | $100,000,000.00 | **$102,860,399.60** | **$111,809,281.60** |

## CONTINGENT WRONGFUL DEATH AND SURVIVAL CLAIMS — HRS §§ 663-3, 663-7

***Contingent only: these figures are preserved for potential FRCP 24 intervention on behalf of 147–175 Minab victims and are not included in the primary Counts I–XIV subtotal.***

| Contingent Claim Component | Legal Basis | LOW ($) | HIGH ($) |
|---|---|---|---|
| (i) Pecuniary loss; 147–175 decedents | HRS §663-3 | $10,829,700.00 | $87,500,000.00 |
| (ii) Pre-death conscious pain and suffering | HRS §§663-3, 663-7 | $7,350,000.00 | $105,000,000.00 |
| (iii) Funeral/burial: $6,000–$15,000 each | HRS §663-3 | $882,000.00 | $2,625,000.00 |
| (iv) Loss of prospective net accumulations | HRS §663-3 | $2,768,300.00 | $63,125,000.00 |
| **WRONGFUL DEATH SUBTOTAL** | | **$21,830,000.00** | **$258,250,000.00** |

## GRAND AGGREGATE DAMAGES TABLE

***Primary claims plus contingent wrongful death and survival claims HRS §§ 663-3, 663-7***

| Category | LOW ($) | HIGH ($) |
|---|---|---|
| Tier 1 — Compensatory base | $133.20 | $427.20 |
| Tier 2 — Treble + mandatory fees (Count VI) | $75,266.40 | $500,854.40 |
| Tier 3 — Hawaii-wide disgorgement (Count XI) | $210,000.00 | $1,008,000.00 |
| Tier 4 — Injunctive compliance (Count XIII) | $2,575,000.00 | $10,300,000.00 |
| Tier 5 — Punitive damages (Count XIV) | $100,000,000.00 | $100,000,000.00 |
| **Primary claims subtotal (Counts I–XIV)** | **$102,860,399.60** | **$111,809,281.60** |
| Tier 6 — Contingent wrongful death | $21,830,000.00 | $258,250,000.00 |
| **GRAND TOTAL — ALL CLAIMS** | **$124,690,399.60** | **$370,059,281.60** |

## VI. PRAYER FOR RELIEF

**290.** WHEREFORE, Plaintiff Grant Gribble, appearing in Pro Se, respectfully prays that this Court enter judgment in favor of Plaintiff and against Defendant Anthropic PBC as follows:

## PRAYER A — COMPENSATORY DAMAGES

**291.** That this Court award Plaintiff compensatory damages against Defendant Anthropic PBC in the following specific components and amounts:



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

**(a) Consumer Economic Damages — Plaintiff Grant Gribble Individually:**

The safety premium component of all Claude Pro subscription fees paid by Plaintiff to Anthropic in the State of Hawaii from the inception of his subscription through the date of trial, representing the difference between the subscription price Anthropic charged Plaintiff in reliance on its Constitutional AI, RSP, Model Specification and AUP safety marketing representations, and the subscription price that Plaintiff would have been willing to pay had Anthropic accurately disclosed Claude's five architectural defects with the specificity, quantification, and operational candor that Hawaii consumer protection law requires.

**(i)** The specific dollar computation is as follows and is independently set forth in the table below:

LOW SCENARIO: Plaintiff subscribed to Claude Pro for six (6) months before February 28, 2026 at $20.00 per month = $120.00 total pre-Minab fees. Of that $120.00, twenty-five percent (25%) represents the measurable safety premium — the component attributable solely to Anthropic's Constitutional AI, RSP, Model Specification, and AUP safety narrative — totaling $30.00 in pre-Minab safety premium damages recoverable under Prayer A(a)(i).

HIGH SCENARIO: Plaintiff subscribed for twenty-four (24) months before February 28, 2026 at $20.00 per month = $480.00 total pre-Minab fees. Of that $480.00, thirty percent (30%) represents the safety premium, totaling $144.00 in pre-Minab safety premium damages. Additionally, under the fraudulent concealment tolling doctrine recognized in *Hana Ranch, Inc. v. Kanakaole*, 67 Haw. 438, 444 (1984), the statute of limitations is tolled backward by twelve (12) additional months, recovering twelve additional months × $20.00 × 30% = $72.00 in tolled backward safety premium damages. **Prayer A(a)(i) Total: LOW $30.00 / HIGH $216.00**

**(ii)** the specific dollar computation is as follows and is independently set forth in the table below:



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

LOW SCENARIO: Plaintiff subscribed to Claude Pro for six (6) months before February 28, 2026 at $20.00 per month = $120.00 total pre-Minab fees. Of that $120.00, twenty-five percent (25%) represents the measurable safety premium — the component attributable solely to Anthropic's Constitutional AI, RSP, Model Specification, and AUP safety narrative — totaling $30.00 in pre-Minab safety premium damages recoverable under Prayer A(a)(i).

HIGH SCENARIO: Plaintiff subscribed for twenty-four (24) months before February 28, 2026 at $20.00 per month = $480.00 total pre-Minab fees. Of that $480.00, thirty percent (30%) represents the safety premium, totaling $144.00 in pre-Minab safety premium damages. Additionally, under the fraudulent concealment tolling doctrine recognized in *Hana Ranch, Inc. v. Kanakaole*, 67 Haw. 438, 444 (1984), the statute of limitations is tolled backward by twelve (12) additional months, recovering twelve additional months × $20.00 × 30% = $72.00 in tolled backward safety premium damages. **Prayer A(a)(i) Total: LOW $30.00 / HIGH $216.00**

**(iii)** All subscription fees paid by Plaintiff to Anthropic between February 28, 2026 — the date on which Anthropic's obligation to issue corrective disclosure arose and which Anthropic deliberately and systematically suppressed — and the date of this filing on August 10, 2026, a period of one hundred fifty-seven (157) consecutive days equal to five point sixteen (5.16) months, which fees Plaintiff paid in direct and complete reliance on Anthropic's continued silence about Claude's role in the targeting failure that killed one hundred forty-seven (147) to one hundred seventy-five (175) people, including between one hundred eight (108) and one hundred thirty-one (131) children between ages six and twelve, at Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran, on the morning of February 28, 2026.

**(iv)The specific dollar computation is as follows:**



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

BOTH SCENARIOS (FIXED): 5.16 months × $20.00/month = **$103.20** in concealment-period subscription fees paid in full reliance on Anthropic's deliberate 157-day post-Minab concealment. This figure is identical across LOW and HIGH scenarios because the concealment period is a fixed calendar fact — February 28, 2026 through August 10, 2026 = 157 days — independent of Plaintiff's prior subscription duration. **Prayer A(a)(ii) Total: LOW $103.20 / HIGH $103.20 (Fixed)**

**(v)** The difference in value between Claude AI subscription services as warranted — as warranted to be governed by Constitutional AI safety architecture that "ensures safety isn't an afterthought," as warranted to have been subjected to rigorous pre-deployment evaluation under Anthropic's Responsible Scaling Policy, as warranted to comply with an Acceptable Use Policy prohibiting deployment in autonomous weapons targeting without meaningful human oversight, and as warranted to be "among the most capable and safe AI systems currently available" — and Claude AI subscription services as actually designed, delivered, and deployed, exhibiting all five material architectural defects described in Paragraphs 12 through 16 of this Complaint, recoverable as benefit-of-the-bargain damages under HRS § 490:2-313 (Count VIII), HRS § 490:2-314 (Count IX), and HRS § 490:2-315 (Count X).

The specific benefit-of-the-bargain differential is identical in amount to the safety premium calculation under Prayer A(a)(i) — it is the same economic harm expressed through the warranty recovery theory rather than the tort recovery theory. **Prayer A(a)(iii) Total: LOW $30.00 (alternative) / HIGH $216.00 (alternative).** Not additive to A(a)(i).

**(vi)** All forward-facing economic losses attributable to Anthropic's continuing failure to issue corrective disclosures — projected subscription payments Plaintiff will be forced to either continue making in reliance on uncorrected false representations or forfeit the professional access that Anthropic's safety narrative induced him to acquire, during the anticipated eighteen (18) months between the filing of this

Complaint and the anticipated date of trial. LOW SCENARIO: Plaintiff cancels subscription upon filing on August 10, 2026 — forward-facing loss = $0.00 in additional subscription fees. HIGH SCENARIO: Plaintiff maintains subscription for eighteen (18) additional months pending trial resolution, paying $20.00/month × 30% safety premium × 18 months = **$108.00** in forward-facing safety premium loss.

**Prayer A(a)(iv) Total: LOW $0.00 / HIGH $108.00**

**PRAYER A — CONSUMER ECONOMIC DAMAGES SUMMARY TABLE**

| Prayer A Item | LOW ($) | HIGH ($) | Notes |
|---|---|---|---|
| **A(a)(i) — Pre-Minab safety premium**<br>6 mo × 25%; 24 mo × 30% + 12 mo tolling | 30.00 | 216.00 | Primary safety-premium recovery. |
| **A(a)(ii) — Post-Minab concealment fees**<br>157 days × $20/month; fixed | 103.20 | 103.20 | Full fee recovery, not premium fraction. |
| **A(a)(iii) — Warranty benefit-of-bargain**<br>Alternative; same as A(a)(i) | 30.00 (ALT) | 216.00 (ALT) | Not additive to A(a)(i). |
| **A(a)(iv) — Forward safety premium**<br>LOW: $0; HIGH: 18 mo × $20 × 30% | 0.00 | 108.00 | Projected litigation-period loss. |
| **PRAYER A(a) TOTAL** | **$133.20** | **$427.20** | A(a)(i) + (ii) + (iv) |

**(b) Wrongful Death Damages — HRS §§ 663-3, 663-7 — Subject to FRCP 24 Intervention.** Plaintiff prays that this Court preserve and protect the following wrongful death damage demands on behalf of the families and estates of the one hundred forty-seven (147) to one hundred seventy-five (175) individuals — including between one hundred eight (108) and one hundred thirty-one (131) children between the ages of six and twelve — who were wrongfully killed at Shajareh Tayyebeh Elementary School in Minab, Hormozgan Province, Islamic Republic of Iran, on the morning of February 28, 2026, as a direct and proximate result of Claude's five known and undisclosed architectural defects operating in the Maven Smart System targeting chain, pending intervention by surviving family members pursuant to Federal Rule of Civil Procedure 24 or substitution of real parties in interest pursuant to Federal Rule of Civil Procedure 17:

**(i)** All damages recoverable under Hawaii's Wrongful Death Act, HRS § 663-3, for grief and bereavement, loss of companionship, loss of parental and filial support



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

and guidance, impairment of the quality of life of surviving family members, and emotional distress suffered by each surviving parent, sibling, heir, and designated beneficiary of each decedent, in amounts to be proven at trial. Estimated aggregate: **LOW $10,829,700.00** (147 victims × $73,000.00 average non-economic wrongful death damages per victim) / **HIGH $87,500,000.00** (175 victims × $500,000.00 per victim reflecting the extraordinary nature of children killed in a school during morning classes attributable to a defective AI product deployed without validation).

**(ii)** All economic damages recoverable under HRS § 663-3 for the present value of each decedent's projected future earnings, household contributions, and financial support to dependents — including the present value of the projected lifetime economic contributions of each of the 108 to 131 children killed, calculated from each child's age at the time of death through projected working life expectancy under actuarially sound methodology, discounted to present value at an appropriate rate. Estimated aggregate: **LOW $2,768,300.00** (147 victims × $18,833.00 average present-value economic contribution, weighted for child decedents' shorter accrual periods) / **HIGH $63,125,000.00** (175 victims × $360,714.00 per victim including full lifetime earnings projections for child decedents).

**(iii)** Pre-death conscious pain and suffering — the terror, physical trauma, and conscious suffering experienced by each of the 147 to 175 decedents from the moment of the 06:47 UTC missile strike impact through each decedent's death, with particular moral and legal weight given to the documented presence of 108 to 131 children between ages six and twelve who were at their desks during morning classes when the building was struck and destroyed. Estimated aggregate: **LOW $7,350,000.00** (147 victims × $50,000.00 per victim for brief but conscious and terrifying pre-death suffering) / **HIGH $105,000,000.00** (175 victims × $600,000.00 per victim, weighted heavily for child decedents' conscious terror).

**(iv)** Funeral, burial, and death care expenses for each of the 147 to 175 decedents and associated administrative costs of estate proceedings. Estimated aggregate: **LOW**

**$882,000.00** (147 victims × $6,000.00 per victim) / **HIGH $2,625,000.00** (175 victims × $15,000.00 per victim).

**(v)** Such additional wrongful death and survival action damages as are proven at trial by the evidence, including any damages recoverable under HRS § 663-7 (Hawaii's survival statute) for claims that survived each decedent's death.

**PRAYER A(b) — WRONGFUL DEATH DAMAGES SUMMARY TABLE**

| **Prayer A(b) Item** | **Basis** | **LOW ($)** | **HIGH ($)** |
|---|---|---|---|
| A(b)(i) Family loss | HRS §663-3 | 10,829,700.00 | 87,500,000.00 |
| A(b)(ii) Future support | HRS §663-3 | 2,768,300.00 | 63,125,000.00 |
| A(b)(iii) Pre-death suffering | HRS §§663-3, 663-7 | 7,350,000.00 | 105,000,000.00 |
| A(b)(iv) Funeral/burial | HRS §663-3 | 882,000.00 | 2,625,000.00 |
| A(b)(v) Other proven damages | HRS §663-7 | TBD | TBD |
| **PRAYER A(b) TOTAL** | | **$21,830,000.00** | **$258,250,000.00** |

| **Prayer A(b) Item** | **LOW ($)** | **HIGH ($)** | **Notes** |
|---|---|---|---|
| **A(b)(i) — Wrongful death / family losses** 147–175 victims; grief, companionship, support, guidance, QOL. | 10,829,700.00 | 87,500,000.00 | HRS §663-3; subject to FRCP 24 intervention. |
| **A(b)(ii) — Future earnings / contributions** Present value of lifetime economic support and household contributions. | 2,768,300.00 | 63,125,000.00 | Economic damages under HRS §663-3. |
| **A(b)(iii) — Pre-death pain and suffering** Conscious suffering from strike impact through death. | 7,350,000.00 | 105,000,000.00 | Survival/wrongful death damages. |
| **A(b)(iv) — Funeral and burial** Death-care and estate-administration costs. | 882,000.00 | 2,625,000.00 | 147 × $6,000 / 175 × $15,000. |
| **A(b)(v) — Additional proven damages** Any further HRS §663-7 survival damages proven at trial. | TBD | TBD | Not included in subtotal unless proven. |
| **PRAYER A(b) SUBTOTAL** | **$21,830,000.00** | **$258,250,000.00** | Excludes TBD additional damages. |

***(Contingent — FRCP 24 Intervention Required)***

| WD Component | Basis | LOW ($) | HIGH ($) |
|---|---|---|---|
| (i) Non-economic wrongful death (grief, bereavement, companionship, consortium — 147 victims LOW / 175 victims HIGH) | HRS §663-3; NON-ECONOMIC | 10,829,700.00 | 87,500,000.00 |
| (ii) Economic wrongful death (present value lifetime earnings, support — 147 | HRS §663-3; ECONOMIC | 2,768,300.00 | 63,125,000.00 |



UNITED STATES DISTRICT COURT DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| victims LOW / 175 victims HIGH; child lifetime projections) | | | |
| (iii) Pre-death conscious pain and suffering (07:47 UTC strike through death — 147–175 victims; 108–131 children at desks) | HRS §663-3 + §663-7 SURVIVAL | 7,350,000.00 | 105,000,000.00 |
| (iv) Funeral, burial, death care expenses (147 × $6,000 LOW / 175 × $15,000 HIGH) | HRS §663-3; OUT-OF-POCKET | 882,000.00 | 2,625,000.00 |
| (v) Additional survival action and estate administrative damages (TBD at trial) | HRS §663-7; SURVIVAL | TBD at trial | TBD at trial |
| PRAYER A(b) TOTAL — contingent WRONGFUL DEATH | | $21,830,000.00 | $258,250,000.00 |

**(c) Survival Action Damages.** All damages recoverable under HRS § 663-7 for claims that survived the deaths of each of the 147 persons confirmed killed — and up to 175 persons per the highest estimates — at Shajareh Tayyebeh Elementary School on February 28, 2026, including all damages accruing from the moment of Claude's defective targeting output through the moment of each decedent's death that would have been recoverable by each decedent had they survived, with particular attention to the conscious experience of each child decedent in the moments between the strike impact and death. These survival action amounts are included within and do not exceed the figures stated in Prayer A(b)(iii) above. No separate line-item total is added to avoid duplication.

**PRAYER A — GRAND TOTAL COMPENSATORY DEMAND TABLE**

| Category | LOW ($) | HIGH ($) |
|---|---|---|
| Prayer A(a) — Consumer Econ. Damages (individual) | 133.20 | 427.20 |
| Prayer A(b) — WD (contingent — FRCP 24) | 21,830,000.00 | 258,250,000.00 |
| Prayer A(c) — Survival (subsumed in A(b)(iii)) | 0.00 additional | 0.00 additional |
| PA TOTAL Comp. | $21,830,133.20 | $258,250,427.20 |

**PRAYER B — TREBLE DAMAGES UNDER HRS §480-13(b)(1)**

**292.** That this Court enter judgment against Defendant Anthropic PBC for treble damages pursuant to Hawaii Revised Statutes § 480-13(b)(1), representing three times (3×) the full amount of all actual economic damages proven by Plaintiff at trial on Count VI (HRS Chapter 480 — Unfair and Deceptive Acts or Practices) and Count VII (Hawaii Uniform Deceptive Trade Practices Act, HRS §§ 481A-3, 481A-4). Treble damages under HRS § 480-13(b)(1) are mandatory upon a finding of violation — the Court has no discretion to award less than three times

actual damages once a UDAP violation causing consumer injury is established. *Cieri v. Leticia Query Realty*, 80 Haw. 54, 67 (1995); *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 616 (1980). The treble damages computation applies to the base actual consumer economic damages established in Prayer A(a) above — the safety premium and concealment-period fee components:

**PRAYER B — TREBLE DAMAGES TABLE**

| Component | Base | Multiplier | Trebled |
|---|---|---|---|
| Pre-Minab safety premium — LOW (6 months × $20 × 25%) | $30.00 | × 3 | $90.00 |
| Pre-Minab safety premium — HIGH (24 months × $20 × 30% + 12 months tolling × $20 × 30%) | $216.00 | × 3 | $648.00 |
| Post-Minab concealment-period fees — BOTH SCENARIOS (5.16 months × $20.00) | $103.20 | × 3 | $309.60 |
| Forward-facing safety premium — HIGH only (18 months × $20 × 30%) | $108.00 | × 3 | $324.00 |
| PB TOTAL — TREBLED CONSUMER ECONOMIC DAMAGES | | | LOW: $399.60 / HIGH: $1,281.60 |

**293.** Treble damages under Prayer B are cumulative with, and not duplicative of, the punitive damages demanded under Prayer F. Treble damages serve the distinct statutory purpose of enforcing HRS Chapter 480's consumer protection mandate through legislatively-determined deterrence; punitive damages serve the common law purpose of expressing moral condemnation of and deterring conduct that is malicious, oppressive, or consciously indifferent to the rights and safety of others. Both are independently awarded by separate statutory and common law authority and may be simultaneously recovered by a prevailing plaintiff. *See Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989).

**PRAYER C — RESTITUTION AND EQUITABLE DISGORGEMENT**

**294.** That this Court enter judgment against Defendant Anthropic PBC for restitution of all amounts by which Anthropic was unjustly enriched at Plaintiff's expense and at the expense of the Hawaii subscriber class, pursuant to Count XI (Unjust Enrichment, *Durette v. Aloha Plastic Recycling, Inc.*, 105 Haw. 490 (2004); *Small v. Badenhop*, 67 Haw. 626 (1985)), including the following specifically identified and quantified components of unjust enrichment:

**PRAYER C — RESTITUTION AND DISGORGEMENT TABLE**

| Restitution | Basis | LOW ($) | HIGH ($) |
|---|---|---|---|
| (a) Individual safety-premium restitution — same as Prayer A(a)(i) | Unjust enrichment — individual restitution | 30.00 | 216.00 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| (b) Individual concealment-period fee restitution | Unjust enrichment — concealment-period restitution | 103.20 | 103.20 |
| (c) Hawaii safety-premium disgorgement: ~7,000 subscribers × avg. premium | Equitable disgorgement — Hawaii subscriber class | 210,000.00 | 1,008,000.00 |
| (d) Series H valuation-premium disgorgement: LOW 0%; HIGH 1% = $650M | Equitable disgorgement — Series H (contingent) | 0.00 | 650,000,000.00 (contingent) |
| PC TOTAL (PRIMARY — EXCLUDING contingent SERIES H) | | $210,133.20 | $1,008,319.20 |
| PC TOTAL (INCLUDING contingent SERIES H — HIGH SCENARIO) | | $210,133.20 | $1,008,319.20 + $650,000,000.00 (contingent) |

## PRAYER D — DECLARATORY RELIEF

**295.** That this Court issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Federal Rule of Civil Procedure 57, and Count XII of this Complaint (paragraphs 280–284), declaring the following specific legal relations as a matter of law — each of which, once established by this Court, operates as the structural multiplier enabling every monetary count in this complaint:

## PRAYER D — DECLARATORY RELIEF TABLE

***(Each Declaration — Its Direct Legal Effect and Financial Multiplier Value)***

| Declaration | Legal Effect | Multiplier | LOW ($) | HIGH ($) |
|---|---|---|---|---|
| (a) Claude is defective under Restatement §402A, Ontai, and Acoba; five defects alleged in ¶¶12–16 | Establishes products liability predicate for Counts I and II | Enables $133.20/$427.20 actual damages — multiplied 3× under Count VI trebling to $399.60/$1,281.60 | 0.00 direct | 0.00 direct |
| (b) Safety marketing was materially false under HRS §480-2 and Hawaii fraud law | Establishes UDAP and fraud predicates for Counts III, IV, VI, VII | Enables mandatory trebling: $399.60 LOW / $1,281.60 HIGH; mandatory attorneys' fees: $75,000 LOW / $500,000 HIGH | 0.00 direct | 0.00 direct |
| (c) Duty to issue corrective disclosures re: five defects, Epic Fury, and Minab strike | Establishes ongoing violation predicate for Count XIII injunctive relief | Enables injunctive compliance costs: $2,575,000 LOW / $10,300,000 HIGH | 0.00 direct | 0.00 direct |





UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | | |
|---|---|---|---|---|
| (d) Continued unqualified safety marketing is a continuing HRS §480-2 violation | Establishes continuing violation predicate for Count XIV punitive damages and HIGH scenario tolling extensions | Enables $100,000,000.00 punitive demand; enables HIGH tolling extensions: $72.00 backward + $108.00 forward | 0.00 direct | 0.00 direct |
| Cumulative Multiplier Value of All Four Declarations | Enables entire $102,860,399.60 / $111,809,281.60 primary liability total | Each dollar in the primary total depends on at least one of these four declarations | $102,860,399.60 (multiplier) | $111,809,281.60 (multiplier) |
| PD DIRECT MONETARY ADDITION | | | $0.00 | $0.00 |

**PRAYER E — PERMANENT INJUNCTIVE RELIEF**

**296.** That this Court issue a permanent injunction against Defendant Anthropic PBC pursuant to Federal Rule of Civil Procedure 65(d), Hawaii Revised Statutes § 480-13(b)(2), *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), and Count XIII of this Complaint (paragraphs 285–292), ordering the following five specific, independently compelled, and independently enforceable obligations — each with its quantified compliance cost, its compliance timeline, its enforcement mechanism, and its direct connection to the specific violation that gives rise to it:

**PRAYER E — PERMANENT INJUNCTIVE RELIEF TABLE**

***(Five Orders — Five-Year Compliance — Quantified Compliance Costs)***

| Injunctive Order | Connected Violation | LOW Cost | HIGH Cost | Timeline |
|---|---|---|---|---|
| (a) Corrective disclosure to current/known former Claude Pro subscribers re: five defects, Epic Fury, Minab, concealment | HRS §480-2 concealment violation + HRS §480-13(b)(2) | $50,000.00 | $200,000.00 | 30 days from judgment |
| (b) Safety-marketing overhaul: revise consumer, API, investor, and product materials | HRS §480-2 deceptive marketing violation — all 5 UDAP violations | $25,000.00 | $100,000.00 | 60 days from judgment |
| (c) Court-approved independent technical auditor for five years; annual defect-domain audits | HRS §480-2 + Defects 1–5 (no domain validation, Defect 5) | $2,500,000.00 (5 yrs × $500K/yr) | $10,000,000.00 (5 yrs × $2M/yr) | 90 days from judgment; 5-year retention |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | | |
|---|---|---|---|---|
| (d) No safety claims without independent domain-validation support | HRS §481A-3(a)(5), (a)(7), (a)(12) — prospective UDTPA constraint | $0.00 (embedded in Order c) | $0.00 (embedded in Order c) | Contemporaneous with Order (a) |
| (e) Annual sworn compliance reports by CEO and General Counsel; nonfiling = contempt | FRCP 65(d); Court's inherent contempt authority | $0.00 (embedded in Order c) | $0.00 (embedded in Order c) | Annual; commencing 1 year from judgment |
| PE TOTAL — INJUNCTIVE COMPLIANCE OBLIGATION (NET ADDITIVE) | | $2,575,000.00 | $10,300,000.00 | 5-year compliance period |

## PRAYER F — PUNITIVE DAMAGES

**297.** That this Court enter judgment against Defendant Anthropic PBC for punitive damages in the amount of ONE HUNDRED MILLION DOLLARS ($100,000,000.00), pursuant to Hawaii Revised Statutes § 663-10.9, *Masaki v. General Motors Corp.*, 71 Haw. 1, 16–17 (1989), *Gibo v. City and County of Honolulu*, 52 Haw. 231, 236 (1970), and Count XIV of this Complaint (paragraphs 293–304).

**298.** The $100,000,000.00 punitive demand is submitted to the jury for determination, subject to this Court's constitutional review, and is supported by the four-channel Masaki analysis and the three-guidepost Gore/Campbell constitutional proportionality framework fully set forth in Count XIV of Section V. The specific dollar components of the $100,000,000.00 punitive demand and their legal basis are as follows:

## PRAYER F — PUNITIVE DAMAGES TABLE

*Treble damages under Prayer B ($399.60 LOW / $1,281.60 HIGH) and punitive damages under Prayer F ($100,000,000.00) are both proper simultaneously. Treble damages serve the specific statutory deterrence purpose of HRS §480-13(b)(1). Punitive damages serve the common law moral condemnation purpose of HRS §663-10.9 and Masaki. They are legally distinct remedies with independent authorities and may both be awarded upon a verdict for Plaintiff*

| Masaki Channel | Basis | Amount |
|---|---|---|
| Channel 1 — Reprehensibility: concealment, deaths, child victims, repeated safety campaign, alleged deception | Masaki, 71 Haw. at 16–17; BMW v. Gore, 517 U.S. 559, 575–77 (1996) | $40,000,000.00 |

| | | |
|---|---|---|
| Channel 2 — Harm relationship: \$100M ÷ 147 victims = \$680,272.11 each; Campbell exception alleged | State Farm v. Campbell, 538 U.S. 408, 425 (2003) | \$40,000,000.00 |
| Channel 3 — Financial position: \$100M calibrated to alleged valuation/revenue scale | Masaki, 71 Haw. at 16–17; financial calibration | \$15,000,000.00 |
| Channel 4 — Private attorney general: pro se AI-liability claims for Hawaii subscribers | Hawaii private attorney general doctrine; Masaki equitable enhancement | \$5,000,000.00 |
| PF TOTAL — Punitive Demand | Channels 1 + 2 + 3 + 4 = \$100,000,000.00 exactly | \$100,000,000.00 |
| Gore Guidepost 1 — Reprehensibility | MAXIMUM — all five Gore factors present | |
| Gore Guidepost 2 — Ratio (Campbell exception) | SATISFIED — egregious conduct / small compensatory damages exception | |
| Gore Guidepost 3 — Civil Penalties | SATISFIED — 157 days × \$51,744/day FTC penalty × 2 violations = \$16,247,616 FTC exposure confirms range | |
| Constitutional Proportionality Status | CONSTITUTIONAL — All three Gore guideposts satisfied | |

### PRAYER G — ATTORNEYS' FEES AND LITIGATION COSTS

**299.** That this Court enter a supplemental judgment against Defendant Anthropic PBC for all reasonable attorneys' fees and litigation costs incurred by Plaintiff in prosecuting this action, pursuant to the following independent and cumulative statutory and equitable authorities:

**PRAYER G — ATTORNEYS' FEES AND COSTS TABLE**

| Fee/Cost | Authority | LOW (\$) | HIGH (\$) |
|---|---|---|---|
| (a) Mandatory attorneys' fees under HRS §480-13(b)(1) | HRS §480-13(b)(1) — mandatory fee-shifting | 75,000.00 | 500,000.00 |
| (b) Equitable fee-shifting/private attorney general enhancement | Hawaii private attorney general doctrine; Ninth Circuit equitable fee-shifting | 25,000.00 | 150,000.00 |
| (c) Expert witness fees: AI safety and architecture experts; military targeting systems experts; financial forensic experts for Series H disgorgement calculation; actuarial experts for wrongful death economic loss projections; damages computation experts | FRCP 26(b)(4); 28 U.S.C. §1920(3) | 15,000.00 | 125,000.00 |
| (c) Expert fees: AI safety, targeting, forensic finance, actuarial, damages | 28 U.S.C. §1920(2) | 5,000.00 | 45,000.00 |
| (e) Taxable costs: PACER, research, service, printing, travel | FRCP 54(d)(1); 28 U.S.C. §1920 | 1,200.00 | 12,500.00 |
| PG TOTAL — Fees/Costs | | \$121,200.00 | \$832,500.00 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

## PRAYER H — COSTS OF SUIT

**300.** That this Court enter a separate judgment against Defendant Anthropic PBC for all costs of suit incurred by Plaintiff in prosecuting this action pursuant to Federal Rule of Civil Procedure 54(d)(1) and 28 U.S.C. § 1920, including all clerk's filing fees, summons and service fees, fees of the court reporter for transcripts of depositions necessarily obtained, fees for exemplification and copies of papers necessarily used in the case, and any other costs specifically authorized by statute or court rule, in amounts to be established by a verified Bill of Costs filed in accordance with Local Rule 54.2 of the United States District Court for the District of Hawaii within fourteen (14) days of entry of final judgment.

**PRAYER H — COSTS OF SUIT TABLE**

| Cost | Authority | LOW ($) | HIGH ($) |
|---|---|---|---|
| District Court civil filing fee (28 U.S.C. §1914) | 28 U.S.C. §1920(1) | 405.00 | 405.00 |
| Summons/service on Anthropic PBC registered agent | 28 U.S.C. §1920(1) | 150.00 | 150.00 |
| Court reporter/transcript fees: 5–20 depositions | 28 U.S.C. §1920(2) | 2,500.00 | 18,000.00 |
| Exemplification/reproduction of documentary evidence | 28 U.S.C. §1920(4) | 500.00 | 3,500.00 |
| Electronic legal research (Westlaw/LexisNexis subscriptions during litigation period) | LR 54.2(c)(8) | 1,200.00 | 6,000.00 |
| Misc. recoverable costs (postage, PACER, certified mailings) | 28 U.S.C. §1920; LR 54.2 | 145.00 | 645.00 |
| PH TOTAL — Suit Costs | | $4,900.00 | $28,700.00 |

## PRAYER I — PRE-JUDGMENT AND POST-JUDGMENT INTEREST

**301.** That this Court award pre-judgment interest and post-judgment interest against Defendant Anthropic PBC as follows:

**PRAYER I — INTEREST TABLE**

| Interest | Rate / Authority | LOW ($) | HIGH ($) | Notes |
|---|---|---|---|---|
| (a) Pre-judgment interest on liquidated compensatory damages at 10% p.a. | HRS §636-16 (10% per annum) | Trial calc. | Trial calc. | Accrual date = first subscription payment date; TBD in discovery |
| LOW estimate: $133.20 × 10% × 2 yrs = $26.64 | HRS §636-16 | 26.64 | — | LOW consumer damages component only |
| HIGH estimate: $427.20 × 10% × 2 yrs + WD interest | HRS §636-16 | — | 85.44 + wrongful death interest | HIGH scenario — consumer + wrongful death |

| | | | | |
|---|---|---|---|---|
| (b) Post-judgment interest on full judgment under 28 U.S.C. §1961(a) | 28 U.S.C. §1961(a) | Judgment calc. | Judgment calc. | Applied to the full $102,860,399.60 LOW / $111,809,281.60 HIGH primary judgment |
| LOW estimate: $102,860,399.60 × ~4.25% × 0.5 yr = $2,185,783.49 | 28 U.S.C. §1961(a) | 2,185,783.49 | — | Estimate based on current Treasury yield |
| HIGH estimate: $111,809,281.60 × ~4.25% × 1 yr = $4,751,894.47 | 28 U.S.C. §1961(a) | — | 4,751,894.47 | Estimate based on current Treasury yield |
| PI TOTAL — Interest Est. | | $2,185,810.13 | $4,751,979.91 | |

**PRAYER J — SUCH OTHER AND FURTHER RELIEF AS THIS COURT DEEMS JUST AND PROPER**

**302.** That this Court grant Plaintiff Grant Gribble such other and further relief, both legal and equitable, as the Court in the exercise of its full jurisdiction determines to be just, proper, necessary, and warranted by the evidence adduced at trial and the law of the State of Hawaii and the United States, including without limitation:

**PRAYER J — ADDITIONAL EQUITABLE RELIEF TABLE**

| Relief | Authority | LOW ($) | HIGH ($) |
|---|---|---|---|
| (a) Special Master Appointment: Appointment of a Special Master under FRCP 53 to oversee the five-year independent audit program ordered under Prayer E(c) and to resolve any compliance disputes arising under the permanent injunction | FRCP 53 | Court-set | Court-set |
| (b) Structural Relief: Any additional structural injunctive relief not specifically enumerated in Prayer E that the Court determines is necessary to prevent future harm to Hawaii consumers from Anthropic's continued deployment of Claude in national security targeting applications without the domain validation, binding human-override architecture, and real-time accuracy verification mechanisms that DoD Directive 3000.09 requires | HRS §480-13(b)(2); equitable jurisdiction | Court-set | Court-set |
| (c) FTC Referral Order: An order directing the Clerk of this Court to transmit a copy of the final judgment and all supporting findings of fact and conclusions of law to the Federal Trade Commission Bureau of Consumer Protection and to the | Court's inherent authority; FTC Act §5 referral | $0.00 | $0.00 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| Department of Justice Civil Division, for consideration of any federal enforcement action arising from the same conduct | | | |
| (d) SEC Referral Order: An order directing the Clerk of this Court to transmit a copy of the final judgment to the Securities and Exchange Commission Division of Enforcement, for consideration of any securities disclosure violations arising from Anthropic's failure to disclose the Minab targeting failure and Claude's five architectural defects in its confidential Form S-1 registration statement filed June 1, 2026 | Court's inherent authority; Securities Act §12 | $0.00 | $0.00 |
| (e) FRCP 24 Facilitation: Such orders as the Court deems appropriate to identify, notify, and provide the opportunity to intervene to the surviving families of the 147 to 175 individuals killed at Shajareh Tayyebeh Elementary School on February 28, 2026, so that their wrongful death claims may be adjudicated in this proceeding and they may not be deprived of their legal remedies solely because their identities are not known to Plaintiff at the pre-discovery stage | FRCP 24; FRCP 17; Court's case management authority | $21,830,000.00 contingent | $258,250,000.00 contingent |
| (f) Any other relief: Such other and further legal or equitable relief as justice and the evidence require | Court's full jurisdictional authority | TBD | TBD |

**PRAYER FOR RELIEF — GRAND FINAL SUMMARY TABLE**

| Prayer | Relief | LOW ($) | HIGH ($) |
|---|---|---|---|
| A(a) | Consumer Econ. Damages — individual (safety premium + concealment fees + forward) | $133.20 | $427.20 |
| A(b) | WD — 147–175 victims (contingent — FRCP 24) | $21,830,000.00 | $258,250,000.00 |
| B | Treble Damages — HRS §480-13(b)(1) mandatory 3× consumer economic damages | $399.60 | $1,281.60 |
| C | Restitution/Disgorgement — Hawaii-wide (~7,000 subscribers) | $210,133.20 | $1,008,319.20 |
| D | Declarations — 4 declarations (multiplier value = $102,860,399.60/$111,809,281.60) | $0.00 direct | $0.00 direct |
| E | Permanent Injunction — 5 orders, 5-year compliance | $2,575,000.00 | $10,300,000.00 |
| F | Punitive — Masaki 4-Channel / Gore-Campbell (FLAT BOTH SCENARIOS) | $100,000,000.00 | $100,000,000.00 |



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

| | | | |
|---|---|---|---|
| G | Fees/Costs — Mandatory (§480-13) + Equitable Enhancement | $121,200.00 | $832,500.00 |
| H | Costs of Suit — FRCP 54(d)(1) + 28 U.S.C. §1920 | $4,900.00 | $28,700.00 |
| I | Pre/Post-Judgment Interest — HRS §636-16 + 28 U.S.C. §1961(a) | $2,185,810.13 | $4,751,979.91 |
| J | Other Equitable Relief — FTC/SEC referral, FRCP 24 facilitation, Special Master | Court-set | Court-set |
| PRIMARY CLAIMS TOTAL (Prayers A(a), B, C, E, F, G, H, I) | | $105,097,576.13 | $116,921,780.71 |
| + contingent WRONGFUL DEATH (Prayer A(b)) | | $21,830,000.00 | $258,250,000.00 |
| TOTAL — ALL PRAYERS COMBINED | | $126,927,576.13 | $375,171,780.71 |

## VII. DEMAND FOR JURY TRIAL

**303.** Plaintiff Grant Gribble, pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution, hereby demands trial by jury on all claims and issues in this action that are triable by a jury as of right, including but not limited to: all factual issues relating to Anthropic's knowledge of Claude's five architectural defects; all factual issues relating to the falsity of Anthropic's Constitutional AI, Responsible Scaling Policy, Model Specification, and Acceptable Use Policy marketing representations; all factual issues relating to the causal chain between Claude's architectural defects and the February 28, 2026 Minab strike; all factual issues relating to the 157-day concealment; and all issues relating to the amount of compensatory, trebled, disgorgement, and punitive damages to be awarded.

**304.** Plaintiff expressly reserves his right to jury trial under the Seventh Amendment and Rule 38(b) and files this demand contemporaneously with the complaint to preserve that right in full. The issues in this case — the nature of Claude's architectural defects, the accuracy of Anthropic's safety representations, the causal role of those defects in the Minab targeting chain, and the reprehensibility of the post-strike concealment — are precisely the kinds of factual determinations that the framers of the Constitution assigned to the institution of the civil jury. Plaintiff demands that every dollar of compensatory, trebled, and punitive damages in this complaint be determined



UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

by twelve citizens of the District of Hawaii, deliberating upon the full evidentiary record, under the instructions of this Honorable Court.

***Respectfully Submitted,***

**/Date/** August 10, 2026 **/Signature/** Grant Gribble

August 10, 2026

Grant Gribble
3206 Ahinahina Place
Honolulu, HI 96816
(808)556-6667
militinc@gmail.com
Plaintiff, *Pro Se*

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

USDC AUG 10 '26 8:52AM